FILED
2010 Sep-21  PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | |
|---|---|
| JOHN MILTON HARDY, | ] |
| | ] |
| Petitioner, | ] |
| | ] |
| v. | ]                    5:07-cv-1222-IPJ-RRA |
| | ] |
| COMMISSIONER RICHARD ALLEN, | ] |
| | ] |
| Respondent. | ] |

**MEMORANDUM OPINION**

This action seeks habeas corpus relief with respect to the petitioner John Milton Hardy's state court conviction and death sentence on a charge of capital murder. (*See* 28 U.S.C. § 2254).

**TABLE OF CONTENTS**

Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

The Scope of Federal Habeas Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

The Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    I.      Joinder of the Petitioner's Trial with his Codefendant's Trial Violated his Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    II.     Joinder of the Petitioner's Sentencing Trial with his Codefendant's Trial Violated his Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. . . . . . . . . . . . . . . 35

III.     The Method of Selecting Grand Jury Forepersons in Morgan County is Racially Discriminatory and Violative of the Petitioner's Rights under the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . 40

IV.      The Petitioner's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to United States Constitution were Violated by the State's Impermissible Comments on the Petitioner's Post-*Miranda* Silence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

V.       It was Error for the Court to Allow the State's Lay Witnesses to Offer Conclusions about Whether the Petitioner Appeared in the Videotape. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

VI.      The Petitioner was Arrested and Detained Pursuant to an Invalid Fugitive Warrant from Alabama. . . . . . . . . . . . . . . . . . . . . . . . . . . 59

VII.     Prosecutorial Misconduct Prejudiced the Petitioner at His Capital Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

VIII.    The State Failed to Comply with its Discovery Obligations under *Brady v. Maryland*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

IX.      It was Error for the Trial Court to Find the Existence of the Heinous, Atrocious or Cruel Aggravating Factor in this Case. . . . . . . . . . . . 84

X.       The Trial Court Should Have Conducted Fully Sequestered Voir Dire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

XI.      The Trial Court Should Have Ordered a Change of Venue for the Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

XII.     The Qualified Venire was Impermissibly Small. . . . . . . . . . . . . . 101

XIII.    Double Counting Robbery as an Element of the Capital Offense and as an Aggravating Circumstance was Improper. . . . . . . . . . . . . . . . . 106

XIV.     The Prosecution's Use of its Peremptory Challenge to Remove from the Jury a Black Juror on the Basis of Her Race Violated the Petitioner's Rights under the Eighth and Fourteenth Amendments to the U.S. Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

2

XV.      Alabama's Statutory Sentencing Scheme Violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article 1, Sec. 6, 8, and 11 of the Alabama Constitution.. . . . . . . 110

XVI.     As Applied in Alabama, the Death Penalty Constitutes Cruel and Unusual Punishment and Violates the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sec. 15 of the Alabama Constitution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

XVII.    The Petitioner was Denied the Effective Assistance of Counsel Before, During and after the Trial of this Cause, in Violation of the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Sec. 6 of the Constitution of the State of Alabama. . . . . . . . . . . . . . . . . 115

XVIII.   Trial Counsel were Ineffective During the Penalty Phase of the Petitioner's Trial, and this Ineffectiveness Resulted in the Unjust and Unconstitutional Imposition of the Death Penalty. . . . . . . . . . . . 124

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

## PROCEDURAL HISTORY

On October 27, 1995, the petitioner, John Milton Hardy was found guilty of capital murder committed during the course of a first degree robbery.  A penalty hearing immediately followed, and on October 30, 1995, the jury recommended by a vote of 10 to 2, that Hardy be sentenced to death.

A formal sentencing hearing as required by Alabama Code § 13A-5-47 (1975) followed and, in accordance with the jury's recommendation, the trial judge sentenced Hardy to death on December 21, 1995.

Hardy appealed his conviction and death sentence to the Alabama Court of Criminal Appeals, raising sixteen claims.  On March 26, 1999, that court entered a published opinion

affirming Hardy's conviction and death sentence.  *Hardy v. State*, 804 So.2d 247 (Ala. Crim. App. 1999).

Hardy presented the same sixteen claims to the Alabama Supreme Court in a petition for a writ of certiorari.  On November 3, 2000, the Alabama Supreme Court affirmed Hardy's conviction and death sentence.  *Ex Parte Hardy*, 804 So.2d 298 (Ala. 2000).

The United States Supreme Court denied Hardy's petition for a writ of certiorari on November 26, 2001.  *Hardy v. Alabama*, 534 U.S. 1043 (2001).

On November 19, 2002, Hardy filed a petition for relief from judgment pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.  Initially, the trial court dismissed the petition as untimely filed.  However, the Alabama Court of Criminal Appeals reversed the trial court's dismissal of the petition and remanded the case back to the trial court for further proceedings.  *Hardy v. State*, 887 So. 2d 316 (Ala. Crim. App. 2004).

On return to remand, the trial court denied the petition on March 8, 2006.  The Alabama Court of Criminal Appeals affirmed the denial of the petition on February 23, 2007, *Hardy v. State*, 4 So. 3d 585 (Ala. Crim. App. 2007)(table), and denied Hardy's application for rehearing on April 6, 2007.  *Hardy v. State*, 9 So. 3d 577 (Ala. Crim. App. 2007)(table). The Alabama Supreme Court denied Hardy's petition for a writ of certiorari on June 22, 2007.  *Hardy v. State*, 13 So. 3d 56 (Ala. 2007)(table).

Shortly thereafter, on June 28, 2007, Hardy filed the present habeas petition in this court.


## FACTUAL BACKGROUND

4

The Alabama Court of Criminal Appeals, in its decision on direct appeal, set forth the

following statement of the facts:

> In the early morning hours of September 7, 1993, Clarence Nugene Terry, the clerk at a Bud's Convenience Store located in Decatur, was murdered and robbed. A surveillance camera captured the entire robbery-murder on videotape, and the videotape was recovered at the scene. The videotape showed that Hardy and Sneed entered the store and that Hardy was armed with a gun. Immediately upon entering the store, Hardy began shooting at Terry. As Hardy fired the initial shot, Sneed walked past Hardy toward the cash registers. The first shot missed Terry, and he ran behind the counter, trying to hide. Sneed, by this time also behind the counter, tried to open the cash registers as Terry lay on the floor near Sneed's feet. As Sneed attempted to open the cash registers, Hardy, who was still in front of the counter, leaned over the counter and shot Terry in the chest. Terry tried to protect and hide himself after this shot. Hardy walked around the counter, and while standing over Terry, fired five shots into Terry's face and head. Forensic evidence showed that Terry was still conscious when Hardy began shooting him in the head. Terry suffered gunshot wounds to the left cheek, left upper cheek, center of his forehead, left ear, left eye socket, right side of his chest, and the palm of his right hand. Any of the wounds to the head or the one to the chest would have proved fatal. As Terry lay dying on the floor, Sneed and Hardy continued their attempts to open the cash registers. Sneed, at one point, kicked Terry's foot to move it out of his way. The attempts to open the cash registers were unsuccessful, so Hardy and Sneed unplugged one of the cash registers and took it with them when they ran out of the store.

> The state's evidence further showed that on August 29, 1993, a few days before the robbery-murder, Sneed and Christopher Hines drove in Hines's blue 1978 Ford automobile from Louisville, Kentucky, to Tanner, Alabama, to visit Hines's relatives. Sometime after arriving in Tanner, Hines introduced Sneed to Hardy. On the evening of September 6, 1993 (the evening before the early-morning crime), Hardy, Sneed, and Hines rode in someone else's automobile to Tennessee to purchase fireworks and beer. They returned to Alabama, where they spent the remainder of the evening drinking. Around 10:30 p.m., Hines let Hardy borrow his automobile; Sneed left with Hardy. Hines did not see either Hardy or Sneed until around 3:00 or 4:00 a.m. the next morning, when he accompanied them to a location near Hardy's father's house, where, using a sledgehammer, the three men attempted to get money out of a cash register. Subsequently, the cash register was identified as the one taken during the robbery-murder, and Hines's fingerprint was later found on a piece of the cash register that was recovered. Sometime later that day Hardy,

Sneed, and Hines returned to Hardy's father's house, where Hardy and his father had an argument about a gun; Hardy's father accused him of stealing the gun.

The state's evidence also showed that police officers showed the surveillance videotape of the robbery-murder to several persons, including Hines, in an effort to identify the gunman and his accomplice. Hines and three others positively identified Hardy as the shooter. Sneed was identified as the accomplice appearing on the videotape.

On Wednesday, September 8, 1993, Hardy, Sneed, and Hines traveled to Louisville, Kentucky. Hardy was arrested in Kentucky the same day. At the time of his arrest, he was carrying a 9mm semiautomatic handgun. While in custody in Kentucky, Hardy gave an oral statement to the Decatur, Alabama, officers, denying his involvement in the crime; however, he admitted borrowing Hines's automobile on September 6. Also, when asked how much money he "got," he replied that he did not get any because he could not get the cash register open. He further stated the he had hidden the gun, wrapped in plastic, in the attic at his father's house in Alabama; that the clothes, presumably those worn during the crime, had been burned; and that the cash register had been thrown away. He stated that when he was returned to Alabama, he would consent to a search and would show the officers where the gun was located.

Hardy appeared before a judge, waived extradition, and was returned to Alabama. Upon arrival at his father's house, Hardy signed a consent-to-search form. The officers did not find the gun. When asked about it, Hardy stated that he did not know what the officers were talking about and that he had told the officers about a gun just so he could return to Alabama. He further stated that he knew nothing about any burned clothes. There was a smoldering fire in the backyard, but the officers could not determine what had been burned.

*Hardy v. State*, 804 So.2d 247, 255-256 (Ala. Crim. App. 1999).

## THE SCOPE OF FEDERAL HABEAS REVIEW

Pursuant to 28 U.S.C. § 2254(a), a federal district court is prohibited from entertaining

a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the

judgment of a State court" unless the petitioner alleges "he is in custody in violation of the Constitution or laws or treaties of the United States."  In other words, this court's review of habeas claims is limited to federal constitutional questions.  Claims pertaining solely to questions of state law fall outside the parameters of this court's authority to provide relief under § 2254.  Thus, unless otherwise expressly stated, use of the word 'claim' in this opinion presupposes a federal claim of constitutional proportion.

I.      **Exhaustion and Procedural Default**

Prior to seeking relief in federal court from a state court conviction and sentence, a habeas petitioner is first required to present his federal claims to the state court by exhausting all of the state's available procedures.  The purpose of this requirement is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court convictions.  As explained by the Eleventh Circuit:

> In general, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies.  28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . .").  "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction. . . .  The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.  Federal courts are not forums in which to relitigate state trials."  *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) (*quoting Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S. Ct. 3383, 3391-92, 77 L.Ed.2d 1090 (1983)).

> Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130

7

L.Ed.2d 865 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76, 92 S.Ct. 509, 519, 30 L.Ed.2d 438 (1971)) (internal quotation marks omitted).  The Supreme Court has written these words:

> [T]hat the federal claim must be fairly presented to the state courts . . . . it is not sufficient merely that the federal habeas applicant has been through the state courts. . . .  Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.

> *Picard*, 404 U.S. at 275, 92 S.Ct. at 512.  *See also Duncan*, 513 U.S. at 365, 115 S.Ct. at 888 ("Respondent did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment.").

> Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues.  "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (citations omitted).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998).

Moreover, if a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, because the claim is procedurally defaulted.  Usually, if the last state court to examine a claim explicitly finds that the claim is defaulted because the petitioner failed to follow state procedural rules, then federal review of the claim is also precluded pursuant to federal procedural default principles.  As explained by the Eleventh Circuit:

> The federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is,

8

where the claim is procedurally defaulted.  Federal review of a petitioner's
claim is barred by the procedural default doctrine if the last state court to
review the claim states clearly and expressly that its judgment rests on a
procedural bar, *Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 1043, 103
L.Ed.2d 308 (1989), and that bar provides an adequate and independent state
ground for denying relief.  *See id.* at 262, 109 S.Ct. at 1042-43; *Johnson v.
Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575
(1988).  The doctrine serves to ensure petitioners will first seek relief in
accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567,
1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S.Ct. 882, 102
L.Ed.2d 1004 (1989), and to "lessen the injury to a State that results through
reexamination of a state conviction on a ground that a State did not have the
opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499
U.S. 467, 493, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991).  Federal deference to a state

court's clear finding of procedural default under its own rules is so strong that:

A state court need not fear reaching the merits of a federal claim in an
*alternative* holding.  Through its very definition, the adequate and independent
state ground doctrine requires the federal court to honor a state holding that
is a sufficient basis for the state court's judgment, even when the state court
also relies on federal law." *Harris*, 489 U.S. at 264 n. 10, 109 S. Ct. 1038
(emphasis in original). *See also Alderman v. Zant*, 22 F.3d 1541, 1549-51 (11th
Cir.) (where a Georgia habeas corpus court found that the petitioner's claims
were procedurally barred as successive, but also noted that the claims lacked
merit based on the evidence, "this ruling in the alternative did not have the
effect . . . of blurring the clear determination by the [Georgia habeas corpus]
court that the allegation was procedurally barred"), *cert. denied*, 513 U.S.
1061, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994).

*Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999).

The Supreme Court defines an "adequate and independent" state court decision as one

that "rests on a state law ground that is *independent* of the federal question and *adequate* to

support the judgment." *Lee v. Kemna*, 534 U.S. 362, 375 (2002) *(quoting Coleman v.

Thompson,* 501 U.S. 722, 729 (1991).  Whether or not a state procedural rule is "adequate

and independent" so as to have a preclusive effect on federal review of a claim "is itself a federal question." *Id.* (*quoting Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).

A state procedural rule is "independent of the federal question" when it "rest[s] solidly on state law grounds [that are not] intertwined with an interpretation of federal law." *Judd v. Haley,* 250 F.3d 1308, 1313 (11th Cir. 2001) (*quoting Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)).  To be considered "adequate," by a federal court, the state procedural rule must be both "firmly established and regularly followed."  *Lee v. Kemna,* 534 U.S. at 375 (*quoting James v. Kentucky*, 466 U.S. 341, 348 (1984).  This does not mean that the procedural rule must be applied rigidly in every instance, or that occasional failure to do so eliminates its "adequacy."   Rather, the "adequacy" requirement means only that the procedural rule "must not be applied in an arbitrary or unprecedented fashion."  *Judd v. Haley,* 250 F.3d at 1313.  If it is adequate, then the federal court normally cannot review the issue.   However, if the rule is not firmly established, or if it is applied in an arbitrary, unprecedented and manifestly unfair fashion, it is not adequate to preclude federal review. *Card v. Dugger*, 911 F.2d at 1517.

There are also instances where the doctrines of procedural default and exhaustion intertwine.  For instance, if a petitioner's federal claim is unexhausted, the district court will traditionally dismiss it without prejudice or stay the cause of action in order to allow the petitioner first to avail himself of his state remedies.  However, "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, this court can simply find that the claim is "procedurally defaulted, even

10

absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (*citing Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998)).

There are only three circumstances in which an otherwise valid state-law ground will not bar a federal habeas court from considering a constitutional claim that was procedurally defaulted in state court: (1) where the petitioner had good "cause" for not following the state procedural rule and was actually "prejudiced" by not having done so; (2) where the state procedural rule was not "firmly established and regularly followed"; and (3) where failure to consider the petitioner's claims will result in a "fundamental miscarriage of justice." *See Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring); *see also*, *e.g.*, *Coleman v. Thompson*, 501 U.S. at 750 (holding that a state procedural default will bar federal habeas review of the federal claim, "unless the [habeas petitioner] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the [federal] claims will result in a fundamental miscarriage of justice"); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."); *Smith v. Murray*, 477 U.S. 527, 537 (1986) (same); *Davis v. Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'") (*quoting Schlup v. Delo*, 513 U.S. 298, 327 (1995) (*in turn quoting Murray v. Carrier*, 477 U.S. at 496))

11

A.      The "Cause and Prejudice" Standard

As the "cause and prejudice" standard clearly is framed in the conjunctive, a petitioner must prove both parts.  To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

> Objective factors that constitute cause include "interference by officials" that makes compliance with the State's procedural rule impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." *Ibid*.  In addition, constitutionally "[i]neffective assistance of counsel . . . is cause." *Ibid*.  Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default. *Id*. at 486-488, 106 S.Ct. at 2644-45.

*McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).  *See also Murray v. Carrier*, 477 U.S. at 488 ("Ineffective assistance of counsel . . . is cause for a procedural default."); *Reed v. Ross*, 468 U.S. 1, 16 (1984) ("[W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures.").

Once cause is proved, a habeas petitioner also must prove prejudice.  Such a showing must go beyond proof "that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

12

B.      The "Fundamental Miscarriage of Justice" Standard

In a "rare," "extraordinary,"[1] and "narrow class of cases,"[2] a federal court may consider a procedurally defaulted claim in the absence of a showing of "cause" for the procedural default, if: (1) a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537-38 (1986) (*quoting, respectively, Engle v. Isaac*, 456 U.S. 107, 135 (1982), and *Murray v. Carrier*, 477 U.S. at 496);[3] or (2) the petitioner shows "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323 & n.44 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)); *see also, e.g., Smith v. Murray*, 477 U.S. at 537-38.

Even when exhaustion and procedural default are not at issue, federal review of a claim that has been decided on the merits by a state court is fairly restrictive.

---

[1] *Schlup v. Delo*, 513 U.S. 298, 321 (1995) ("To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.").

[2] *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) ("Federal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases despite a petitioner's failure to show cause for a procedural default. These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime. We have described this class of cases as implicating a fundamental miscarriage of justice.") (citing *Murray v. Carrier*, 477 U.S. 478, 485 (1986)).

[3] Specifically, the *Murray v. Carrier* Court observed that, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." 477 U.S. at 496.

II.      **Rules Governing Habeas Corpus Cases Under § 2254**

   A.      **28 U.S.C. § 2254(d) and (e)**

   When it enacted the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), Congress significantly limited the circumstances under which a habeas petitioner

may obtain relief.  Indeed, under the AEDPA, a petitioner is entitled to relief on a federal

claim only if he shows that the state court's adjudication of his claim "resulted in a decision

that was contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court," or that the court's rulings "resulted in a decision

that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."  28 U.S.C. § 2254(d)(1) and (2).  *See also Williams*

*v. Taylor*,  529 U.S. 362, 404-405 (2000); *Brown v. Payton*, 544 U.S. 133, 141-142 (2005);

*Miller-El v. Dretke*, 545 U.S. 231, 240 (2005); *Putman v. Head*, 268 F.3d 1223, 1241 (11th

Cir. 2001).  "Moreover, a state court's factual determinations are presumed correct unless

rebutted by clear and convincing evidence."  *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th

Cir. 2005) (*citing* 28 U.S.C. § 2254(e)(1)).

   A state court's adjudication of a claim will be sustained under § 2254(d)(1) unless it

is "contrary to" clearly established, controlling Supreme Court precedent, or it is an

"unreasonable application" of that law.  These are two different inquiries, not to be confused,

nor conflated, as the Supreme Court explained in *Williams v. Taylor*, 529 U.S. 362 (2000),

saying:

> Section 2254(d)(1) defines two categories of cases in which a state prisoner
> may obtain federal habeas relief with respect to a claim adjudicated on the
> merits in state court.  Under the statute, a federal court may grant a writ of

> habeas corpus if the relevant state-court decision was either (1) "*contrary to . . .* clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of . . .* clearly established Federal law, as determined by the Supreme Court of the United States."

*Williams,* 529 U.S. at 404-405 (emphases in original).  The statute limits the source from which "clearly established Federal law" can be drawn to "holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Id*. at 412; *see Jones v. Jamrog*, 414 F.3d 585, 590-591 (6th Cir. 2005); *Sevencan v. Herbert*, 342 F.3d 69, 73-74 (2nd Cir. 2003); *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted).

A state-court determination can be "contrary to" clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law.  Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Likewise, a state-court determination can be an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.  Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should

15

not apply or unreasonably refuses to extend that principle to a new context
where it should apply.

*Id*. at 407; *see also Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).  Whether a
particular application of Supreme Court precedent is "reasonable" turns not on subjective
factors, but on whether the application of Supreme Court precedent at issue was "objectively
unreasonable."  The question is not whether the state court "correctly" decided the issue, but
whether its determination was "reasonable," *even if incorrect*.  *See Bell v. Cone*, 535 U.S. 685,
694 (2002).

Having explained the scope of this court's authority to review state court decisions,
it is now appropriate to examine the federal procedural rules applicable to the controversy
presently before the court.

**B.       Procedural Rules Governing Habeas Corpus Cases Under § 2254**

A habeas corpus petition must meet the "heightened pleading requirements [of] 28
U.S.C. § 2254 Rule 2c."  *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (other citations
omitted).  A petitioner must specify all grounds for relief available to him, state the facts
supporting each ground, and state the relief requested.  28 U.S.C. § 2254, Rule 2(c)(1)-(3) of
the *Rules Governing Section 2254 Cases*.  A "general reference to the transcripts, case records
and briefs on appeal patently fails to comply with Rule 2(c)."  *Phillips v. Dormire*,  2006 WL
744387, *1, No. 4:04CV1483 (E.D. Mo. March 20, 2006) (*citing Adams v. Armontrout*, 897
F.2d 332, 333 (8th Cir. 1990).

The burden of proof is on the habeas petitioner to establish a factual basis for the relief
he seeks.  *Hill v. Linahan*, 697 F.2d 1032, 1036 (11th Cir. 1983).  *See also Stano v. Dugger,*

16

901 F.2d 898-899 (11th Cir. 1990).  708 F.2d 549, *reh'g denied*, 714 F.2d 159 (11th Cir.

1983).  That burden is to demonstrate at least *prima facie* evidence establishing the alleged

constitutional violation.   The mere assertion of a ground for relief, without more factual

detail, does not satisfy petitioner's burden of proof or the requirements of 28 U.S.C. §

2254(e)(2) and Rule 2(c), *Rules Governing § 2254 Cases in the United States District Courts*.

With these principles in mind, the court now turns to the eighteen claims Hardy has

raised.  The court will address each of them in turn.


I.      **JOINDER OF THE PETITIONER'S TRIAL WITH HIS CODEFENDANT'S TRIAL VIOLATED HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

The petitioner first argues that the trial court's refusal to sever his trial from that of

his co-defendant, Ulysses Sneed, violated his Fifth, Sixth, Eighth and Fourteenth Amendment

rights.

> This joint trial in effect resulted in Petitioner facing a second private prosecutor: Ulysses Sneed.  Mr. Sneed's attorneys elicited damaging yet irrelevant testimony which, if it had been brought out by the prosecution, would have constituted prosecutorial misconduct.  Mr. Sneed's attorneys made prejudicial comments at closing argument in their attempts to gut Petitioner's alibi defense.  The defenses of Petitioner and Mr. Sneed were antagonistic and because the trial court refused to sever their trials, Petitioner did not receive a fair trial.   A joint trial of co-defendants must be severed when the co-defendants' defenses are so irreconcilable and mutually exclusive that a co-defendant suffers compelling prejudice. *Zafiro v. U.S.*, 506 U.S. 534 (1993).  In this case, Petitioner's defense and the defense of his co-defendant were so antagonistic that trying them jointly compromised his right to put on a defense, his right to be protected against the introduction of bad character evidence at his trial, and his right to confront witnesses against him.   The prejudice to Petitioner from consolidating his trial with that of his co-defendant far outweighed any interest in judicial economy.  The Petitioner respectfully asserts

that his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

*Petition* at 4-5.

When Hardy raised this claim on direct appeal from his conviction, the Alabama Court of Criminal Appeals found that the trial court did not abuse its discretion in denying Hardy's motions for severance of his trial.

> Hardy contends that the "joinder of [his] trial with his codefendant's violated [his] rights, and the trial court's refusal to grant a severance was reversible error." The joint indictment of Hardy and Sneed was proper because two or more defendants may be charged in the same indictment if they are alleged to have participated in the same act or transaction. Ala.R.Crim.P. 13.3(b)(1). Here, Hardy and Sneed were charged with participation in the same act or transaction. Defendants joined in the same indictment shall be jointly tried unless severed as provided in Rule 13.4. If it appears that a defendant is prejudiced by such a joinder, the trial court may grant a severance or provide whatever other relief justice requires. Rule 13.4(a). The rule makes no distinction between capital and noncapital offenses. *See Rogers v. State*, 630 So.2d 78 (Ala.Crim.App. 1991), *rev'd*, 630 So.2d 88 (Ala. 1992), *aff'd on remand sub nom. Musgrove v. State*, 638 So.2d 1347 (Ala.Crim.App. 1992), *aff'd*, 638 So.2d 1360 (Ala. 1993), *cert. denied*, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994); *Hinton v. State*, 548 So.2d 547 (Ala.Crim.App. 1988), *aff'd*, 548 So.2d 562 (Ala.), *cert. denied*, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). The Alabama rule pertaining to joinder and severance is taken from the federal rule. Fed.R.Crim.P. 14. *See also Hinton v. State*, 548 So.2d at 555.

> Hardy, by a timely filed pretrial motion, moved for a severance, claiming that he was not involved in the crime; that Sneed had confessed and had implicated Hardy in the crime; that his and Sneed's defenses were antagonistic to the point of being irreconcilable and mutually exclusive; and that, for the jury to believe him, it must disbelieve Sneed. At a pretrial hearing, the trial court denied Hardy's motion to sever, finding, among other things, as follows:

> > Defendant's counsel do not assert that the defendant and co-defendant have irreconcilable and mutually exclusive defenses. Specifically, the defendant asserts he was in another state at the time of the alleged offense and did not participate

18

with the co-defendant in causing the death of the deceased. The defendant asserts the co-defendant has given a statement implicating himself and the defendant in the alleged offense and that the co-defendant is attempting to protect a third person by implicating the defendant.

The court has weighed the inconvenience and expense to the state of separate trials against any possible prejudice to this defendant. The court has also considered the possibility of the admission of the defendant . . . Sneed's statement into evidence. Should Mr. Sneed not testify in the case, and should his statement, or any portion thereof, be offered and admitted into evidence, any portions specifically referring to defendant Hardy shall be redacted. Given the protections afforded the defendant under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 . . . (1968), and its progeny, as well as the court's belief that under all the circumstances as a practical matter it is within the capacity of the jurors to follow the court's instructions and to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, the defendant's motion for severance is DENIED."

(C.R.198.)

Hardy renewed his motion for a severance several times during the trial. Each time, the motion was denied.

Weighing against severance is a preference for joint trials where joint crimes are involved. *Zafiro v. United States*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). The United States Supreme Court stated the policy in *Richardson v. Marsh*, 481 U.S. 200, 210, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), as follows:

It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of

19

relative culpability-advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

(Footnotes omitted.)

In *Hill v. State*, 481 So.2d 419, 424 (Ala.Crim.App. 1985), we stated:

The decision whether to grant a severance, or order a joinder of defendants, lies within the broad discretion of the trial court. This Court will not overturn that decision absent an abuse of discretion. *United States v. Webster*, 734 F.2d 1048, 1052 (5th Cir.), *cert. denied sub nom. Hoskins v. United States*, 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). "In order to establish an abuse of discretion, the defendant must show that he 'received an unfair trial and suffered compelling prejudice against which the trial court was unable to afford protection.' *See U.S. v. Berkowitz*, 662 F.2d [1127] at 1132 [ (5th Cir. 1981) ]." [ *United States v.*] *Webster*, 734 F.2d [1048] at 1052 [ (5th Cir.), *cert. denied*, 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984) ].

"When codefendants allege antagonistic defenses as a ground for severance, this Court has applied very specific tests to determine whether the trial was unfair. To compel severance, the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. *See, United States v. Berkowitz*, 662 F.2d [1127] at 1132 [ (5th Cir.) ]. The defenses must be so antagonistic that the jury, in order to believe the defense of one defendant, must necessarily disbelieve the other defendant's defenses. *Id*." *Webster*, 734 F.2d at 1053.

. . .

We agree that, "antagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other." *United States v. Arruda*, 715 F.2d 671, 679 (1st Cir.1983). "Antagonism of defenses requires severance only where the defenses are so inconsistent that the jury would have to believe one defendant at the expense of the other; the conflict alone establishes the guilt of a defendant." *United States v. Drougas*, 748 F.2d 8, 20 (1st Cir. 1984).

20

"[S]everance is required because of 'mutually antagonistic defenses' only when the defenses are so antagonistic that 'the acceptance of one party's defense will preclude the acquittal of the other.'" *United States v. Hendrix*, 752 F.2d 1226, 1232 (7th Cir.), *cert. denied sub nom. Merritt v. United States*, 471 U.S. 1021, 105 S.Ct. 2032, 85 L.Ed.2d 314 (1985).

*See Ex parte Washington*, 562 So.2d 1304, 1305-06 (Ala. 1990); *Greathouse v. State*, 624 So.2d 202 (Ala.Crim.App. 1992), *aff'd*, 624 So.2d 208 (Ala. 1993).

In *Greathouse v. State*, 624 So.2d at 205, we stated:

"Even if defendants attempt to cast blame on each other, severance is not necessarily required." *United States v. Arthur*, 949 F.2d 211, 217-18 (6th Cir. 1991). "The burden is on defendants to show that an antagonistic defense would present a conflict 'so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' *United States v. Davis*, 623 F.2d 188, 194-95 (1st Cir. 1980). . ." *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992). See also *United States v. Crotinger*, 928 F.2d 203, 206 (6th Cir. 1991). "The so-called 'doctrine of antagonistic defenses' is a narrow one. *See* [ *United States v. Manner*, 887 F.2d 317, 326 (D.C. Cir. 1989), *cert. denied*, 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990) ]. It applies only when "there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty"; it does not apply when "independent evidence of each defendant's guilt supports the jury's verdict." *United States v. Leonard*, 494 F.2d 955, 966 (D.C. Cir. 1974) (citation omitted and emphasis added in *Leonard* ). *United States v. Harrison*, 931 F.2d 65, 71 n. 8 (D.C. Cir.), *cert. denied*, 502 U.S. 953, 112 S.Ct. 408, 116 L.Ed.2d 356 (1991).

A defendant seeking to overturn a denial of a motion for severance has the burden of demonstrating specific and compelling prejudice that the trial court cannot protect against and that will cause the defendant to receive an unfair trial. The defendant must demonstrate that the prejudice is specific and that it resulted from the denial. A demonstration of some prejudice is insufficient. *Minnis v. State*, 690 So.2d 521 (Ala.Crim.App. 1996). In order to justify a severance, a defendant must show before or during the trial that there was a serious risk that his rights would be compromised, or that

severance was necessary for the jury to make a reliable judgment. *Zafiro v. United States*, 506 U.S. at 539, 113 S.Ct. 933.  He must show more than that he was tried with a codefendant whose strategy was generally antagonistic to his.  *United States v. Brown*, 16 F.3d 423 (D.C. Cir.), *cert. denied*, 513 U.S. 900, 115 S.Ct. 257, 130 L.Ed.2d 178 (1994).  The test of whether a severance should be granted on the grounds of prejudice is whether, under all the circumstances, as a practical matter, it is within the capacity of the jurors to follow the court's instructions and to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts. *Holsemback v. State*, 443 So.2d 1371 (Ala.Crim.App. 1983).

Hardy argues that the trial court abused its discretion in denying his motion for severance because, he says, his and Sneed's defenses were antagonistic to the point of being irreconcilable and mutually exclusive, and because the admission of Sneed's inculpatory post-arrest statement violated his rights under the Confrontation Clause of the Sixth Amendment. He further argues, in effect, that Sneed's counsel made comments in closing argument that were prejudicial to him; that demonstrate his and Sneed's antagonistic and mutually exclusive defenses; and that impermissibly connected or linked him with Sneed's statement, thus nullifying the purpose of the redaction of the statement.  On the other hand, the state argues that the defenses were not so antagonistic as to be irreconcilable and mutually exclusive; that Hardy failed to meet his burden of showing compelling prejudice that would warrant a severance; that the comments of Sneed's trial counsel in closing arguments and the testimony elicited from witnesses on cross-examination were "minor" and "insignificant" and did not rise to the level of compelling prejudice; and that, even if the comments and testimony elicited were improper and erroneously admitted, in light of the substantial and overwhelming independent evidence of Hardy's guilt, they were harmless.

Hardy's defense was that he was not present when the crime was committed and that he had no knowledge of it.  He attempted, through alibi witnesses, to show that he was at home when the crime was committed, and he presented witnesses who testified that he was not one of the people committing the crime shown in the surveillance camera videotape.  Sneed's defense was that he participated in the robbery part of the crime, but not the murder; that he was one of the people in the videotape but not the gunman; and that he did not intend that anyone be killed.  He called no witness in his defense and did not testify himself.  Rather, his defense was presented by his counsel through argument and cross-examination of witnesses.

It is obvious that the defenses are not incompatible or so antagonistic that the acceptance of one party's defense would preclude the acquittal of the

other. The defenses are not so irreconcilable that it could be reasonably inferred that the differences in them alone would demonstrate that both are guilty. Hardy has not shown that he could have been acquitted only if Sneed's defense was rejected, nor has he shown that he would have been convicted only if Sneed's defense was accepted.  His defense clearly did not depend on Sneed's conviction.  The evidence that resulted in Hardy's conviction came from state witnesses, not from Sneed, whose redacted statement made no reference to Hardy.  We agree with the findings of the trial court that the defenses were not so antagonistic as to be irreconcilable and mutually exclusive.

In reference to Hardy's contention that his rights under the Confrontation Clause were violated by the admission in evidence of Sneed's post-arrest statement, we agree that under some circumstances admission of a nontestifying codefendant's post-arrest statement can create a serious confrontation problem requiring reversal. However, those circumstances do not exist here.

The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right to confront hostile witnesses at his criminal trial. *Cumbie v. Singletary*, 991 F.2d 715 (11th Cir.), *cert. denied*, 510 U.S. 1031, 114 S.Ct. 650, 126 L.Ed.2d 608 (1993); U.S. Const. Amend. VI.  This right extends to state prosecutions through the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).  The admission of a nontestifying codefendant's confession at a joint trial violates the defendant's right to confrontation if the confession expressly incriminates the defendant. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).  Under such circumstances, an instruction that the jury shall disregard the confession as evidence against the defendant is insufficient to render it admissible, *id.* at 137, 88 S.Ct. 1620, unless the confession is redacted to eliminate all references to the defendant or his participation in the crime. *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *United States v. Petit*, 841 F.2d 1546 (11th Cir.), *cert. denied*, 487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988); *Bird v. State*, 594 So.2d 644 (Ala.Crim.App. 1990), *rev'd on other ground*, 594 So.2d 676 (Ala. 1991).

In this case, the trial court redacted Sneed's post-arrest statement to eliminate any reference to Hardy and instructed the jury that it could consider the statement against only the person who made it-Sneed. The trial court instructed the jury as follows:

> A confession made outside of court by one defendant may
> not be considered as evidence against the other defendant who

23

was not present and in no way a party to the confession.
Therefore, if you find that a confession was in fact voluntarily
and intentionally made by Defendant Sneed, you should consider
it as evidence in the case against Defendant Sneed; but you must
not consider it and should disregard it in considering evidence
in the case against Defendant Hardy.

(R. 3689-90.) Hardy argues, however, that testimony elicited by Sneed's
counsel from certain witnesses on cross-examination and certain remarks of
Sneed's counsel in closing argument rendered the redaction and limiting
instructions meaningless.

Hardy contends that Sneed's counsel's closing argument emphasizing
that two people were involved in the commission of the crime impermissibly
implicated him as the other person in Sneed's statement. We do not agree. We
also note that Hardy made no objection to Sneed's counsel's argument. There
is nothing in the redacted statement to which counsel's argument can logically
be tied. The jury could not have known what had been eliminated, if anything,
from Sneed's statement or known that Hardy was the subject of the omitted or
changed portion. The jury, of course, knew that another person was involved
in the crime and, indeed, was the shooter, from the videotape and other
evidence independent of Sneed's statement. Sneed's counsel's argument in this
regard was not improper.

Hardy further contends that the following highlighted portion of
Sneed's counsel's closing argument impermissibly linked him with Sneed's
statement:

"My client is guilty of being with the wrong person at the
wrong time and going in and trying to take the money, but he
never, ever intended that anybody get hurt. It would be
abominable for anybody to find him guilty of capital murder
because he was with the wrong person at the wrong time. *He
was with a liar is who he was with. He was with somebody who
lied, and somebody who has lied to you.*"

(R. 3611.) Hardy's counsel's objection to these remarks was sustained. No
request was made for curative instructions. Again, there is nothing in the
redacted statement to which counsel's argument could be logically tied. There
was no basis from which the jury could infer that Hardy's role in the crime had
been redacted from Sneed's statement. While we do not necessarily approve
of this argument, we do not find it improper in this instance. The trial court
acted to limit any prejudice to Hardy that may have resulted from the

24

arguments of Sneed's counsel.  It repeatedly instructed the jury that lawyers' statements are not evidence.  Juries are presumed to follow the court's instructions.  *Richardson v. Marsh*; *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), *cert. denied*, 520 U.S. 1253, 117 S.Ct. 2414, 138 L.Ed.2d 179 (1997); *Taylor v. State*, 666 So.2d 36 (Ala.Crim.App. 1994), *aff'd*, 666 So.2d 73 (Ala. 1995), *cert. denied*, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).  After closing argument, the trial court instructed the jury as follows:

> "An attorney's statements and arguments are not evidence. They are intended to help you understand the evidence and apply the law; however, you should disregard any remark, statement or argument of counsel which is not supported by the evidence or by the law as given to you by the court."

(R. 3688.)  In the absence of negating evidence, and we find none here, we are entitled to presume that the jury heard, understood, and followed these instructions.  Even assuming, *arguendo*, that the remarks in question were improper, we find no error because the trial court instructed the jury that it could not consider Sneed's post-arrest statement against Hardy.

Hardy further contends that he was prejudiced by the joinder because of information elicited from certain witnesses by Sneed's counsel on cross-examination.  He specifically refers to information elicited that Hardy ran with a "gang of young black males" that "caused trouble" and that he had been involved in an altercation at a nightclub shortly before the crime was committed.  He also refers to questions asked on cross-examination where objections to the questions were sustained before answers were given.  In this regard, he specifically refers to the question addressed to a police officer, "How is it that you know about him since you became involved in law enforcement?" (R. 3145.)  Hardy's objection to this question was sustained; the question was not answered.  He also refers to the question addressed to a police officer, asking if Sneed had confessed to where the gunman and his father lived. An objection to this question was sustained. These questions and answers clearly do not connect Hardy with Sneed's statement, and while they may have been questionable, they do not indicate such prejudice as would have required a severance.

The independent evidence of guilt against Hardy and against Sneed was both substantial and compelling.  The nature of the charge and of the evidence is not of such a character or is not so complicated that a jury could not reasonably be expected to compartmentalize or separate the two cases and evaluate the evidence properly and individually as to each defendant.  And, importantly, the trial court specifically instructed the jury to determine the

guilt or innocence of each defendant by considering his own conduct and the evidence that applied to him, as follows:

> "You have heard two trials presented at the same [time]. As you listen to these instructions, and as you deliberate, it is your duty to give separate, personal consideration to the cause of each individual defendant. When you do so, you must analyze what the evidence shows with respect to that individual, leaving out of consideration entirely any evidence admitted solely against the other defendant. Each defendant is entitled to have his case determined from his own acts and statements and the other evidence in the case which may be applicable to him.

> "I will give you instructions specific to defendant Hardy, instructions specific to defendant Sneed and instructions that apply to both cases."

(R. 3664-65.) Again, we presume that the jury followed the court's instructions.

> As we have previously stated, the burden of proof is on the defendant seeking a severance to demonstrate specific and compelling prejudice that the trial court cannot protect against and that causes the defendant to receive an unfair trial. This burden is heavy. After reviewing the record, we find no basis upon which to conclude that the trial court abused its discretion in denying Hardy's motions for severance. Hardy did not meet his burden of proof.

*Hardy*, 804 So. 2d at 257-62.

Hardy then presented the claim to the Alabama Supreme Court in a petition for a writ of certiorari. That court analyzed the issue of antagonistic defenses somewhat differently, but relied on the authorities cited by the Alabama Court of Criminal Appeals and agreed with the appellate court, finding that Hardy was not prejudiced by the trial court's failure to sever his trial.

> Hardy was tried jointly with Sneed for the capital robbery-murder. Both Hardy and Sneed objected strenuously and persistently to being tried together.

26

At trial, Hines identified the image of the gunman on the videotape as Hardy. Likewise at trial, Decatur Officer Eric Partridge, Decatur Investigator Thomas Townsend, and the Decatur chief investigator for the case, Dwight Hale, identified the videotape image of the gunman as Hardy.

> Partridge testified that he [had] known Hardy for 15 years; that they had gone to school together; that they rode the same school bus daily for five or six years; that he [had] also 'known him through the police department' (R. 3134), and that, while he was a police officer, he saw Hardy two to three times a week; and that the last time he had seen him before the commission of the September 7, 1993, robbery-murder was around August 20, 1993. Townsend testified that he [had] known Hardy all of Hardy's life; that he knows Hardy's family; that they live in the same community; and that, during the year preceding the capital offense, he saw Hardy an average of three times a week. Hines testified that, when he viewed the videotape several days after the offense, he identified the gunman in the videotape as Hardy. He further testified that he had been with Hardy on several occasions during the days preceding the crime and that he was with Hardy during the hours around the crime except between approximately 10:30 p.m., when he gave Hardy the keys to his automobile, and around 3:00 or 4:00 a.m. the following morning, when Hardy returned; and that after Hardy returned, they were going to go get breakfast, but instead Hardy took him to where the cash register was.

804 So.2d at 271-72. "Hale, the chief investigator for this case, testified that he spent a total of about 15 hours around Hardy after Hardy's apprehension, which included interviewing Hardy in Louisville and transporting him to Alabama." 804 So.2d at 271.

Similarly, at trial, Hines and Hale identified the videotape image of the unarmed intruder as Sneed.

> Hines testified that he and Sneed were "best friends"; that he had known him seven or eight years; that when they arrived in Alabama, they went places with Hardy; that he saw Sneed several hours before the crime and again several hours after the crime; and that he recognized Sneed in the videotape when he viewed it several days after the crime.

*Sneed v. State*, 783 So.2d 841, 855 (Ala.Crim.App. 1999).

27

In concluding that Sneed was the unarmed person depicted in the videotape, Hale testified that Sneed gave information at booking that he was 6 feet, 1 inch in height and that he weighed 275 pounds; that Sneed appeared to actually be a little heavier than that; that he spent 3 or more hours with Sneed when he interviewed him in Kentucky within a week of the crime; that he spent additional time with Sneed after Sneed was returned to Alabama; and that after viewing the videotape during the interview in Kentucky, Sneed admitted that he was the participant depicted in the videotape carrying the cash register.

*Id.*, at 855. Moreover, at trial, the State introduced a version of a purported statement by Sneed admitting to being the unarmed robber. The statement had been redacted extensively to eliminate all references to Hardy.

Hardy's defense was that he was not present when the crime was committed and that he had no knowledge of it. He attempted, through alibi witnesses, to show that he was at home when the crime was committed, and he presented witnesses who testified that he was not one of the people committing the crime shown in the surveillance camera videotape. Sneed's defense was that he participated in the robbery part of the crime, but not the murder; that he was one of the people in the videotape but not the gunman; and that he did not intend that anyone be killed.

*Hardy*, 804 So.2d at 260. Neither Hardy nor Sneed testified at trial. The jury rejected both defenses and returned guilty verdicts and death penalty recommendations against both Hardy and Sneed. The trial court sentenced both to death.

Hardy contended at trial and on appeal, and still insists before us, that Sneed's defense was so antagonistic to Hardy's that the trial court's trying the two defendants jointly constituted reversible error. Indeed, although the trial court had ordered Sneed's counsel not to identify Hardy as the gunman, Sneed's counsel's cross-examination of the State's witnesses and Sneed's counsel's closing arguments necessarily implied that Hardy was the gunman. Among numerous statements by Sneed's counsel implying that Hardy was the gunman are the following typical remarks in argument:

". . . Charles Sneed is guilty of being with the wrong person at the wrong time, and he's guilty of lying. He went in there to take some money, but the clear uncontroverted evidence is that he

never intended for there to be any sort of hurting or killing or maiming or anything. He never intended that. There's absolutely no evidence that my client ever had a weapon, used a weapon, or intended to hurt anybody.

"....

". . . But sometimes things happen and it makes it even more important and appropriate for you people to make the right decision in this case as to *the culpability of either of these defendants*, because *there's a significant difference in the culpability of these people.*

"....

"You also saw that when my client walked in, the other person in the video, the first thing he does is he raises that .22 rifle and points it at the clerk. . . .  After the first shot, [the victim] goes and falls down behind the counter and begs for his life, and you know that my client didn't do anything to cause that.

"....

". . . But the truth of the matter is my client thought they were going to get some money, not harm anybody, not hurt anybody, certainly not kill anybody, and get some money to go buy some more beer.

"Well when you look at that video, it is obvious that the other person never had that intention whatsoever.  He comes in blasting.  He comes in there and he fires a shot and he can't even wait.  He wants to get over there and shoot him again or shoot at him again when it was totally unnecessary, totally unnecessary.

"All he had to do was hold that gun, wait for my client to get the money and walk out of there, and nothing would have ever happened. There's a big difference in culpability of those two people.

"....

29

". . . Furthermore, the truth of the matter is there's not one scintilla, one iota of evidence to indicate that my client, Charles Sneed, had any idea the other person was going to use that gun for any other purpose other than to scare him.

". . . .

". . . The clear uncontroverted evidence is that Charles Sneed was in Kentucky, that he came down here.  He didn't know a lot of people down here.  He was basically along for the ride.  What's he going to do?  He opens the door and the first thing that happens is this other person starts blasting.  I mean, he has got the gun and if he doesn't do what he's supposed to do then he might get killed or hurt.  What's he supposed to do?

". . . .

"       My client is guilty of being with the wrong person at the wrong time and going in and trying to take the money, but he never, ever intended that anybody get hurt. It would be abominable for anybody to find him guilty of capital murder because he was with the wrong person at the wrong time.  He was with a liar is who he was with.  *He was with somebody who lied and somebody who has lied to you.*

". . . .

"I think it's obvious from those questions that I asked, that what Lieutenant Boyd said when he was in Kentucky, who took the gun when they left there, who did it, who disposed of it.  It's pretty obvious to me that Charles Sneed-I call him Charles. *Charles Sneed was not the one who masterminded this robbery or the murder of it.*

". . . .

". . . [The judge] is going to tell you that in my case that there is-she's not going to tell you these words but it won't take you long to figure it out. That there is no evidence that Charles Sneed was the triggerman in this case.

". . . .

30

"Well, there was one person in that video who intentionally killed somebody. There's no doubt about that. Make no mistake, I don't profess to tell you who it was because I don't care, but somebody intended to intentionally kill Mr. Terry."

(R. 3590-3623.) (Emphasis added.)

While the arguments of counsel do not constitute evidence and the trial court repeatedly so instructed the jury, these remarks by counsel would necessarily convey to the jurors the impression that they were learning the inside story on the robbery-murder, a bell that no instructions or rulings could unring.

The particular rulings at issue are the trial court's denials of Hardy's timely filed and heard motion for a severance of his trial from Sneed's trial and his several renewals of this motion for severance during the trial. The law establishes two tests for determining whether two defendants' respective defenses are so antagonistic that a joint trial constitutes error. Neither of the two tests identifies reversible error in Hardy's case.

The first test is that "[t]he defenses must be so antagonistic that the jury, in order to believe the defense of one defendant, must necessarily disbelieve the other defendant's defenses[;]" that is, "severance is required because of mutually antagonistic defenses only when the defenses are so antagonistic that the acceptance of one party's defense will preclude the acquittal of the other." *Hill v. State*, 481 So.2d 419, 424 and 425 (Ala.Crim.App. 1985) (internal quotation marks omitted). On the one hand, we must disagree with the rationale of the Court of Criminal Appeals that,

It is obvious that the defenses are not incompatible or so antagonistic that the acceptance of one party's defense would preclude the acquittal of the other. . . . Hardy has not shown that he could have been acquitted only if Sneed's defense was rejected, nor has he shown that he would have been convicted only if Sneed's defense was accepted. His defense clearly did not depend on Sneed's conviction.

*Hardy*, 804 So.2d at 260. As a matter of practical psychology and advocacy, the only way for Sneed to persuade the jury to acquit him of capital murder and to convict him of only a lesser included offense on his theory that he was an accomplice only in the robbery, with no intent to kill anyone, was to deflect all of the blame for the capital murder onto the only other party within the

31

jurisdiction of this jury, namely Hardy himself.  As a practical matter, as distinguished from a mere theoretical possibility, the jury would not accept Sneed's defense without redressing Terry's murder by convicting Hardy.  The jury could hardly acquit Hardy of the capital murder if Sneed successfully deflected all the blame for the capital murder from himself to Hardy.  The jury could hardly accept Sneed's defense that Hardy was the gunman and the sole intentional murderer and still accept Hardy's defense that he was not a participant in the crime at all.  Thus this first test identifies the defendants' respective defenses as so antagonistic as to require separate trials.

On the other hand, the terms of this very same test coupled with the eventuality that the jury, in fact, *disbelieved* and rejected Sneed's defense, renders harmless the rulings by the trial court denying Hardy's motion, and his renewals thereof, for a severance.  That is, because the jury did not believe Sneed's defense, it did not necessarily preclude the jury from accepting Hardy's defense.

The second test is

"that an antagonistic defense would present a conflict so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both [defendants] are guilty. . . .  It applies only when there is a danger that the jury will unjustifiably infer that this conflict *alone* demonstrates that both [defendants] are guilty; it does not apply when independent evidence of each defendant's guilt supports the jury's verdict."

*Greathouse v. State*, 624 So.2d 202, 205 (Ala.Crim.App. 1992), *aff'd*, 624 So.2d 208 (Ala. 1993) (emphasis added) (citations and internal quotation marks omitted). This second test may be more appropriate than the first test to the dynamics of the particular case before us.  That is, while the jury apparently disbelieved the self-serving aspect of Sneed's defense, his denial of complicity in the intentional murder itself, the jury likely inferred from Sneed's defense that Hardy was, in fact, the gunman.  The second test, however, does not entitle Hardy to a reversal because, as already quoted, "it does not apply when independent evidence of each defendant's guilt supports the jury's verdict." *Id*., at 205 (internal quotation marks omitted).  In the case before us, superabundant evidence, entirely independent of Sneed's influence on the trial, proves Hardy's guilt of capital robbery-murder.  The independent evidence consists of Hardy's own inculpatory statements, Hines's testimony about the prelude to and the aftermath of the robbery-murder, the videotape of the robbery-murder, and the identification of the videotape image of the gunman

as Hardy by Hines, Partridge, and Townsend, who were all thoroughly knowledgeable of Hardy's features and appearance before and after the commission of the robbery-murder.

While our analysis of the issue of antagonistic defenses differs in part, as discussed, from the rationale of the Court of Criminal Appeals, we have relied on the authorities cited by that Court and we agree with the result reached by that Court. While trying Hardy jointly with Sneed was judicially risky in this case, it did not prejudice Hardy in the final analysis, and, accordingly, it does not entitle him to relief.

*Ex parte Hardy*, 804 So.2d at 301-305.

The United States Supreme Court has emphasized that:

Joint trials "play a vital role in the criminal justice system." *Richardson v. Marsh*, 481 U.S. 200, 209, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987). They promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.*, at 210, 107 S.Ct., at 1708. For these reasons, we repeatedly have approved of joint trials. *See ibid.*; *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *United States v. Marchant*, 12 Wheat. 480, 6 L.Ed. 700 (1827); *cf.* 1 C. Wright, *Federal Practice and Procedure* § 223 (2d ed. 1982) (citing lower court opinions to the same effect).

*Zafiro v. United States*, 506 U.S. 534, 537-538 (1993). Furthermore, "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n. 8 (1986). The Supreme Court has also determined:

all joint trials, whether of several codefendants or of one defendant charged with multiple offenses, furnish inherent opportunities for unfairness when evidence submitted as to one crime (on which there may be an acquittal) may influence the jury as to a totally different charge. . . . This type of prejudicial effect is acknowledged to inhere in criminal practice, but it is justified on the grounds that (1) the jury is expected to follow instructions in limiting this evidence to its proper function, and (2) the convenience of trying different

33

> crimes against the same person, and connected crimes against different
> defendants, in the same trial is a valid governmental interest.

*Spencer v. Texas*, 385 U.S. 554, 562 (1967)(internal citations omitted). *Zafiro*, *Lane*, and

*Spencer* clearly establish that a prisoner is not entitled to habeas relief based on a state court's

denial of a severance motion unless the prisoner can show that his joint trial with a

co-defendant was so prejudicial that he was deprived of his right to a fair trial. *See e.g.,*

*Zafiro*, 506 U.S. at 539; *Smith v. Kelso*, 863 F.2d 1564, 1567-68 (11th Cir. 1989)(noting that

habeas relief is available for a state trial court's denial of a severance motion "only if" there

was "prejudice from a joint trial amounting to fundamental unfairness").

On appeal from the denial of this claim in Hardy's Rule 32 petition, the Alabama

Court of Criminal Appeals found that the "defendants' respective defenses [were] so

antagonistic as to require separate trials." *Ex parte Hardy*, 804 So. 2d at 304. The court

went on to conclude, however, that Hardy was not entitled to any relief since he was not

prejudiced by the joint trial, since the "superabundant evidence, entirely independent of [his

co-defendant's] influence on the trial, proves [his] guilt of capital robbery-murder." *Id.* at

305.

The trial court's refusal to sever Hardy's trial from that of his co-defendant, Ulysses

Sneed, did not "result[ ] in prejudice so great as to deny a defendant his Fifth Amendment

right to a fair trial." *Lane*, 474 U.S. at 446, n. 8. In *Smith*, the Eleventh Circuit rejected the

petitioner's claim because evidence other than his co-defendant's testimony was sufficient to

convict him. 863 F.2d at 1571-72. The same conclusion is warranted based on the record

of Hardy's trial in this case. Accordingly, the Alabama Court of Criminal Appeals' denial of

this claim was not contrary to, or an unreasonable application of Supreme Court precedent, and it did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  This claim is due to be dismissed.

II.    **JOINDER OF THE PETITIONER'S SENTENCING TRIAL WITH HIS CODEFENDANT'S TRIAL VIOLATED HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

Hardy claims that the trial court denied his constitutional right to an individualized sentencing hearing when it refused to sever the penalty phase of his trial from that of his co-defendant, Ulysses Sneed.

Petitioner's penalty phase trial was also consolidated with Mr. Sneed's. (R-3744) Both Petitioner and Mr. Sneed repeatedly moved to sever their capital trials, but the trial court denied these requests. (R-2068, 2683, 3883). Because Petitioner's death sentence rests on a consolidated penalty phase trial at which the jury was told to consider penalty phase and guilt phase evidence that applied only to Mr. Sneed, Petitioner's own sentencing determination was unreliable. The joint penalty phase procedure and sentencing used in this case violated Petitioner's constitutionally guaranteed rights to due process, a fair trial and a reliable sentence under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Capital sentences must be individualized.  In *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), the United States Supreme Court held that a capital defendant is constitutionally entitled to present to the jury evidence of "any aspect of [his] character or record and any circumstances of the offense that [he] proffers as a basis for a sentence less than death." The Supreme Court has stated that this mandate that a death sentence be individualized renders inadmissible at the penalty phase evidence which does not bear on the capital defendant's "personal responsibility and moral guilt." *Enmund v. Florida*, 458 U.S. 782, 801 (1982). *See also Zant v. Stephens*, 462 U.S. 862 (1983) and *Lewis v. State*, 380 So.2d 970, 979 (Ala.Cr.App. 1979).

At the penalty phase in this case, the trial court allowed the jury to consider evidence from the guilt phase. The guilt phase evidence presented against the co-defendant would have been inadmissible against Mr. Hardy, had they had separate trials.  However, at this penalty phase, guilt phase evidence relevant only to Mr. Sneed was admitted while the jury considered the Petitioner's sentence.  Mr. Sneed's oral statements to the police would not have been part of the Petitioner's conviction or sentencing determination had they had separate trials.  However, Petitioner's sentence was rendered after evidence regarding Ulysses Sneed's culpability and further prejudicial evidence solicited by Mr. Sneed's attorneys were admitted.

The trial court attempted to address this concern at the penalty phase by instructing the jury that it should not consider evidence admitted against the co-defendant. (R-3766, 3887) The risk of prejudice, however, was too great to be alleviated with a jury instruction. The jury was being asked to parse out the aggravating and mitigating evidence in Petitioner's case although that evidence was not separated when it was presented to them.  The State relied on its case at the guilt phase.  (R-3764, 3874-78)  Petitioner renewed his objection to that evidence.

The jurors were instructed to consider each defendant as an individual. But the jurors were not told to clear their minds of all of the prejudicial evidence introduced by and against Mr. Sneed at the guilt stage when considering the appropriate sentence for Petitioner.

Petitioner's penalty phase jury recommended by a 10-2 vote that he be executed. The vote in this case belies any claim of harmless error.  It was likely that a proper sentencing proceeding at which the jury considered only evidence applicable to Mr. Hardy would have changed the vote of at least one juror.  *See Mills v. Maryland*, 486 U.S. 367 (1988) (constitutional violation if even a single juror is precluded from considering mitigating circumstances).

Because Petitioner was entitled to that determination being based solely on his acts, character and background, this Court must remand grant Petitioner's habeas corpus petition.

*Petition* at 10-12.

The Alabama Court of Criminal Appeals found that the trial court did not abuse its

discretion in denying the motion for severance in the penalty phase and in conducting a joint

penalty-phase trial in Hardy's case.[4]  *Hardy*, 804 So.2d at 264.  The respondent maintains

that the Alabama Court of Criminal Appeals properly rejected the merits of this claim, and

that Hardy has not alleged, and cannot show that the denial of the claim "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established

federal law, as determined by the Supreme Court of the United States," or that the decision

"resulted in a decision that was based on an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding."  *Respondent's Brief* (doc. 17) at 21.

The petitioner counters that § 2254(d) does not apply here because the "state courts decided

Mr. Hardy's claim based on state law."  *Petitioner's Reply Brief* (doc. 26) at 21.

However, the Alabama Court of Criminal Appeals clearly addressed Hardy's claims

under federal law:

> The Eighth Amendment requires an individualized sentencing
> determination in death penalty cases.  *Stringer v. Black*, 503 U.S. 222, 112
> S.Ct. 1130, 117 L.Ed.2d 367 (1992); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct.
> 2954, 57 L.Ed.2d 973 (1978). The record does not support Hardy's claim that
> a joint sentencing hearing in this case made it impossible for the jury in this
> instance to render this required individualized sentencing decision as to each
> defendant. This was not a case in which there was considerably more
> aggravating evidence against one defendant than against the other. Both
> defendants had been indicted and convicted of the same robbery-murder. The
> evidence of aggravating circumstances that the state presented at the sentencing
> hearing was identical as to each defendant. In addition, each defendant
> presented mitigating evidence relevant to his character and record. Hardy's
> sister, Norma Jean Newton, testified at the sentencing phase before the jury
> that Hardy was 21 years of age when the crime was committed; that he was
> well liked, helpful, did not have a reputation for violence, had never committed
> a violent crime before this offense; and that the crime for which he was
> convicted was "out of character" for him. Frank D. Travis, a church youth

---

[4]  The Alabama Supreme Court did not specifically address this claim, but found that the
"Court of Criminal Appeals has not erred to reversal in its treatment of any of the other issues argued
by Hardy."  *Ex Parte Hardy*, 804 So. 2d at 308.

director who became acquainted with Hardy when he was counseling other youth in the Hardy home, testified that Hardy was a "nice kid"; that he encouraged other kids to do the "right thing"; and that he was "peaceable" and not a troublemaker. David Burleson III, one of Hardy's former teachers, testified he was shocked to hear that Hardy had committed such a crime. Joe Willie Johnson, a friend and former classmate of Hardy's, testified that Hardy had a good reputation for peaceableness. Lorraine Newton Hardy, his mother, testified that he was a "good boy" and that she could not believe that he had committed the crime charged, and she recommended that his punishment be life imprisonment.

Before, during, and after closing arguments, the trial court specifically instructed the jury to give separate consideration to each defendant. The jury was informed on each occasion that each defendant was entitled to have his sentence decided on the evidence and law applicable to him and that any evidence that was limited to one defendant should not be considered as to the other defendant. In addition, counsel for the defendants, as well as the prosecutor, in their closing arguments, reiterated and emphasized the instructions of the trial court in this regard. After closing arguments in the sentencing phase, the trial court instructed the jury as follows:

> "You have heard two separate sentencing hearings that were presented at the same time. As you listen to these instructions and as you deliberate, it is your duty to give separate personal consideration to the sentence of each individual defendant.

> "When you do so, you must analyze what the evidence shows with respect to that individual, leaving out of consideration entirely any evidence admitted solely against the other defendant.

> "Each defendant is entitled to have his sentence determined from his own acts, statements and other evidence in the case, which may be applicable to him."

(R. 3887-88.) There being nothing in the record to indicate the contrary, we presume that the jury understood and followed these instructions. *See Richardson v. Marsh*; *United States v. Tipton*. We find nothing in the record that suggests that the jury was unable to weigh the evidence separately, separate the aggravating and mitigating circumstances applicable to each defendant, consider and weigh them, and render the individualized decision required. The

38

evidence as to each defendant and the issues in the case were not complicated,
were straightforward, and obviously were easily understandable.

*Hardy*, 804 So. 2d at 263-264.

The appellate court correctly applied *Stringer v. Black*, 503 U.S. 222 (1992) and
*Lockett v. Ohio*, 438 U.S. 586 (1978), to the facts of Hardy's case.  Although the Eighth
Amendment requires an individualized sentencing determination in death penalty cases, the
same policy considerations that favor joint trials in the guilt phase also apply to the sentencing
phase.  *See U.S. v. Tipton,* 90 F.3d 861, 892 (4th Cir. 1996); *U.S. v. Bernard*, 299 F.3d 467
(5th Cir. 2002); *Glock v. Singletary*, 36 F.3d 1014 (11th Cir. 1994).  In applying *Stringer* and
*Lockett* to the facts of Hardy's case, the court found that record simply did not support a
claim that the joint sentencing hearing made it impossible for the jury to render an
individualized sentencing decision with regard to each defendant.  Both defendants were
charged with the same aggravating circumstances and the evidence presented by the state as
to the aggravating circumstances was the same.  Vol 21, Tab R-20, pp. 3750-3751, Vol. 22,
Tab R-27, pp. 3891-3893, 3915-3917.[5]  Each defendant was allowed to make separate
opening statements, to present his mitigating evidence separately, then to make separate
closing statements.[6]  The court specifically instructed the jury on several occasions that the
two separate sentencing hearings involved two separate cases, that the evidence must be
considered separately and individually, and that the jury was required to give separate

---

[5] References to Vol. ___, Tab R-___ are to the state court record submitted by the respondent.

[6] The sentencing phase of the trial took place in the following order: court's jury instructions
as to Hardy, court's jury instructions as to Sneed, state's opening statement, Hardy's opening
statement, Sneed's opening statement, Hardy's witnesses, Sneed's witnesses, state's closing argument,
Hardy's closing argument, Sneed's closing argument.

personal consideration to the sentence of each individual defendant.  Vol. 21, Tab R-18, p. 3739-3741; Vol. 21, Tab R-19, p. 3745, Vo. 21, Tab R-22, p. 3766, Vol. 27, Tab R-27, pp. 3887-3888.

In light of the record, it was in no way unreasonable for the Alabama Court of Criminal Appeals to conclude that the petitioner was not deprived of an individualized sentencing.  Hardy has not demonstrated that the state appellate court's decision on this issue was contrary to, or an unreasonable application of, clearly established federal law, or that it was an unreasonable interpretation of the facts in light of the evidence before that court.  This claim is due to be dismissed.

## III.   THE METHOD OF SELECTING GRAND JURY FOREPERSONS IN MORGAN COUNTY IS RACIALLY DISCRIMINATORY AND VIOLATIVE OF THE PETITIONER'S RIGHTS UNDER THE UNITED STATES CONSTITUTION

In support of his claim that Morgan County's method of selecting grand jury forepersons is racially discriminatory, the petitioner argues the following:

> Petitioner moved to dismiss the indictment in this case because of discrimination in the selection of the grand jury foreperson. (C-47-50) At a hearing on the motion, Petitioner presented the testimony of current Morgan County district attorney, who established that the method of selecting the foreperson is susceptible to discriminatory abuse. Petitioner also proved that a black person has never been chosen to serve as a foreperson of a Morgan County grand jury. Nevertheless, the trial court denied his motion to dismiss the indictment. (R-2154)

> The Alabama Supreme Court's decision in *Ex parte State* (*In re: Pace v. State*), 714 So. 2d 332 (Ala. 1997), requires that this Court reverse the Petitioner's conviction. In *Pace*, the Supreme Court of Alabama held that Morgan County's lengthy history of racial discrimination in the selection of grand jury forepersons violated the Equal Protection Clause.  *Pace*, at 336.

40

*Petition* at 12-13.  When he raised this claim on direct appeal, the Alabama Court of Criminal Appeals[7] found that Hardy had failed to establish a prima facie case of discrimination in the selection of the grand jury foreperson:

> Hardy claims that the charging indictment is due to be dismissed and his conviction reversed because, he says, the method of selecting the grand jury foreperson in Morgan County is racially discriminatory.  Hardy filed a pretrial motion seeking to dismiss the indictment based, in part, upon this allegation. Thereafter, the trial court held a hearing and subsequently found that no prima facie case of discrimination had been established.
>
> This court recently addressed this issue in *Drinkard v. State*, 777 So.2d 225 (Ala.Crim.App. 1998). The testimony elicited in *Drinkard* (involving the same county, the same prosecutor, and the same procedure for selecting the grand jury foreperson) is essentially identical to the testimony elicited in this case. Of particular significance, here again there is no indication in the record of the racial composition of the grand jury.  We, therefore, rely on *Drinkard* to dispose of this issue, and hold that the trial court properly found that Hardy failed to establish a prima facie case of discrimination in the selection of the grand jury foreperson.

*Hardy*, 804 So. 2d at 264.

In denying this claim on direct appeal, the Alabama Court of Criminal Appeals relied on *Drinkard v. State*, 777 So.2d 225 (Ala. Crim. App. 1998), *opinion withdrawn and superceded by Ex parte Drinkard*, 777 So.2d 295 (Ala.2000), in determining that Hardy did not prove a prima facie case of discrimination in the selection of the grand jury foreperson.

In *Drinkard,* the court found as follows:

> We must still answer the question whether the manner by which the grand-jury foreperson was selected was discriminatory, using the criteria applied by the United States Supreme Court in *Rose v. Mitchell*, 443 U.S. 545, 565, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979).  The United States Supreme Court

---

[7]   The Alabama Supreme Court did not specifically address this claim, but found that the "Court of Criminal Appeals has not erred to reversal in its treatment of any of the other issues argued by Hardy." *Ex Parte Hardy*, 804 So. 2d at 308.

in *Rose* set forth three criteria for determining if the defendant has made a prima facie showing that the manner of selecting a grand-jury foreperson is racially discriminatory:

> "The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. . . .  Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as [foreman], over a significant period of time. . . .  This method of proof, sometimes called the 'rule of exclusion,' has been held to be available as a method of proving discrimination in jury selection against a delineated class. . . . Finally . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing."

*Rose v. Mitchell*, 443 U.S. at 565, 99 S.Ct. 2993 (*quoting Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977)).

First, it has been long established that African-Americans make up a recognizable, distinct class. Second, we must analyze the history of discrimination. Before our holding in *Pace*, there had never been a black grand-jury foreperson in Morgan County. Drinkard was tried in 1995, the same year this Court, in *Pace*, addressed Morgan County's method of selecting grand-jury forepersons; this means that at the time of Drinkard's indictment there was no record indicating any black had ever served as grand-jury foreperson in Morgan County. Because 10% of the population in Morgan County is black, before 1997 there was a marked degree of underrepresentation.

However, the third criterion is whether the selection method is "susceptible of abuse or is not racially neutral." Morgan County has recently changed its method of selecting grand-jury forepersons. Before 1993, the trial court appointed grand-jury forepersons, based on the recommendation of the prosecutor. Since that time, grand-jury forepersons have been selected by the members of the grand jury itself. As we noted in *Pace*, the "new procedure [in which the grand-jury members themselves choose the grand-jury foreperson] should limit any appearance of discrimination in the judicial process." 714 So.2d at 338, n. 6.

Allowing the grand jury the freedom to choose its own foreman forecloses a question of discrimination in the judicial process.

42

*Ex parte Drinkard*, 777 So.2d 295, 303-304 (Ala. 2000).

The court in *Drinkard* relied on *Rose v. Mitchell*, in concluding that Morgan County's new method of selecting the foreperson of the grand jury, adopted in 1993,[8] was not discriminatory in light of the fact that the grand jury was given the freedom to select its own foreman.  Thus, in relying on *Drinkard* in reaching the same conclusion in Hardy's direct appeal, the Alabama Court of Criminal Appeals' decision was necessarily based upon *Rose* as well.  Hardy makes no argument that the decision was contrary to, or an unreasonable application of, clearly established federal law, or that it was an unreasonable interpretation of the facts in light of the evidence before the court.  Therefore, this claim is due to be dismissed.

Moreover, even assuming that the method by which the grand jury foreperson was selected was discriminatory, Hardy's claim still would fail.  The Supreme Court has held that discrimination in the selection of a grand jury foreperson, from within the ranks of a properly constituted grand jury, does not violate due process when the foreperson serves only a ministerial role.  *Hobby v. United States*, 468 U.S. 339, 344-345 (1984).  Hardy makes no claim that there were any irregularities in the selection of the grand jury itself.  Furthermore, in Alabama, the position of grand jury foreperson is ministerial in nature.  *See Ex parte Drinkard,* 777 So.2d 295, 304 (Ala. 2000)("However, even if we assumed that such discrimination did occur, we would hold, as the United States Supreme Court did in *Hobby v. United States*, 468 U.S. 339, 346, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984), that because of

---

[8]  The new method of selecting the grand jury foreperson in Morgan County was used for the first time in selecting the foreperson of the grand jury that indicted Hardy in this case.  Vol. 13, Tab R-8, p. 2105.

the ministerial function of grand-jury forepersons in Alabama, there is no invasion of the 'the distinctive interests of the defendant protected by the Due Process Clause.'").  Therefore, any discrimination in the selection of the foreperson of the grand jury would not have violated Hardy's right to due process.

IV.   **THE PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO UNITED STATES CONSTITUTION WERE VIOLATED BY THE STATE'S IMPERMISSIBLE COMMENTS ON THE PETITIONER'S POST-MIRANDA SILENCE**

In support of this claim, Hardy offers the following:

Petitioner's rights guaranteed under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated at trial when a State's witness, Lieutenant Dwight Hale, impermissibly commented on Petitioner's post-Miranda silence. The State's attorney compounded this error when he asked Lieutenant Hale to describe Petitioner's response when asked if he could prove that he was not guilty. Defense counsel objected to the impermissible and prejudicial admission of this testimony and the subsequent question. (R-3314, 3377-81) The trial court initially agreed that the officer's statement and the prosecutor's question violated Petitioner's rights, but then reversed itself, denied a motion for a mistrial and did not give a curative instruction. (R-3383) The court's failure to correct this error violated the aforementioned constitutional rights of Petitioner.

. . .

In this case, the admission of such plainly unconstitutional testimony was fundamentally unfair to Petitioner.  He had been assured in the *Miranda* warnings that his silence would not be used against him.  The principles of due process are violated when the State calls "attention to [an accused's] silence at the time of arrest" and insists "that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn . . . ." *United States v. Hale*, 422 U.S. 171 (1975) (White, J., concurring).  Lieutenant Hale and the District Attorney called attention to Petitioner's silence.  Lieutenant Hale's comments and the State's questioning of him was (sic) violated Petitioner's rights to due process and a fair trial and requires the granting of the instant habeas petition.

44

*Petition* at 16-17.

In concluding that the trial court properly denied Hardy's motion for a mistrial, the

Alabama Court of Criminal Appeals[9] found as follows:

> Hardy contends that "the trial court erred by allowing a state witness to impermissibly comment on [his] post-Miranda silence." (Appellant's brief, p. 27.) Shortly after Hardy was arrested in Kentucky, he was advised of his *Miranda* rights by Sergeant Dwight Hale of the Decatur Police Department. He signed a form acknowledging that he understood those rights, he waived them, and he agreed to give a statement. He was questioned by Hale and Sergeant John Boyd, also of the Decatur Police Department. That statement was not recorded; however, Hale made notes of what Hardy said.

> In his statement, Hardy denied involvement in the crime, but made certain damaging admissions that implicated him in it. Hale testified for the state, relating the substance of Hardy's statement.  Hardy bases his contention that Hale impermissibly commented on his post-*Miranda* silence on the following testimony:

>> "A. [HALE]: . . . [W]e told [Hardy] that we had also found a cash register that had been recovered just a short distance from where he lived, and that some fingerprints had been lifted off of those items that were recovered. He was still crying, denying any involvement in anything.

>> "Then he was told that we knew he was involved, you could see him on the videotape, there was no denying it, and that if he had any kind of evidence to prove that he was not involved in anything, was not in Decatur on that night, that if he would tell us about it we would do our best to investigate it and follow up and make it known to everyone.

>> "Again, we told him about the tape. We told him that the vehicle, you could see Hines's vehicle at one section of the tape and it looks like a '78 Ford as it drove in front of the doors on the tape.

---

[9]  The Alabama Supreme Court did not specifically address this claim, but found that the "Court of Criminal Appeals has not erred to reversal in its treatment of any of the other issues argued by Hardy." *Ex Parte Hardy*, 804 So. 2d at 308.

"Q. [PROSECUTOR]: Back up just a second, Dwight. What was his response when you told him if he had anything you could check out or investigate to indicate that he was not guilty?

"[HARDY'S COUNSEL]: We object to that. That violates our client's right of the Fifth Amendment.

"THE COURT: Sustained.

"Q. What was said or done next?

"A. Then we started to show him some photographs of the victim. He turned his head away. He was still crying. He got real agitated and acted as though he was going to jump up out of the chair.  Boyd was seated to one side of the desk.  I was behind it. Boyd reached around and grabbed him, and I came around the desk and grabbed him.  We told him to calm down, that nobody was going to hurt him, just to calm down.  Boyd had a few words with him and then Boyd left the room.

"Q. What [was] said or done next, Dwight?

"A. I sat and talked to him a few minutes to calm him down, talked to him about the crime and how horrible it was that the man was shot so many times at close range, advised him that if he was a religious person he should pray about what he had done and think about what he had done, that warrants had been issued, he had been identified and nothing was going to change anything at that point.  He was still crying, sobbing.  He asked me to help him or if I could help him.  I told him I couldn't make him any kind of promises or any kind of deals, that just like I told him, the warrants had been issued and he would be charged with the crime, it would be left up to the courts what happened to him.

"We sat there.  He got quiet for a few minutes.  Two or three minutes nothing was said.  I looked at him and I said, 'John, how much money did you get out of the cash register?' He said, 'None, we couldn't get it open.'  I asked him if Hines was involved in it, that even though he wasn't on the video, if he was with him when they done the robbery, if he was just outside driving the car.  He said, 'No.' I asked him what happened to the gun and clothes.  He said the gun was wrapped in plastic and he

hid it in the attic in his father's house in Tanner.  He said the clothes were burned in the backyard at his father's house.

"I asked him about the cash register.  He said it was thrown away.  After that, I asked him about taking down a statement, him signing a statement.  He stated he wanted me to get him a Bible, that he wanted to think about it and pray about it and talk to me again later.

"At that time we ended the interview and he was taken over to the Jefferson County Correctional Center."

(R. 3312-17.)

Later in the day, after the jury had been excused for the night, the record shows the following occurred:

"[HARDY'S COUNSEL]: We would move for a mistrial on the following grounds. The District Attorney phrased one of his questions earlier today in such a manner that was tantamount to a comment of the defendant. . . .

". . . .

"[HARDY'S COUNSEL]: Failure to deny something. . . . We're not going to ask for a cautionary instruction. We'll just ask for a mistrial. We think the cure would be worse than the-

"THE COURT: I agree.  As I recall the question, it was in the course of the discussion between Mr. Hardy [and] Lieutenant Hale, and he was just reciting what was stated at the time right there when they were in Louisville.   Do you know of anything-the objection was sustained."

Thereafter, the trial court denied Hardy's motion. (R. 3377-79, 3383-83.)

*Marshall v. State*, 570 So.2d 832, 833-34 (Ala.Crim.App. 1990) (*quoting Ex parte Wiley*, 516 So.2d 816, 817-18 (Ala. 1987)), states:

Under the United States Constitution and the Constitution of the State of Alabama, an accused is guaranteed the right to remain silent.  5th Amendment, United States Constitution; Art. 1, § 6, Alabama Constitution (1901).  A

47

necessary component of the right to remain silent is that the accused's silence cannot be used against him. . . .

. . . .

. . . A person may assert his constitutional rights at any time.  He may answer questions if he wishes, but he may stop at any time. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 . . . (1966).

Once a suspect knowingly and voluntarily waives his right to remain silent and has answered some questions, if he thereafter wishes to invoke his right to remain silent, he "must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994), *cert. denied*, 514 U.S. 1086, 115 S.Ct. 1801, 131 L.Ed.2d 727 (1995).   Furthermore, introducing evidence that the defendant, after *Miranda* warnings, elected to remain silent when confronted with accusations violates the defendant's Fifth Amendment right to remain silent and his Fifth and Fourteenth Amendment rights to due process.  *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Ex parte Johnson*, 629 So.2d 619 (Ala. 1993).  *Ex parte Harris*, 387 So.2d 868, 871 (Ala. 1980).

[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings.   In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used [against him] at trial.

*Doyle*, 426 U.S. at 617-18[, 96 S.Ct. 2240], *citing United States v. Hale*, 422 U.S. 171, 177, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975).  In *Ex parte Harris*, supra, at 871, this Court held that it was "fundamentally unfair and in violation of due process of law to inform a person under arrest that he has a right to remain silent and then permit an inference of guilt from that silence." *See, also, Ex parte Brooks*, 562 So.2d 604 (Ala. 1990). "A comment is deemed to be a reference to a defendant's silence if . . . the remark was of such a character that the jury would 'naturally and necessarily' take it to be a comment on [the]

> defendant's silence. . . .   The standard is strict; virtually any
> description of a defendant's silence following arrest and a
> *Miranda* warning will constitute a *Doyle* violation." *United*
> *States v. Rosenthal*, 793 F.2d 1214, 1243 (11th Cir. 1986).

*Ex parte Myers*, 699 So.2d 1285, 1293 (Ala. 1997), *cert. denied*, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998).

As the record shows, when the question complained of was asked, "What was [Hardy's] response when you told him if he had anything you could check out or investigate to indicate he was not guilty?," an objection to the question was sustained before Hale could respond.  Thus, we do not know what his answer would have been.  Up to that time, it appears from the record that Hardy had waived his *Miranda* rights, had agreed to talk to the officers, and appeared to be fully cooperating.  There is nothing in the record to suggest that he ever contemplated electing to remain silent or deciding that he wanted to stop answering questions.  Did Hardy invoke his right to silence when he was asked if there was anything the officers could check out or did he respond in some other way?  We do not know; certainly the jury did not know.  We agree with the state-nothing was presented from which it could be inferred that Hardy had elected to remain silent or invoked his right to do so.  The record is devoid of anything that indicates silence on Hardy's part.

We find the following particularly helpful in considering the circumstances surrounding Hardy's statement:

> In some circumstances it may be unclear whether a
> suspect has invoked his right to remain silent. . . .   In some
> circumstances, however, a suspect's statement as to his
> willingness or unwillingness to answer questions, or his silence
> in response to some questions, does not constitute even an
> ambiguous or equivocal invocation of the right to remain silent.
> In *Bradley v. Meachum*, 918 F.2d 338 [ (2d Cir. 1990), *cert.*
> *denied*, 501 U.S. 1221, 111 S.Ct. 2835, 115 L.Ed.2d 1004
> (1991),], the suspect received *Miranda* warnings and indicated
> his willingness to talk to the police.  When asked about the
> robbery at issue, Bradley first stated that he was not going to say
> whether he was involved or not; he then immediately denied any
> connection to the robbery.  In the ensuing one-hour colloquy,
> Bradley talked about several subjects, including telling the officer
> that he had no alibi but then proceeding to account for his
> whereabouts at the time of the crime.  The district court ruled
> that Bradley's initial statement constituted an invocation of his

right to remain silent. We reversed, ruling that, in light of what followed, Bradley's initial statement that he would not say whether or not he had been involved was 'part of an ongoing stream of speech,' and was 'n[either] . . . an invocation of the right to remain silent,' *id*. at 342, 'no[r] the functional equivalent of silence,' *id*. at 343. *See also United States v. D'Antoni*, 856 F.2d 975, 980-81 (7th Cir. 1988) (where in response to inquiry as to whether he was willing to answer questions, suspect stated that he had already given all the information he had, but he then answered further questions, that statement was not an assertion of the right to remain silent). In support of our holding in *Bradley*, we relied on, *inter alia*, *United States v. Lorenzo*, 570 F.2d 294, 297-98 (9th Cir. 1978), which held that though a suspect may, if he chooses, selectively waive his Fifth Amendment right by indicating that he will respond to some questions but not to others, his simple failure to respond to one question, after he has responded to others, does not constitute invocation of the right to remain silent.

*United States v. Ramirez*, 79 F.3d 298, 304-05 (2d Cir.), *cert. denied*, 519 U.S. 850, 117 S.Ct. 140, 136 L.Ed.2d 87 (1996).

In this case, Hardy's silence, if any, when Hale asked if he had any evidence to prove that he was not involved in the crime, while answering other questions, before and after, does not constitute even an equivocal invocation of his right to remain silent. We further conclude that, under the facts here, the jury would not have naturally and necessarily taken Hale's rendition of what occurred during the taking of Hardy's statement to be a comment on Hardy's silence. The trial court properly denied Hardy's motion for a mistrial.

*Hardy*, 804 So. 2d at 264-268 (footnote omitted).

The respondent argues that the Alabama Court of Criminal Appeals properly rejected the merits of this claim, and that Hardy has not alleged in the petition, and cannot show that the denial of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or that the decision "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Respondent brief* (doc. 17) at 21, citing 28 U.S.C. § 2254(d).

The petitioner argues, however, that the Alabama Court of Criminal Appeals' decision was contrary to clearly established federal law.

> In a criminal case, no negative inference from the defendant's failure to testify is permitted because a criminal defendant has an absolute privilege against self-incrimination protected by the Fifth and Fourteenth Amendments of the United States Constitution. *Griffin v. California*, 380 U.S. 609, 614 (1965). "The Government retains the burden of proving facts relevant to the crime . . . and cannot enlist the defendant in this process at the expense of the self incrimination privilege." *Mitchell v. United States*, 526 U.S. 314, 330 (1999). The Supreme Court set aside the conviction in *Griffin* because the court's instruction permitted the jury to take the defendant's failure to testify "into consideration as tending to indicate the truth of [the State's] evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable." 380 U.S. at 610. In so doing, the Supreme Court held that "the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id*. at 615.

> The prosecution violated Mr. Hardy's privilege against self-incrimination by doing precisely what Griffin and its progeny prohibit – explicitly calling the jury's attention to something that Mr. Hardy never said. At Mr. Hardy's trial, the district attorney asked "What was [Hardy's] response when you told him if he had anything you could check out or investigate to indicate he was not guilty?" (R. 624). The trial court at first sustained its ruling and then overruled its earlier ruling, over defense counsel's objection.

> "Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated." *United States v. Robinson*, 485 U.S. 25, 32 (1988). The prosecution's referenced comment on Mr. Hardy's silence violated his Fifth and Fourteenth constitutional rights inasmuch as it directly invited the jury to draw an adverse inference from Mr. Hardy's silence because the comment improperly shifted the burden of proof to the defense by suggesting that Mr. Hardy had some correlative burden to speak to establish his own innocence. Mr. Hardy is entitled to federal habeas relief.

*Petitioner's Reply Brief* (doc. 26) at 19-21.

Hardy maintains that the appellate court's opinion was contrary to *Griffin v. California*, 380 U.S. 609 (1965).  In *Griffin*, the court held that a defendant's refusal to testify at trial may not be used as evidence of his guilt.  *Id.* at 615.  However, Hardy's case did not involve a comment on his refusal to testify at trial.  Rather, the claim made by Hardy on direct appeal and in his original habeas petition in this case is that the state's witness impermissibly commented on his post-*Miranda* silence.  Such a claim is clearly controlled by the law set forth by the Supreme Court in *Doyle v. Ohio*, 426 U.S. 610 (1976).  In fact, the petitioner  specifically argued on direct appeal and in the petition filed in this case that Lieutenant Hale impermissibly commented on Hardy's post-*Miranda* silence in violation of *Doyle*.  Therefore, Hardy's argument in his reply brief that the state appellate court's decision was contrary to *Griffin* is misplaced.

The Alabama Court of Criminal Appeals correctly relied on and applied *Doyle* to the facts of Hardy's case.  In *Doyle*, the Court held that, because *Miranda* warnings contain an implicit assurance that "silence will carry no penalty," it would be fundamentally unfair to allow a defendant's post- *Miranda* silence to be used against him at trial. *Doyle*, 426 U.S. at 618; *see also Wainwright v. Greenfield*, 474 U.S. 284 (1986) (prosecution's use of post-*Miranda* silence as evidence of sanity violated due process).  First, there is nothing in the record to suggest that Hardy ever invoked his right to remain silent.  In fact, Hardy signed a waiver of his *Miranda* rights,[10] then made a statement to Decatur Police Officers Hale and Boyd in which he made admissions implicating him in the crime.  Furthermore, the testimony

---

[10]  *State's Exhibit 68*, Vol. 24, p. 84.

52

of Sergeant Hale concerning Hardy's statement did not implicate *Doyle*, since Sergeant Hale said nothing to indicate that Hardy was in fact silent when asked if he had any kind of evidence to prove that he was not involved in the crime.  Clearly, the state court's rejection of this claim did not involve an unreasonable application of *Doyle* and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  This claim is due to be dismissed.

## V.    IT WAS ERROR FOR THE COURT TO ALLOW THE STATE'S LAY WITNESSES TO OFFER CONCLUSIONS ABOUT WHETHER THE PETITIONER APPEARED IN VIDEOTAPE

Hardy contends that the trial court erred in allowing Officers Boyd and Hale to testify, over objection, that he was the gunman depicted in the store's surveillance videotape. *Petition* at 18.  The Alabama Court of Criminal Appeals found that the admission of the identification testimony did not amount to reversible error.  *Hardy v. State*, 804 So. 2d at 268-275.[11]

The respondent maintains that this issue fails to state a claim for habeas relief because it presents only a question of state law and that federal habeas corpus does not lie to review errors, if any, under state law.  *Respondent's Brief* (doc. 17) at 29 (*citing Pulley v. Harris*, 456 U.S. 37, 41 (1984) and *Breedlove v. Moore*, 279 F.3d 952, 963-964 (11th Cir. 2002)(state courts are "the final arbiter of [State] evidentiary law; [thus,] federal courts must respect that

---

[11]   The Alabama Supreme Court did not specifically address this claim, but found that "Part V of the opinion of the Court of Criminal Appeals addresses this issue of the circumstances that will justify a witness's identifying a person's image on a videotape.  *Hardy*, 804 So. 2d at 268-75.  We expressly approve the splendid discussion of this issue by the Court of Criminal Appeals. These rulings by the trial court do not constitute reversible error."  *Ex Parte Hardy*, 804 So. 2d at 307.

law absent a constitutional violation.  A federal habeas court may not issue the writ on the

basis of a state's interpretation of its own laws and rules, absent extreme circumstances.")).

The petitioner, in his reply brief, again argues the merits of the claim, claiming that "it is

incontestable that Sergeant John Boyd and Lieutenant Dwight Hale were not present at the

scene when Clarence Terry was killed.  They were therefore incompetent witnesses to testify

about Mr. Hardy's presence at the scene."  *Petitioner's Reply Brief* (doc. 26) at 22.  He

concludes that:

> The State of Alabama must abide by the rules of evidence so the jurors
> will have reliable and competent testimony that is not unduly prejudicial.  This
> clear violation of the Due Process Clause Fifth, Sixth, Eighth, and Fourteenth
> Amendments to the United States Constitution mandates this Court grant the
> instant habeas corpus petition.

*Petitioner's Reply Brief* (doc. 26) at 23.

> A federal court may grant a state prisoner's petition for a writ of habeas
> corpus only to correct federal constitutional errors.  28 U.S.C. § 2254(a).  We
> therefore generally will not review a state trial court's decisions on whether to
> admit evidence and will not grant a writ of habeas corpus simply because a
> state trial judge has erred, under state law, in this determination.  *Leverett v.*
> *Spears*, 877 F.2d 921, 925 (11th Cir. 1989); *Boykins v. Wainwright*, 737 F.2d
> 1539, 1543 (11th Cir. 1984), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1775, 84
> L.Ed.2d 834 (1985); *Shaw*, 695 F.2d at 530 ("we do not sit as a "super" state
> supreme court,'" able to "grant the petitioner relief simply because we believe
> the trial judge has erred" (*quoting Meyer v. Estelle*, 621 F.2d 769, 771 (5th Cir.
> 1980))); *see also Donnelly v. De Christoforo*, 416 U.S. 637, 642-43, 94 S.Ct.
> 1868, 1871, 40 L.Ed.2d 431 (1974).

> We will grant habeas relief, however, if the admission of the evidence
> has deprived the petitioner of a federal constitutional right.  For instance, if a
> state trial judge has correctly admitted evidence under state law, but this
> application of the state rule violated a specific federal constitutional right, we
> will grant the writ.  *See Burgett v. Texas*, 389 U.S. 109, 113-14, 88 S.Ct. 258,
> 261, 19 L.Ed.2d 319 (1967) (the admission of a prior conviction was
> constitutional error when the prior conviction had been obtained in violation
> of the right to counsel; "[t]he States are free to provide such procedures as they

choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution").

Similarly, if a state trial judge erroneously admitted evidence in violation of a state law and the error made the petitioner's trial so fundamentally unfair that the conviction was obtained in violation of the due process clause of the fourteenth amendment, we will give habeas relief. *Leverett*, 877 F.2d at 925; *Boykins*, 737 F.2d at 1544; *Shaw*, 695 F.2d at 530. An erroneous evidentiary ruling creates such fundamental unfairness when the wrongfully admitted evidence is "material in the sense of a crucial, critical, highly significant factor." *Leverett*, 877 F.2d at 925; *Shaw*, 695 F.2d at 530 (*quoting Hills*, 529 F.2d at 401).

*Thigpen v. Thigpen*,  926 F.2d 1003, 1011-1012 (11th Cir. 1991).

Hardy's claim clearly involves only a state court's evidentiary ruling, and as such, it does not warrant habeas relief unless the state court's decision to allow Hale and Boyd to testify at trial that Hardy was the gunman depicted in the videotape deprived him of a federal constitutional right or rendered the trial so fundamentally unfair that the conviction was obtained in violation of the Due Process Clause of the Fourteenth Amendment.  This requires that the admission of evidence rendered the petitioner's state proceedings fundamentally unfair, i.e., that the wrongly-admitted evidence is a crucial, critical, highly significant factor.

*Thigpen v. Thigpen*, 926 F.2d 1003, 1012 (11th Cir. 1991).

Nothing in Hardy's claim comes close to meeting this standard.  He has made nothing more than a conclusory allegation in his petition that the "use of Sergeant Boyd's testimony and the videotape in this manner was so prejudicial as to deny Petitioner due process, a fair trial and the heightened reliability required in death penalty cases."  *Petition* at 20. Moreover, three other witnesses, Eric Joseph Partridge, Thomas Townsend, and Christopher Hines, also identified Hardy as the gunman in the video.  *Hardy*, 804 So. 2d at 271.  The

record reflects that each of these witnesses was much more familiar with Hardy than was

Officer Hale.

> Hale, the chief investigator for this case, testified that he spent a total of about 15 hours around Hardy after Hardy's apprehension, which included interviewing Hardy in Louisville and transporting him to Alabama.  Partridge testified that he has known Hardy for 15 years; that they had gone to school together; that they rode the same school bus daily for five or six years; that he has also "known him through the police department" (R. 3134), and that, while he was a police officer, he saw Hardy two to three times a week; and that the last time he had seen him before the commission of the September 7, 1993, robbery-murder was around August 20, 1993.  Townsend testified that he has known Hardy all of Hardy's life; that he knows Hardy's family; that they live in the same community; and that, during the year preceding the capital offense, he saw Hardy an average of three times a week.  Hines testified that, when he viewed the videotape several days after the offense, he identified the gunman in the videotape as Hardy.  He further testified that he had been with Hardy on several occasions during the days preceding the crime and that he was with Hardy during the hours around the crime except between approximately 10:30 p.m., when he gave Hardy the keys to his automobile, and around 3:00 or 4:00 a.m. the following morning, when Hardy returned; and that after Hardy returned, they were going to go get breakfast, but instead Hardy took him to where the cash register was.

> The above qualifications of each of these latter three witnesses constitute a clearly sufficient basis for concluding that each was better qualified or in a better position than the jury to correctly identify Hardy.  Weighing heavily in favor of admitting their identifications is their "familiarity derived from a . . . close relationship to, or substantial and sustained contact with" Hardy.  *United States v. Pierce*, 136 F.3d at 774.  For example, they had far more opportunity than the jurors to see Hardy from a variety of angles and distances and under different lighting conditions.  In addition, they were more familiar with Hardy's carriage and posture. Because the depiction of the gunman was in fact a moving picture, the three, having seen Hardy in motion and being familiar with his mannerisms and body movements, were certainly in a better position to identify him than the jury, who had primarily seen Hardy motionless in a sterile courtroom.  *See State v. Hardy*, 76 Wash. App. 188, 884 P.2d 8, 10 (1994).  Moreover, all three witnesses were familiar with Hardy's appearance at the time the surveillance videotape was made-Hines more than the two law enforcement officers because he had seen Hardy hours before and hours after the capital offense.  We have also taken into consideration the fact that Hardy obscured his face from view at the time of the offense, thus altering his

appearance in an attempt to avoid being identified. *See United States v. Stormer*, 938 F.2d 759, 762 (7th Cir. 1991) ("Because the police officers who identified Stormer had worked with him for several years and were familiar with his appearance, they were in a better position to properly identify Stormer as the robber [depicted in the surveillance photographs] than the jury, especially in light of the fact that poor picture quality of the surveillance photographs in conjunction with Stormer's efforts to alter his appearance served to hinder the jury in making the crucial decision of whether Stormer was the man depicted in the surveillance photographs."). *See also People v. Robinson*, 908 P. 2d 1152, 1155 (Colo. App. 1995) (in rejecting the contention that the jury would not be less able to make a comparison than would the police detective, the court noted that the surveillance videotape is "less than clear"; that it shows, "for the most part, only a profile view of the robber"; that it distorts "to some extent the viewer's perspective concerning the robber's height"; and that it is "quite brief, and the opportunity to make a comparison is therefore very limited"), *aff'd*, 927 P. 2d 381 (Colo. 1996). Particularly in regard to Hines's identification of Hardy as the gunman in the videotape, *see Ex parte Rieber*, 663 So.2d at 1011 (after observing that "[t]he record indicates that [the witness's] identification of Rieber as the gunman shown on the videotape was based on his personal knowledge of Rieber's physical characteristics and on his appearance on the day of the murder," the Court stated that "even if we were to agree with Rieber's characterization of [the witness's] testimony as an opinion, and we do not, our conclusion as to the admissibility of [the witness's] testimony would not be different"); *State v. Winston*, 959 S.W.2d 874, 878 (Mo. Ct. App. 1997) (where the defendant's girlfriend's sister "had spent time with defendant in the time immediately surrounding the burglaries and was familiar with his features," and where "the person in the printout of the video tape was moving quickly and is somewhat difficult to see," there was a basis for concluding that the sister was more likely to correctly identify the defendant than was the jury in a print generated from a videotape of the surveillance camera, i.e., she was in possession of knowledge that the jury did not have and thus was helpful to the jury). We conclude that the trial court's admission of the identifications of Hardy by Partridge, Townsend, and Hines was within its sound discretion. *See United States v. Pierce*, 136 F.3d at 773 ("'The ultimate decision as to the admissibility of lay opinion testimony is committed to the sound discretion of the district court and will not be overturned on appeal unless there is a clear abuse of discretion.' *United States v. Myers*, 972 F.2d 1566, 1576-77 (11th Cir. 1992).").

Because three of the witnesses (Partridge, Townsend, and Hines) provided ample basis upon which to conclude that they were better qualified than the jury to correctly identify Hardy, we need not be concerned with any arguable weakness in Hale's identification testimony. Hale's identification was

57

cumulative of the three other witnesses' identifications, which were clearly admissible.  *See also Robinson v. People*, 927 P.2d 381, 384 (Colo. 1996) ("although the witness must be in a better position than the jurors to determine whether the image captured by the camera is indeed that of the defendant, this requires neither the witness to be 'intimately familiar' with the defendant nor the defendant to have changed his appearance").  *Compare United States v. Pierce*, (a probation officer, who had met with Pierce on 10 occasions during the 7-month period prior to the charged offenses, some of those meetings taking place in her office and others in Pierce's home, was properly allowed to give her opinion that the robber disguised with dark glasses and a baseball hat was in fact Pierce);  *State v. Gardner*, 955 S.W.2d 819, 825 (Mo. Ct. App. 1997) (officer's identification testimony provided assistance to the jury because the videotape was of poor quality, the perpetrator obscured part of his face with his arm, the officer had known Gardner for 10 years, and his identification was not the sole identification testimony, but supplemented the victim's identification and the images on the videotape, which the jury viewed); *People v. Morgan*, 214 A.D.2d at 809, 625 N.Y.S.2d at 674 (1995) (where the appellant changed his appearance before trial, detective who "encountered [him] less than five hours after the commission of the crime and remained with him for four or five hours during which time he had the opportunity to observe his facial features, physical characteristics, mannerisms and clothing," was properly allowed to give his opinion that the appellant was the robber depicted in the surveillance videotape).

*Hardy*, 804 So. 2d at 271-273.

In light of the same testimony by these other witnesses identifying Hardy as the gunman on the surveillance video, Hardy has failed to demonstrate that Hale's testimony was "a crucial, critical, highly significant factor" leading to the conviction.  *Thigpen*, 926 F.2d at 1012.  Therefore, he is not entitled to have his claim reviewed in this court and the claim is due to be dismissed.

## VI. THE PETITIONER WAS ARRESTED AND DETAINED PURSUANT TO AN INVALID FUGITIVE WARRANT FROM ALABAMA

Hardy asserts that he was illegally arrested in Kentucky pursuant to an invalid fugitive warrant and that, therefore, the Alabama courts did not have jurisdiction to try him. The Alabama Supreme Court found that the arrest was valid. *Ex Parte Hardy*, 804 So. 2d at 305-307.

The respondent argues that this court is barred from considering this claim under the doctrine enunciated in *Stone v. Powell*, 428 U.S. 465 (1976). *Respondent's Brief* (doc. 17) at 30-31. The petitioner argues that *Stone v. Powell* does not apply in his case because he was not afforded a full and fair consideration of the claim in state court.

> Recently, in *Peoples v. Campbell*, 377 F.3d 1208 (11th Cir. 2004), the court reiterated "For a claim to be fully and fairly considered by the state courts, where there are facts in dispute, full and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state court." *Id* at 1224. In this case, the issue was never raised at the trial court level and the Alabama Court of Criminal Appeals only reviewed this issue under a plain error standard. There was no finding of facts in the trial court and the appellate court merely reviewed the record to determine this issue, therefore there was no "full and fair consideration" of his Fourth Amendment claim in state courts.

*Petitioner's Reply Brief* (doc. 26) at 24.

This is not a valid ground for habeas relief.

> We are generally barred from hearing Fourth Amendment claims in a federal habeas corpus proceeding. In *Stone*, the Supreme Court held that

> > where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

428 U.S. at 494, 96 S.Ct. at 3052.

> An "opportunity for full and fair litigation" means just that: an opportunity. If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, *Stone v. Powell* bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes.

*Caver v. State of Ala.*, 577 F.2d 1188, 1192 (5th Cir. 1978).  "'[F]ull and fair consideration' in the context of the Fourth Amendment includes 'at least one evidentiary hearing in a trial court and the availability of meaningful appellate review when there are facts in dispute, and full consideration by an appellate court when the facts are not in dispute.'"  *Bradley v. Nagle*, 212 F.3d 559, 565 (11th Cir. 2000) (*quoting Caver*, 577 F.2d at 1191).  Although "sometimes 'full and fair consideration' means consideration by two tiers of state courts[;] sometimes it requires consideration by only one."  *O'Berry v. Wainwright*, 546 F.2d 1204, 1213 (5th Cir. 1977).

> For a claim to be fully and fairly considered by the state courts, "where the facts are in dispute, full and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state court.  Where, however, the facts are undisputed, and there is nothing to be served by ordering a new evidentiary hearing, the full and fair consideration requirement is satisfied where the state appellate court, presented with an undisputed factual record, gives full consideration to defendant's Fourth Amendment claims."

*Tukes v. Dugger*, 911 F.2d 508, 513-14 (11th Cir. 1990) (*quoting O'Berry*, 546 F.2d at 1213).  Although a defendant cannot show a Fourth Amendment violation if "[t]he state of the law at the time of his trial did not deprive [the defendant] of an opportunity for full and fair litigation" of his claim, *Caver*, 577 F.2d at 1194, the situation is different if the claim did not exist at the time of his trial.  Where the "particular Fourth Amendment claim did not even exist until years after [the defendant's] arrest and trial [ ], . . . he did not benefit from the 'opportunity for fair and full litigation' of it in [the state's] court[ ] to which he was entitled."  *Anderson v. Calderon*, 232 F.3d 1053, 1068 (9th Cir. 2000).  A claim argued at trial and on appeal but "ignored" by the state appellate court has not received full and fair consideration, and our consideration of it is thus not barred by *Stone*.  FN.  *Agee v. White*, 809 F.2d 1487, 1490 (11th Cir. 1987).

> FN.  Where, however, the issue was presented to
> the state trial, intermediate appellate, and state
> supreme courts, each court rejected the issue, the
> intermediate appellate court stated that it had
> "carefully examined the record and determined"
> the merits of the issue, and a dissent from the
> denial of rehearing before the intermediate
> appellate court was written on that issue, the
> petitioner "cannot successfully argue that he did
> not receive full consideration of his claim."
> *Swicegood v. State of Ala.*, 577 F.2d 1322, 1324
> (5th Cir. 1978).

*Lawhorn v. Allen*, 519 F.3d 1272, 1287-1288 (11th Cir. 2008).

The petitioner argues that he was not afforded a full and fair consideration of his claim in state court.  Specifically, he maintains that

> In this case, the issue was never raised at the trial court level and the Alabama
> Court of Criminal Appeals only reviewed this issue under a plain error
> standard.  There was no finding of facts in the trial court and the appellate
> court merely reviewed the record to determine this issue, therefore there was
> no "full and fair consideration" of his Fourth Amendment claim in state courts.

The petitioner is mistaken.  This claim was in fact raised in the trial court.  On February 4, 1994, the petitioner filed a motion to dismiss the indictment against him on the ground that he was "illegally arrested pursuant to an invalid arrest warrant which was served upon [him] in the State of Kentucky, outside the jurisdiction of this Honorable Court, and thus this Court lacks personal jurisdiction over [him]."  Vol. 1, Tab R-1, p. 47.  The Alabama Supreme Court stated the following regarding the hearing on the motion to dismiss the indictment:

> On February 4, 1994, Hardy moved to dismiss the indictment against him on
> the ground that he was "illegally arrested pursuant to an invalid arrest warrant
> which was served upon [him] in the State of Kentucky, outside the jurisdiction
> of this Honorable Court."  After hearing testimony and arguments, the trial
> court denied the motion.

61

At the hearing on Hardy's motion to dismiss, Sergeant Mark Fox of the Jefferson County, Kentucky, Police Department testified that he arrested Hardy on September 11, 1993, after Fox received a copy of the warrant issued on September 10, 1993, for Hardy's arrest for allegedly committing the capital offense in Decatur, Alabama.  Sergeant Fox testified that he served this arrest warrant on Hardy during this arrest.  After Hardy's arrest and during his interrogation in Kentucky by Decatur, Alabama, Detectives Boyd and Hale, Hardy told the detectives that he wanted to return to Alabama.  Hale then explained to Hardy that he would have to appear before a Kentucky judge before he could return to Alabama.  Hardy testified, at the hearing on his motion to dismiss in the Morgan County, Alabama, Circuit Court, that he appeared before a Kentucky judge and signed a form waiving his right to any extradition proceedings.  Hardy testified that he voluntarily signed the extradition waiver because he wanted to return to Alabama.

*Ex Parte Hardy*, 804 So. 2d at 306.

After unsuccessfully raising the claim in the trial court, Hardy again unsuccessfully

presented it on appeal to both the Alabama Court of Criminal Appeals and the Alabama

Supreme Court.  The Alabama Supreme Court found as follows:

Hardy further claims that he was not validly arrested in Kentucky and that, therefore, the Alabama courts did not acquire jurisdiction to try him. Specifically, Hardy claims that his arrest in Kentucky was illegal because he was not arrested pursuant to a valid fugitive arrest warrant signed by the Governor of the State of Alabama.  Therefore, Hardy maintains, his extradition to Alabama was not valid.  The evidence, however, shows that Alabama courts properly acquired jurisdiction over Hardy to conduct the proceedings in this case.

The record contains a copy of a warrant for Hardy's arrest for this capital robbery-murder and a supporting affidavit.  The affidavit was sworn by Lieutenant Richard H. Crowell of the Decatur, Alabama, Police Department on September 10, 1993, and the warrant was issued by District Judge David J. Breland of Morgan County, Alabama, on September 10, 1993.  The arrest warrant is not a fugitive arrest warrant.  On September 11, 1993, on this warrant, Hardy was arrested in Kentucky, and he was soon returned to Alabama, where he appeared before Judge Breland at an initial appearance hearing, where Judge Breland advised him of the charge against him.  A second arrest warrant was issued on October 25, 1993, after the grand jury had indicted Hardy for capital murder on October 22, 1993.  After the indictment

was served on Hardy pursuant to this second warrant, he was arraigned on January 6, 1994, in the Morgan County, Alabama, Circuit Court.  At the arraignment, the trial judge granted the defense an additional 30 days in which to file "pre-arraignment motions."  On February 4, 1994, Hardy moved to dismiss the indictment against him on the ground that he was "illegally arrested pursuant to an invalid arrest warrant which was served upon [him] in the State of Kentucky, outside the jurisdiction of this Honorable Court."  After hearing testimony and arguments, the trial court denied the motion.

. . . .

Even though Sergeant Fox did not arrest Hardy pursuant to a valid fugitive arrest warrant, his arrest of Hardy was valid under Kentucky law, specifically § 440.280, Ky.Rev.Stat.Ann. (Michie 1985), the Kentucky counterpart of Alabama's § 15-9-41, Ala.Code 1975.  Section 440.280, Ky.Rev.Stat.Ann., provides:

> The arrest of a person may be lawfully made also by any peace officer or a private person, without a warrant upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding one (1) year, but when so arrested the accused must be taken before a judge with all practicable speed and complaint must be made against him under oath setting forth the ground for the arrest as in the preceding section; and thereafter his answer shall be heard as if he had been arrested on a warrant.

Likewise, § 15-9-41, Ala. Code 1975, provides:

> The arrest of a person may be lawfully made also by an officer or a private citizen without a warrant upon reasonable information that the accused stands charged with a crime punishable by death or life imprisonment in the courts of another state.  When so arrested, the accused must be taken before a district or circuit court judge with all practicable speed and complaint must be made against him under oath setting forth the ground for the arrest as in Section 15-9-40, and thereafter his answer shall be heard as if he had been arrested on a warrant.

The facts in the case before us show that Sergeant Fox, the Kentucky officer, arrested Hardy, although without a Kentucky warrant or a fugitive

63

warrant, upon "reasonable information that [Hardy stood] charged in the courts of [Alabama] with a crime punishable by death or imprisonment for a term exceeding one (1) year." § 440.280, Ky.Rev.Stat.Ann. (Michie 1985). Thus Sergeant Fox's arrest of Hardy was validly authorized by statute. *See Ex parte Hamm*, 564 So.2d 469 (Ala.), *cert. denied*, 498 U.S. 1008, 111 S.Ct. 572, 112 L.Ed.2d 579 (1990); § 440.280, Ky.Rev.Stat.Ann. (Michie 1985), and § 15-9-41, *Ala.Code* 1975. Further, Hardy's waiver of extradition and voluntary agreement to return to Alabama operated not only to validate his return to Alabama but also to waive the requirement of the Kentucky statute for a formal complaint and further proceedings in the Kentucky courts. *See, e.g., Williams v. State*, 535 So.2d 225, 228 (Ala.Crim.App. 1988); and *Davis v. State*, 536 So.2d 110, 114-16 (Ala.Crim.App. 1987). Finally, "by [the service of the indictment], the [Alabama] court acquir[ed] jurisdiction of [Hardy's] case." *Fields v. State*, 121 Ala. 16, 17, 25 So. 726, 726 (1898). *See also Ross v. State*, 529 So.2d 1074, 1078 (Ala.Crim.App. 1988).

*Ex Parte Hardy*, 804 So. 2d at 305-307.

The record in this case indicates beyond question that Hardy received full and fair consideration of this claim in the state courts. The facts of Hardy's arrest are undisputed. Thus, "the full and fair consideration requirement is satisfied where the state appellate court, presented with an undisputed factual record, gives full consideration to defendant's Fourth Amendment claims." *Tukes v. Dugger*, 911 F.2d 508, 513-14 (11th Cir. 1990). The Alabama Supreme Court fully considered the invalid arrest claim, concluding that the arrest was proper. Because it is clear that Hardy had a full and fair opportunity to litigate his Fourth Amendment claim in the Alabama courts, this court need not review it.

## VII. PROSECUTORIAL MISCONDUCT PREJUDICED THE PETITIONER AT HIS CAPITAL TRIAL

Hardy claims that the "prosecutors engaged in misconduct throughout [his] trial," depriving him of a "fundamentally fair trial, due process and a reliable sentence as guaranteed

by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution."

Specifically, Hardy asserts that:

> A.     the prosecutor misstated the law and thereby misled the jury;
>
> B.     the prosecutor improperly expressed personal opinions about the evidence;
>
> C.     the district attorney twice read the indictment to the jury and improperly informed the jury that he had signed the indictment; and
>
> D.     the prosecutor shifted the burden of proof and created an unconstitutional presumption of death.

*Petition* at 22-28.

Hardy unsuccessfully raised each of these claims on appeal to the Alabama Court of Criminal Appeals and the Alabama Supreme Court.[12]  In reviewing the claims, the Alabama Court of Criminal Appeals noted the following:

> Hardy contends that the prosecutor engaged in prosecutorial misconduct by making allegedly improper comments and that, as a result, he was denied a fundamentally fair trial, due process, and a reliable sentence.  We review these contested comments for plain error only, Ala.R.App.P. 45A, FN, because defense counsel did not enter objection to any of the contested comments.
>
> > FN.  Rule 45A, Ala.R.App.P., reads:
> >
> > In all cases in which the death penalty has been imposed, the court of criminal appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has

---

[12]   The Alabama Supreme Court specifically addressed only Claim C, but found that the "Court of Criminal Appeals has not erred to reversal in its treatment of any of the other issues argued by Hardy."  *Ex Parte Hardy*, 804 So. 2d at 308.

or probably has adversely affected the substantial
right of the appellant.

"While this failure to object does not preclude review in
a capital case, *it does weigh against any claim of prejudice.*" *Ex
parte Kennedy*, 472 So.2d [1106,] 1111 [ (Ala.), *cert. denied*,
474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985) ] (emphasis
in original).  "This court has concluded that the failure to object
to improper prosecutorial arguments . . . should be weighed as
part of our evaluation of the claim on the merits because of its
suggestion that the defense did not consider the comments in
question to be particularly harmful." *Johnson v. Wainwright*,
778 F.2d 623, 629 n. 6 (11th Cir. 1985), *cert. denied*, 484 U.S.
872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).

*Kuenzel v. State*, 577 So.2d 474, 489 (Ala.Crim.App. 1990), *aff'd*, 577 So.2d
531 (Ala.), *cert. denied*, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).

In considering what constitutes plain error in a capital case, we
have adhered to the interpretation of the term "plain error"
adopted by the Alabama Supreme Court, which follows the
interpretation given that term by the federal courts.  *See Ex parte
Harrell*, 470 So.2d 1309 (Ala.), *cert. denied*, 474 U.S. 935, 106
S.Ct. 269, 88 L.Ed.2d 276 . . . (1985); *Ex parte Womack*, 435
So.2d 766 (Ala.), *cert. denied*, 464 U.S. 986, 104 S.Ct. 436, 78
L.Ed.2d 367 (1983).  *See also Hooks v. State*, 534 So.2d 329
(Ala.Cr.App.1987), *aff'd*, 534 So.2d 371 (Ala.1988), *cert.
denied*, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005
(1989).  Plain error is error that has or probably has adversely
affected a substantial right of the appellant, Ala.R.App.P. 45A,
or is so obvious that the failure to notice it would seriously affect
the fairness or integrity of the judicial proceedings. *Ex parte
Womack.*

*Bush v. State*, 695 So.2d 70, 87 (Ala.Crim.App. 1995), *aff'd*, 695 So.2d 138
(Ala.), *cert. denied*, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997).
"'[T]he plain-error exception to the contemporaneous-objection rule is to be
"used sparingly, solely in those circumstances in which a miscarriage of justice
would otherwise result.'"  *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct.
1038, 84 L.Ed.2d 1 (1985), *quoting United States v. Frady*, 456 U.S. 152, 163,
102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)."  *Burton v. State*, 651 So.2d 641, 645
(Ala.Crim.App. 1993), *aff'd*, 651 So.2d 659 (Ala. 1994), *cert. denied*, 514 U.S.
1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).

*Hardy*, 804 So. 2d at 276-277.

Prior to addressing each of Hardy's separate arguments on prosecutorial misconduct,

the appeals court set out the law pertaining to such claims:

In evaluating the propriety of prosecutorial arguments, we adhere to the following principles:

As the United States Supreme Court stated in *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986):

It "is not enough that the prosecutors' remarks were undesirable or even universally condemned." The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

*Burton v. State*, 651 So.2d at 651. (Citation omitted.)

In *United States v. Young*, . . . 470 U.S. [1], at 11, 12, 16, 105 S.Ct. 1038, 84 L.Ed.2d 1 [ (1985),] the Court noted:

Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, . . . the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's [remark] would have on the jury's ability to judge the evidence fairly. . . .

. . . .

Especially when addressing [a claim of] plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim

67

against the entire record. We have been reminded:

> "In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution." Johnson v. United States, 318 U.S. 189, 202, 63 S.Ct. 549, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring).'

*Ex parte Parker*, 610 So.2d 1181, 1183-84 (Ala. 1992), *cert. denied*, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993). "Questions of the propriety of argument of counsel are largely within the trial court's discretion, *McCullough v. State*, 357 So.2d 397, 399 (Ala.Cr.App. 1978), and that court is given broad discretion in determining what is permissible argument." *Bankhead v. State*, 585 So.2d 97, 105 (Ala.Crim.App. 1989), *rev'd on other grounds*, 625 So.2d 1146 (Ala. 1993).

In its initial remarks to the jury, the trial court instructed the jury that an attorney's statements and arguments are not evidence and that the jury "should disregard any remark, statement, or argument which [is] not supported by the evidence or by the law," as instructed. (R. 2210.) The court repeated this instruction in its oral charge at the close of the guilt phase of the trial. (R. 3688.) After closing arguments in the penalty phase, the trial court instructed the jury as follows:

> "Any comments or remarks or statements made by counsel are not evidence and cannot be used as evidence in this case. Likewise, any remarks that one attorney has used concerning the comments or remarks of another attorney, that is not evidence, nor can those remarks be taken or used or looked at against ... either of the defendants."

(R. 3886-87.) During instructions, the court also stated, "Your deliberations and verdict should be based solely upon the evidence you have seen and heard and the law on which I have instructed you." (R. 3905, 3929.)

*Hardy*, 804 So. 2d at 277-278.

## A.  The Prosecutor Misstated the Law and Thereby Misled the Jury

Hardy first claims that "[d]espite the fact that the State conceded that the mitigating circumstance of 'no significant history of prior criminal activity' existed, the prosecutor told the jury during the penalty phase that it was not a mitigating circumstance.  (R-3751)  See Ala. Code § 13A-5-51 (1) (1975)."  *Petition* at 22-23.  In denying this claim, the Alabama Court of Criminal Appeals found:

> Hardy contends that the prosecutor misstated the law when he told the jury in his opening argument in the penalty phase that the mitigating circumstance of § 13A-5-51(1)- "no significant history of prior criminal activity"- was not a mitigating circumstance, despite having conceded that the mitigating circumstance existed as to each defendant.  He argues that, pursuant to the statement highlighted in the prosecutor's argument below, the jury did not consider this mitigating circumstance.
>
> "There's at least one mitigating circumstance in this case that we admit is present.  That is that neither defendant had a significant criminal history prior to this time.  We will tell you that they don't.  That's a mitigating circumstance and I think the judge will tell you that you can consider that. *It's going to be our position that's not a mitigating circumstance.*
>
> "The Judge is going to tell you . . . that you don't look to count up, there's one, two, three aggravating, or one, two, three, four mitigating; well, there's three here and four there.  It's not just a matter of counting them but you're also supposed to weigh them.
>
> "We submit to you in this case - I won't admit at all that [there] will be more mitigating circumstances than aggravating circumstances.  But if they are, I submit to you they will not outweigh the weight of the aggravating circumstances in the way

the crime was committed, and I'll ask you to return a verdict of death."

(R. 3751-52.)

It is clear from a reading of the prosecutor's arguments that, while the highlighted comment was a misstatement, it was inadvertent and was not intended to mislead the jury. It is further clear from a reading of all counsels' arguments and the trial court's instructions that the mistake was corrected and the jury was correctly informed that the state conceded the mitigating circumstance. "The allegedly inappropriate comment cannot be viewed in isolation, but rather should be in the context in which it occurred." *Mason v. State*, 768 So.2d 981, 991 (Ala.Crim.App. 1998).

In opening remarks in the penalty phase, Hardy's counsel stated, "The State . . . ha[s] also correctly indicated there's one mitigating circumstance that [it's] going to concede." (R. 3754.) In Hardy's counsel's closing remarks, he stated:

> "Nobody has brought anything before you to tell you that he has done things like this before or done violent things before.
>
> "In fact, the District Attorney has told you himself, and the Judge will instruct you that one of the mitigating circumstances that the law requires you to consider is the fact that my client had no prior criminal record of any significance."

(R. 3840-41.) Sneed's attorneys further remarked in closing, "[Y]ou do have the District Attorney's admission that there's no significant previous criminal history." (R. 3854.) In the prosecutor's closing remarks, he stated:

> "And as I told you this morning, we admit because it's the truth, that neither one of them had any, either Hardy or Sneed, any significant criminal history prior to this crime. Does that knock the punishment down for a crime like this one from death in the electric chair? Does the fact that he has never been charged with another crime before or convicted of another crime lessen the punishment for what you saw on that tape?"

(R. 3868-69.) Furthermore, in its sentencing instructions, the trial court stated the following in regard to the jury's recommendation of a sentence for Hardy:

70

"Only if you find beyond a reasonable doubt that one or both of the aggravating circumstances exist, would you then proceed to your second determination which is to answer this question: what mitigating circumstances exist in this case?  The law of this state provides a list of some of the mitigating circumstances which you may look for in answering this question.    Included in this list are the following specific mitigating circumstances:

"One.  The defendant has no significant history of prior criminal activity. The State of Alabama has admitted the defendant has no significant history of prior criminal activity and therefore you must find that this mitigating circumstance exists.

(R. 3897-98.) (The court instructed the same in regard to the jury's consideration of recommendation of Sneed's sentence.  (R. 3921-22.))  By these repeated reminders that the prosecution had conceded the existence of the mitigating circumstance, any prejudicial effect of the single and isolated comment highlighted above was certainly rendered harmless. Finally, we note that the failure of the four attorneys representing the defendants to object indicates the innocuous nature of the remark.  We find no plain error.

*Hardy*, 804 So. 2d at 278-79 (emphasis in original).

The Alabama Court of Criminal Appeals correctly applied *Darden v. Wainwright*, 477 U.S. 168 (1986) and *United States v. Young*, 470 U.S. 1 (1985) to the facts of this claim. *Darden* requires that the court consider "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)."  *Darden*, 477 U.S. at 181.  It is "is not enough that the prosecutors' remarks were undesirable or even universally condemned."  *Id*.

Similarly, in *Young*, the Court held that:

Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding.  Instead, as *Lawn* teaches, the remarks must be examined within

71

the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error.  In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly.  In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 242, 60 S.Ct. 811, 853, 84 L.Ed. 1129 (1940); *Crumpton v. United States*, 138 U.S. 361, 364, 11 S.Ct. 355, 356, 34 L.Ed. 958 (1891).  Indeed most Courts of Appeals, applying these holdings, have refused to reverse convictions where prosecutors have responded reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray.

. . .

Especially when addressing plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record. We have been reminded:

"In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution." *Johnson v. United States*, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring).

It is simply not possible for an appellate court to assess the seriousness of the claimed error by any other means.  As the Court stated in *United States v. Socony-Vacuum Oil Co.*, 310 U.S., at 240, 60 S.Ct., at 852 "each case necessarily turns on its own facts."

*Young*, 470 U.S. at 11-12, 16.

In applying *Darden* and *Young* to this claim, the court found that the prosecutor's comment was an inadvertent misstatement, that the mistake was corrected, and that the jury was correctly informed that the state conceded that the mitigating circumstance existed.  The appeals court then concluded that the repeated reminders throughout the rest of the trial that the mitigating circumstance did exist rendered the comment harmless.  It was in no way

72

unreasonable for the Alabama Court of Criminal Appeals to conclude that the comment did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181.  Further, Hardy has made no allegation that this decision "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  This claim is due to be dismissed.

**B.  The Prosecutor Improperly Expressed Personal Opinions About The Evidence**

The petitioner next complains that the prosecutor impermissibly expressed his personal opinion that Hardy was guilty when he stated the following during his closing arguments in the penalty phase of the trial:

> I feel like we've shown you what we told you we were going to show.  I'm going to ask you to do that [sentence him to death], and that's what I told you [I] was going to ask you at the beginning of the trial. (R-3838)

> We don't have to speculate about that [Mr. Hardy's involvement in the crime]. You've got the best evidence in the world. You saw the crime happen.  I've never been able to tell the jury that in my life.  (R-3866)

*Petition*, at 25.

In applying *Darden* and *Young* to this claim, the court found that:

> These comments certainly do not rise to the level of plain error, for the simple reason that the [ ] comments were made during the penalty phase-after the jury had already declared Hardy guilty. Thus, even if the prosecutor's comments could be interpreted as the prosecutor's personal opinion that Hardy was guilty, such would have been without any prejudicial effect. (We further note that we construe the [ ] comment in the second excerpt to refer to the evidence, specifically the videotape of the crime, establishing Sneed's guilt.) *See also Boyd v. State*, 715 So.2d 825, 841 (Ala.Crim.App. 1997) (prosecutor's comment during the guilt-phase closing argument- "I think that the State has proved to you beyond a reasonable doubt"- was not improper, but was a legitimate

inference and reasonable impression from the evidence), *aff'd*, 715 So.2d 852 (Ala.), *cert. denied*, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).

*Hardy*, 804 So. 2d at 279-280. It was not unreasonable for the Alabama Court of Criminal Appeals to conclude that these statements did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. Hardy has made no allegation that this decision "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). This claim is due to be dismissed.

## C. The District Attorney Twice Read the Indictment to the Jury and Improperly Informed the Jury That He Had Signed the Indictment

In support of this claim, the petitioner asserts that:

The District Attorney read the indictment to the jury and informed it twice that he had signed it. (R-2224, 3561) The trial court also read the indictment to the jury during its opening comments to the venire. (R-272) By reading the indictment and noting the District Attorney's signature, the prosecution and the court prejudiced Petitioner. Reading the indictment repeatedly emphasized to the jury that another group of individuals has already reviewed the evidence and found that Petitioner committed the crime. By further informing the jury that the District Attorney signed the indictment, the State and the court bolstered the jury's perception of the district attorney, and implied that the prosecutor had a special knowledge of the case that other individuals lacked. Such a disclosure improperly relieved the jury of their responsibility of impartially determining the guilt or innocence of the accused.

Furthermore, the repeated reading of the indictment informed the jury that the district attorney believed Petitioner was guilty. Thus, if the jury were informed that the prosecutor believed the defendant guilty, this disclosure would be given great credence by the jury. This is exactly what occurred when the prosecution twice informed the jury that the district attorney signed the indictment. By so informing the jury that the District Attorney signed the indictment, the State, in essence, told the jury that the District Attorney believed in Petitioner's guilt. The prosecutor's action was unconstitutional under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

*Petition*, at 26-27.

The Alabama Court of Criminal Appeals found this claim to be without merit:

Hardy also contends that the prosecutor twice improperly read the indictment to the jury and stated that he had signed it. The prosecutor first read the indictment and noted his accompanying signature in his opening argument to the jury. (R. 2223-24.) He prefaced this statement by advising the jury that the indictment is not evidence; it is merely "a road map that we go by in a case." (R. 2222.) Before reading the indictment and noting his signature again at the beginning of his closing argument in the guilt phase, the prosecutor again warned that the indictment is not evidence. (R. 3559-61.)

Hardy specifically argues that, by telling the jury that he had signed the indictment, the prosecutor implied that "he, himself, believed in the truth of the grand jury's decision, enough to sign his name to it," which, Hardy argues, was "an improper expression of the prosecutor's personal opinion about Mr. Hardy's guilt" (Appellant's brief, p. 39), and further, that such acknowledgement bolstered the jury's perception of the prosecutor. In *Boyd v. State*, 715 So.2d 825 at 841-42, the court rejected a similar argument by an appellant with the following discussion:

[T]he district attorney's noting in reading the indictment to the jury, that it was signed by him, is not an injection of his personal belief or otherwise improper. Similarly, in *Arthur v. State*, 711 So.2d 1031 (Ala.Cr.App.1996), [*aff'd*, 711 So.2d 1097 (Ala. 1997),] the appellant argued that the prosecutor improperly inserted his credibility in an attempt to bolster the possibility of conviction by stating that the indictment had been signed by him in his capacity as district attorney. This Court stated:

Despite the appellant's argument to the contrary, there was no implication by the prosecutor in this case that he believed the appellant to be guilty and, therefore, was prosecuting the case. The jury was amply instructed that an indictment is not an indication of guilt but rather a vehicle for bringing an individual to trial and the prosecutor's acknowledgment that he signed the indictment in his capacity as district attorney was a statement of fact rather than an opinion or insertion of credibility.

75

*Arthur*, 711 So.2d at 1054.   In the present case, the district attorney was merely reading the indictment to the jury, and his signature was recited as a portion of the indictment and a statement of fact.

"The indictment is the compass and North Star of any criminal prosecution.  The State must navigate its case according  to the indictment or risk venturing into the waters of prejudicial and reversible error."  *Hatton v. State*, 359 So.2d 822, 831 (Ala.Cr.App. 1977), *cert. denied*, 359 So.2d 832 (Ala.1978)." *Kuenzel v. State*, 577 So.2d at 490 (holding that the prosecutor's explanation of the indictment in closing argument of the guilt phase was not improper, the court observed that the prosecutor prefaced his remarks by stating that the indictment was not evidence and further noted that the prosecutor may read and explain the indictment in his opening statement).

In rejecting Hardy's argument, we note that, before the jury heard evidence, the trial court instructed that the jury should not consider the indictment as evidence; that "[i]t is merely the written charge made by the State"; and that the jury could draw no adverse inference against the defendants based on the filing of the indictment. (R. 2204-05.)  In addition, in its oral charge, the court thoroughly instructed the jury on the presumption of innocence (R. 3686-87) and again instructed the jury that the indictment is not evidence (R. 3688).

We also reject Hardy's contention that reading the indictment twice indicated to the jury that another group of individuals-presumably, the grand jury-had already reviewed the evidence and found that Hardy had committed the crime.  Compare the comments and cases discussed in *Thomas v. State*, 766 So.2d 860 (Ala.Crim.App. 1998). We likewise reject Hardy's groundless contention that, by informing the jury that the district attorney had signed the indictment, the state implied that the prosecutor had a special knowledge of the case that others lacked.

Based upon the foregoing, we also reject Hardy's contention that the trial court prejudiced him by reading the indictment to the jury venire and noting the prosecutor's signature on it.  (R. 270-72.)

*Hardy*, 804 So. 2d at 280-281.  In addressing this claim on certiorari, the Alabama  Supreme

Court stated:

We agree with the Court of Criminal Appeals to the extent that its rationale is that the trial court's jury instructions limiting the purposes for which the jurors

76

could consider the indictment and the arguments of counsel prevented the prosecutor's remarks from putting the trial court itself into plain error.  This Court has recently noted:

> An improper argument by counsel cannot, in and of itself, constitute an error.  *See Ex parte Land*, 678 So.2d 224 (Ala. 1996); and *Ex parte Musgrove*, 638 So.2d 1360 (Ala. 1993), *cert. denied, Rogers v. Alabama*, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).  While parties may cause or invite an error, only the court can commit an error.  The error, if any, would consist only of incorrectly overruling an objection to an improper argument, incorrectly refusing a requested curative instruction, giving an inadequate curative instruction after a proper request, denying a motion for a mistrial in the case of an ineradicably prejudicial argument, or, in the very rare case, omitting some necessary *sua sponte* redress for an argument so egregious as to require *sua sponte* redress by the court even absent an objection with appropriate follow-up by the aggrieved party. The prosecutor's argument in this particular instance does not approach the rare degree of egregiousness that would require *sua sponte* redress by the court, and the defendant did not interpose any objection to the argument.   Thus this issue presents no reversible error. *See* Rule 45A, Ala.R.App.P.; *Kuenzel v. State*, 577 So.2d 474 (Ala.Crim.App. 1990), *aff'd*, 577 So.2d 531 (Ala.), *aff'd*, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); and *Ex parte Womack*, 435 So.2d 766 (Ala.), *cert. denied*, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983).

*Ex parte Burgess*, [Ms. 1980803, August 25, 2000] --- So.2d ----, ---- (Ala. 2000).

*Ex parte Hardy*, 804 So. 2d at 307.

In applying *Darden* and *Young* to this claim, the Alabama Supreme Court considered the prosecution's remarks within the context of the entire trial, concluding that "the trial court's jury instructions limiting the purposes for which the jurors could consider the indictment and the arguments of counsel prevented the prosecutor's remarks from putting the trial court itself into plain error." *Ex Parte Hardy*, 804 So. 2d at 307.  It was not

unreasonable for the Alabama Court of Criminal Appeals to conclude that these statements did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181.  Further, Hardy has made no allegation that this decision "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  This claim is due to be dismissed.

**D.   The Prosecutor Shifted the Burden of Proof and Created an Unconstitutional Presumption of Death**

Finally, the petitioner argues that the prosecutor improperly shifted the burden of proof and created an unconstitutional presumption of death when "[a]fter discussing the non-statutory mitigating circumstances in this case, the prosecutor compared them to the aggravating circumstances," and stated, "I submit to you that's not enough to overcome what you saw in that tape." *Petition* at 27.  In finding the prosecutor's comments to be proper, the Alabama Court of Criminal Appeals held:

> Hardy further contends that the prosecutor improperly "shifted the burden of proof and created an unconstitutional presumption of death," (Appellant's brief, p. 41) when, after discussing the argued nonstatutory mitigating circumstances and comparing them to the argued aggravating circumstances, the prosecutor stated,
>
> > The . . . nonstatutory mitigating circumstances in this case, in Hardy's case, the fact that he's got a family that loves him. . . . I feel terribly sorry for his mama, for his sister and anybody else in his family.  I've been around these cases a long time and I feel sorry for those people.  I sincerely do.  But that doesn't excuse what [Hardy] did.  I'm not making light of their feelings.  If we never imposed the death penalty on anyone . . . who had a mama that loved them or a sister that loved them, we wouldn't have y'all in Court.  I submit to you that's not enough to overcome what you saw in that tape.

(R. 3869-70.)

We consider the above comment to be legitimate.

"Whatever is in evidence is considered subject to legitimate comment by counsel." *Bankhead v. State*, 585 So.2d 97 (Ala.Cr.App. 1989), *aff'd*, 585 So.2d 112 (Ala. 1991). *See also Ward v. State*, 440 So.2d 1227 (Ala.Cr.App. 1983). "The prosecutor has the right to present his impressions from the evidence.  He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way.". . . *Donahoo v. State*, 505 So.2d 1067, 1072 (Ala.Cr.App. 1986).

*Burton v. State*, 651 So.2d at 651 (holding that the prosecutor did not commit plain error by arguing that there was "not one shred of evidence" that the defendant and his accomplices did not commit robbery and intentionally kill during that robbery, the court rejected the contention that such argument impermissibly shifted the burden of proof to the defendant)[13] (*quoting Williams v. State*, 601 So.2d 1062, 1072-73 (Ala.Crim.App. 1991), *aff'd*, 662 So.2d 929 (Ala.), *cert. denied*, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992)).

*Hardy*, 804 So. 2d at 281-282.

The Eleventh Circuit Court of Appeals has held that:

---

[13]   The *Burton* court "evaluate[d] the comment in the context of the entire proceedings" as required by *Darden*:

As the United States Supreme Court stated in *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986):

[I]t "is not enough that the prosecutors' remarks were undesirable or even universally condemned." The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

(Citation omitted.)

We must evaluate the comment in the context of the entire proceedings.

*Burton*, 651 S.2d at 651.

> [P]rosecutorial arguments will not warrant habeas corpus relief unless they meet two requirements.  First, they must have encouraged the jury to take into account matters that are not legitimate sentencing considerations.  *Brooks* [*v. Kemp*, 762 F.1383, 1403 (11th Cir. 1985)].  Second, they must have been so prejudicial, when viewed in the context of the entire sentencing, as to have rendered that proceeding "fundamentally unfair."  *Id*. at 1400 (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed. 2d 431 (1974)).

*Johnson v. Wainwright*, 778 F.2d 623, 630 (11th Cir. 1985).

> Improper arguments [only] render [a trial] fundamentally unfair and require reversal when there is a reasonable probability that they changed the outcome of the case.  *See id*. at 1402.  "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  *Id*. at 1401 (*quoting Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

*Spivey v. Head*,  207 F.3d 1263, 1275-76 (11th Cir. 2000).

It is not reasonable to conclude that in the absence of the comment at issue, the jury might have recommended life without parole.  "The comment [did not] 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. at 181 *quoting Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). Therefore, the court cannot conclude that the decision of the state court was contrary to or involved an unreasonable application of clearly established law or that the decision of that court was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  This claim is due to be dismissed.

## VIII.   THE STATE FAILED TO COMPLY WITH ITS DISCOVERY OBLIGATIONS UNDER *BRADY v. MARYLAND*

Hardy next contends that the state violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding evidence that Christopher Hines, an unindicted accomplice to the crime, received favorable treatment in exchange for testifying against Hardy, and evidence regarding the possible involvement of Maurice Cosby in the murder.  *Petition* at 29-30.  Additionally, Hardy claims that the state failed to disclose numerous witness interviews by investigators and prosecutors, despite counsel specifically requesting "all statements of witnesses, on the ground that information contained in such statements were necessary to counsel's attempts to develop exculpatory evidence."  *Petition* at 30.

Hardy first raised his *Brady* claim concerning Hines and Cosby on appeal from the denial of his Rule 32 petition.  The Alabama Court of Criminal Appeals held that the claim was procedurally barred.

> Lastly, the appellant argues that the State withheld evidence that Christopher Hines received favorable treatment due to his testifying for the prosecution, as well as evidence regarding the possible involvement of Maurice Cosby in the murder.
> This argument was raised for the first time on appeal, and was therefore not preserved for this Court's review.  *Boyd v. State*, supra; *Arrington v. State*, supra.

*Hardy v. State*, 4 So.3d 585 (Ala. Crim. App. 2007)(table).[14]

Hardy raised his claim concerning "all witness statements" in his Rule 32 petition and on appeal from the denial of that petition.  The Alabama Court of Criminal Appeals found this claim to be procedurally barred as well:

---

[14]  Vol. 32, Tab R-71, pp. 11-12.

On direct appeal, the appellant raised a *Brady* claim regarding "criminal records of prosecution witnesses."  However, the argument raised in the appellant's Rule 32 petition is not as specific as his argument on direct appeal.  The trial court found the appellant's claim to be precluded from review pursuant to Rule 32.2(a)(4), A. R. Crim. P. (sic), because it was raised and addressed on appeal.  If the argument raised in the petition is a new *Brady* claim, it is precluded from review having been raised for the first time on appeal.  Rules 32.2(a)(3) and (5), Ala. R. Crim. P.  The trial court further found the claim to be a bare allegation unsupported by any material issue of fact or law and, thus, insufficiently pleaded.  Rule 32.2, Rule 32.6(b), Ala. R. Crim. P.

*Id.*

The respondent contends that Hardy is procedurally barred from presenting these claims in federal court since the Alabama Court of Criminal Appeals found them to be procedurally barred.  *Respondent's Brief* (doc. 17) at 46 (*citing Wainwright v. Sykes*, 433 U.S. 72 (1972)).  Hardy counters:

However, if a state procedural rule is not regularly and consistently followed, the state cannot rely on it to bar the claims of the petitioner.  *See Ford v. Georgia*, 498 U.S. 411 (1991); *James v. Kentucky*, 466 U.S. 341 (1984).  In this case, the court reached the merits on some of Mr. Hardy's claims at the same time as finding a procedural default. (R. Rule 32 Supp. 12-16).  If the state court ignores the default and rules on the merits, the federal court may do the same.  *See e.g., Horsley v. Alabama*, 45 F.3d 1486, 1489-1490 (11th Cir. 1995).  Clearly, the state courts have not applied the procedural bar in a regular and consistent manner and the state cannot now rely on said procedural bar.

*Petitioner's Reply Brief* (doc. 26) at 32.

The Alabama Court of Criminal Appeals explicitly found that Hardy's *Brady* claims were procedurally barred.  Hardy makes the conclusory allegation that this court should review the *Brady* claims because "the state courts have not applied the procedural bar in a regular and consistent manner and the state cannot now rely on said procedural bar."  Yet

82

Hardy has not cited a single case in which the Alabama Court of Criminal Appeals has not followed its rule that an appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition itself, or Rule 32.2(a)(3), (4), and (5) of the *Alabama Rules of Criminal Procedure*.  It is clear to this court that it is a firmly established and regularly followed procedural rule in Alabama that an appellate court will not consider a claim raised for the first time on appeal from the denial of a Rule 32 petition,[15] and that Rules 32.2(a)(3), (4), and (5) are firmly established and regularly followed.[16]

Moreover, to the extent that Hardy asserts that "the court reached the merits on some of Mr. Hardy's claims at the same time as finding a procedural default," the court notes that the Alabama Court of Criminal Appeals clearly found that the *Brady* claims were procedurally barred, without so much as a mention of the merits of the claims.  Furthermore, even if the appellate court had denied these claims on the merits after finding them

----

[15] *See e.g.*, *Beckworth v. State*, CR-07-0051, 2009 WL 1164994, *38, n. 11 (Ala. Crim. App. May 01, 2009); *McNabb v. State*, 991 So.2d 313, 321 (Ala. Crim. App. 2007); *Wallace v. State*, 959 So.2d 1161, 1167 (Ala. Crim. App. 2006); *Murray v. State*, 922 So.2d 961, 963 n. 1 (Ala. Crim. App. 2005); *Boyd v. State*, 913 So.2d 1113, 1144 (Ala. Crim. App. 2003); *Arrington v. State*, 716 So.2d 237, 239 (Ala. Crim. App. 1997); *Morrison v. State*, 551 So.2d 435 (Ala. Crim. App.), *cert. denied*, 495 U.S. 911 (1990).

[16] *See e.g., Jenkins v. Bullard*, 210 Fed. Appx. 895, 900 (11th Cir. 2006)(Rule 32.6(b) has been firmly established and regularly followed by the Alabama courts); *Lamb v. State*, No. CR-08-1682, 2010 WL 2546424, *4 (Ala. Crim. App. June 25, 2010)(applying Rule 32.2(a)(5)); *Scott v. State*, CR-06-2233, 2010 WL 1170216 (Ala. Crim. App. March 26, 2010)(applying Rule 32.2(a)(3) &(5)); *Lee v. State*, CR-07-0054, 2009 WL 3255175, *28 (Ala. Crim. App. October 09, 2009)(applying Rule 32.2(a)(3) &(4)); *Freeman v. State*, CR-08-0219, 2009 WL 2657614 (Ala. Crim. App. August 28, 2009)(applying Rule 32.2(a)(5)); *Smith v. State*, CR-05-0561, 2008 WL 4369249 (Ala. Crim. App. September 26, 2008)(applying Rule 32.2(a)(3) &(5)); *Hooks v. State*, 21 So.3d 772 (Ala. Crim. App. 2008)(applying Rule 32.2(a)(3), (4) &(5)).

procedurally barred, it is clear that an alternative holding by a state court does not mean that this court can ignore the procedural default and address the merits of the claims. *See Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) ("[W]here a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court *should apply the state procedural bar and decline to reach the merits of the claim*." (*citing Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989)))(emphasis added).

Because the Alabama Court of Criminal Appeals clearly found that these *Brady* claims were procedurally defaulted, and the court's findings rest upon firmly established and regularly followed state procedural rules, the *Brady* claims are procedurally barred from review in this court and they are due to be dismissed.

## IX.   IT WAS ERROR FOR THE TRIAL COURT TO FIND THE EXISTENCE OF THE HEINOUS, ATROCIOUS OR CRUEL AGGRAVATING FACTOR IN THIS CASE

The petitioner maintains that "[t]he State of Alabama did not properly prove the heinousness aggravating circumstance in Petitioner's case." *Petition* at 30.  In rejecting this claim when it was raised on direct appeal, the Alabama Court of Criminal Appeals found as follows:[17]

> Hardy contends that the trial court's finding that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses was erroneous "for a number of reasons." *See* § 13A-5-49(8).  The only grounds asserted, however, are that the prosecution did not "properly" prove

---

[17]   The Alabama Supreme Court did not specifically address this claim, but found that the "Court of Criminal Appeals has not erred to reversal in its treatment of any of the other issues argued by Hardy." *Ex Parte Hardy*, 804 So. 2d at 308.

this aggravating circumstance and that the facts of this crime, when compared to those cases in which we have held that the circumstance was supported by the evidence, do not separate this crime from other capital murders.

The trial court made the following pertinent findings:

> The court finds the State has proven beyond a reasonable doubt the offense was especially heinous, atrocious, and cruel. This crime is set apart from other capital cases in that the crime was a conscienceless and pitiless crime and was unnecessarily torturous to the victim. The defendant shot and killed Clarence Nugene Terry. When the first shot was fired, the victim ran behind the counter and attempted to hide, rolling himself into a ball; however, the defendant leaned over the counter and shot the victim in the chest. After doing so, the defendant then stood over the victim and shot him in the head at least five more times while the victim lay unarmed and helpless on the floor. Further, the victim did not die immediately after the first shot, but lived for at least fifteen (15) seconds while the defendant continued to fire shots into his head. Therefore, the aggravating circumstance specified in Section 13A-5-49(8), *Code of Alabama*, does exist and is considered by the court in determining the appropriate sentence to impose in this case.

(C.R. 30-31.)

We find that the trial court's findings are fully supported by the record, and we concur in them.

> The evidence in this case clearly supports the trial court's finding that this capital offense was especially heinous, atrocious, and cruel. The appellant shot the victim in the wrist and then shot the victim in the head after she had fallen to the ground. "When a defendant deliberately shoots a victim in the head in a calculated fashion, after the victim has already been rendered helpless by [prior] gunshots . . ., such 'extremely wicked or shockingly evil' action may be characterized as especially heinous, atrocious, or cruel." *Lawhorn v. State*, 581 So.2d 1159 (Ala.Crim.App. 1990), *aff'd*, 581 So.2d 1179 (Ala.), *cert. denied*, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991). *See also McWilliams v. State*, 640 So.2d 982 (Ala.Crim.App. 1991), *aff'd in part, remanded in part on other grounds* [640 So.2d 1015 (Ala. 1993), *aff'd after remand*, 666 So.2d 89

(Ala.Crim.App. 1994), *aff'd*, 666 So.2d 90 (Ala.1995) ]. *Bush v. State*, 431 So.2d 555 (Ala.Crim.App. 1982), *aff'd*, 431 So.2d 563 (Ala.), *cert. denied*, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). Further, "[e]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, and cruel. *Ex parte Whisenhant*, 555 So.2d 235, 243-44 (Ala.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990)." *White v. State*, 587 So.2d 1218 (Ala.Crim.App. 1990), *aff'd*, 587 So.2d 1236 (Ala. 1991), *cert. denied*, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).

*Rieber v. State*, 663 So.2d 985, 993 (Ala.Crim.App. 1994), *aff'd*, 663 So.2d 999 (Ala.), *cert. denied*, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995). *See also Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); *Lindsey v. Thigpen*, 875 F.2d 1509 (11th Cir. 1989); *Bush v. State*, 695 So.2d 70 (Ala.Crim.App. 1995), *aff'd*, 695 So.2d 138 (Ala. 1997). Finally, we note that the prosecution's evidence met the burden set out in *Ex parte Clark*, 728 So.2d 1126 (Ala. 1998): the victim was in fact conscious and aware during most of the ordeal.

*Hardy*, 804 So. 2d at 287-288.

Hardy contends that the state court's finding that the state had proven beyond a reasonable doubt that the offense was "especially heinous, atrocious, and cruel," was contrary to *Maynard v. Cartwright*, 486 U.S. 356 (1988), which held that a similar aggravating circumstance in Oklahoma's death-penalty statute was unconstitutionally vague. *Petitioner's Reply Brief* (doc. 26) at 35. However, Alabama courts have consistently interpreted its heinous, atrocious, and cruel factor to include only those crimes that are "conscienceless . . . pitiless [or] unnecessarily torturous to the victim." *Ex Parte Whisenhant*, 555 So. 2d 235, 244 (Ala. 1989) (*quoting Ex Parte Kyzer*, 399 So. 2d 330, 334 (Ala. 1981)). This narrowed interpretation has consistently survived Eighth Amendment vagueness challenges. *Lindsey v. Thigpen*, 875 F.2d 1509, 1513-1514 (11th Cir. 1989). The Eleventh Circuit has

determined Alabama's application of the heinous, atrocious and cruel factor satisfies federal constitutional muster, and this necessarily includes the way the state has consistently weighed and applied fear into the analysis.  *Lindsey*, 875 F.2d at 1514 (*interpreting Godfrey*, 446 U.S. at 422-429; *Maynard v. Cartwright*, 486 U.S. 356  (1988)).

The evidence at trial revealed that the petitioner shot the unarmed victim in the chest after he fled, attempting to hide from the petitioner, then stood over the victim and shot him at least five more times in the head, while the victim lay helpless on the floor.  The evidence further established that the victim did not die immediately, but lived for at least fifteen seconds while the petitioner continued to fire shots into his head.  In light of this evidence, it is clear that the murder was "conscienceless . . . pitiless [or] unnecessarily torturous to the victim."  The state court's rejection of the claim was in no way contrary to or an unreasonable application of clearly established federal law.  Likewise, it was not an unreasonable determination of the facts in light of the evidence before it.  This claim is due to be dismissed.

## X.    THE TRIAL COURT SHOULD HAVE CONDUCTED FULLY SEQUESTERED VOIR DIRE

Hardy asserts that the "trial court committed reversible error at [his] capital trial by failing to conduct individually sequestered voir dire because there had been prejudicial and inflammatory pretrial publicity and a substantial possibility of prejudice existed." *Petition* at 32-33.  He adds that by "not conducting individually sequestered voir dire, the trial court denied [his] rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution." *Id.* at 33.

In denying this claim on direct appeal, the Alabama Court of Criminal Appeals found as follows:[18]

> Hardy contends that the trial court erred in failing to conduct individually sequestered voir dire of the jury venire to determine whether any veniremember's impartiality had been affected by pretrial publicity.
>
> In Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court. *Browning v. State*, 549 So.2d 548 (Ala.Cr.App. 1989); *Bui v. State*, 551 So.2d 1094 (Ala.Cr.App. 1988), *aff'd*, 551 So.2d 1125 (Ala. 1989), *vacated [on other ground]*, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991).
>
> *Coral v. State*, 628 So.2d 954 (Ala.Cr.App. 1992), *aff'd*, 628 So.2d 1004 (Ala. 1993), *cert. denied*, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). Furthermore, "'the decision of the trial court in denying individual voir dire examination will not be disturbed absent abuse of that discretion.'" *Henderson v. State*, 583 So.2d 276, 283 (Ala.Crim.App. 1990), *aff'd*, 583 So.2d 305 (Ala. 1991), *cert. denied*, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992) (*quoting Hallford v. State*, 548 So.2d 526, 538 (Ala.Crim.App. 1988), *aff'd*, 548 So.2d 547 (Ala.), *cert. denied*, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989)).
>
> Before trial, Hardy filed a motion to be allowed to individually voir dire the veniremembers. In conditionally denying the motion, the trial court stated, "Should a venire member give an answer indicating the necessity for sequestration, that individual veniremember shall be questioned individually on that subject." (C.R.201.) The trial court separated the venire into panels, and each panel was thoroughly questioned by the court and by Hardy's and Sneed's defense counsel regarding the members' exposure to pretrial publicity and whether they could set aside anything that they had heard and decide the case fairly and impartially. Thereafter, counsel was allowed to individually question any member whose answer caused concern. In fact, the trial court granted counsel wide latitude in the questioning of the venire as a whole and in individually questioning particular members.

---

[18]   The Alabama Supreme Court did not specifically address this claim, but found that the "Court of Criminal Appeals has not erred to reversal in its treatment of any of the other issues argued by Hardy." *Ex Parte Hardy*, 804 So. 2d at 308.

We conclude that the trial court did not abuse its discretion in its handling of the voir dire examination, and thus find no error.

*Hardy*, 804 So. 2d at 288-289.

It is well established that trial courts are granted wide discretion in conducting voir dire. *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991). No court has held that an individualized, segregated voir dire is constitutionally required. *Berryhill v. Zant*, 858 F.2d 633,643 (11th Cir. 1988)(*citing Patton v. Yount*, 467 U.S. 1034 n. 10 (1984) (noting that individual sequestered voir dire, while not controlling, "is not an insubstantial" factor in the presumed prejudice analysis)). In *Mu'Min*, the Supreme Court observed that as a general rule, trial courts are afforded "wide discretion . . . in conducting *voir dire* in the area of pretrial publicity," and that "primary reliance on the judgment of the trial court makes good sense." *Mu'Min,* 500 U.S. at 427. The ultimate inquiry is "not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." *Id.* at 430 (*quoting Patton,* 467 U.S. at 1035. The Constitution does not "require[ ] . . . that the jurors be totally ignorant of the facts and issues involved." *Mu'Min,* 500 U.S. at 430.

As in *Mu'Min*, the voir dire proceedings in Hardy's case were "by no means perfunctory." *Id.* at 431. Rather, the record reflects that the voir dire of the venire panels was extensive and thorough. *See* Voir Dire Proceedings, Vols. 4-13, Tab R-7, pp. 233-2047. As the Alabama Court of Criminal Appeals found:

> The trial court separated the venire into panels, and each panel was thoroughly questioned by the court and by Hardy's and Sneed's defense counsel regarding the members' exposure to pretrial publicity and whether they could set aside anything that they had heard and decide the case fairly and impartially.

89

> Thereafter, counsel was allowed to individually question any member whose answer caused concern.  In fact, the trial court granted counsel wide latitude in the questioning of the venire as a whole and in individually questioning particular members.

*Hardy*, 804 So. 2d at 289.

The trial court's examination of prospective jurors was within "the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias." *Mu'Min*, 500 U.S. at 427.  There is no indication that the petitioner was prejudiced by the trial court conducting voir dire examination of prospective jurors in panels rather than individually.  Thus, the Alabama Court of Criminal Appeals' denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law.  This claim is due to be dismissed.

## XI.   THE TRIAL COURT SHOULD HAVE ORDERED A CHANGE OF VENUE FOR THE PETITIONER'S TRIAL

Hardy offers the following in support of this claim:

> A criminal defendant is entitled to a trial by an impartial jury "free from outside influences." *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966).  Due process mandates that when there is pervasive, inflammatory pre-trial publicity, *Rideau v. Louisiana*, 373 U.S. 723 (1963), a defendant is entitled to a change of venue.  Moreover, Alabama law entitles a defendant to a change of venue where a fair and impartial jury cannot be seated. *Ala. Code* § 15-2-20 (1975); Rule 10.1, *Alabama Rules of Criminal Procedure* (1991); *Arthur v. State*, 472 So. 2d 650, 659 (AIa.Cr.App. 1984), *rev'd on other grounds*, 472 So. 2d 665 (Ala. 1985).  Petitioner's capital trial was held in Morgan County.  Both the written and the broadcast media extensively covered the tragic murder, the investigation, and Petitioner's arrest. (C. 45, 179-181)  Petitioner's co-defendant, Mr. Sneed, had given an inculpatory statement to television reporters while he was being booked at the Morgan County Jail. (R-2375)  Moreover, many jurors in the jury pool had heard about the case. (R-303, 549,  658-662, 1137, 1256-58)  In one venire panel, the entire panel had

90

heard or read about the crime. (R-1548)  The trial court, however, failed to order a change of venue. (R. 67)  This failure violated state law and denied Mr. Hardy his right to a fair sentencing hearing by an impartial jury guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

*Petition* at 33-34.[19]

After commenting on the petitioner's lack of factual discussion of this claim when he raised it on direct appeal,[20] the Alabama Court of Criminal Appeals denied the claim.[21]

> In addressing the trial court's denial, we foremost note that Hardy's motion was not "made on oath," as required by Rule 10.1(c), and thus is procedurally defective.  *See Ivery v. State*, 686 So.2d 495, 513 (Ala.Crim.App. 1996), *aff'd as to sentence after remand*, 686 So.2d 520 (Ala.Crim.App. 1996) (death penalty case); *Callahan v. State*, 557 So.2d 1292, 1306 (Ala.Crim.App.), *aff'd*, 557 So.2d 1311 (Ala. 1989), *cert. denied*, 498 U.S. 881, 111 S.Ct. 216, 112 L.Ed.2d 176 (1990) (review of denial of a motion for a change of venue in a death penalty case, under requirement of § 15-2-20(a), that the application be sworn to).
>
> Moreover, Hardy's unsworn allegations are rendered impotent by application of the following principles:
>
> > "It is well established in Alabama . . . that the existence of pretrial publicity, even if extensive, does not in and of itself

---

[19] As is the case with most of his claims, Hardy's argument in the petition is virtually identical to the claim presented in his brief on direct appeal.  *See* Vol. 25, Tab R-31, pp. 54-55.  The petitioner did not address this claim in his reply brief.

[20]      We in no way condone a party's reliance on the mere citing of page numbers from the record, without a discussion of the pertinent facts from those pages and application of the pertinent law to those facts.  We consider such reliance an indication of a lack of merit of the contention the party asserts.  Nonetheless, out of an abundance of caution, we will review Hardy's claim.

*Hardy*, 804 So. 2d at 289.

[21] The Alabama Supreme Court did not specifically address this claim, but found that the "Court of Criminal Appeals has not erred to reversal in its treatment of any of the other issues argued by Hardy."  *Ex Parte Hardy*, 804 So. 2d at 308.

constitute a ground for changing venue and thereby divesting the trial court of jurisdiction of an offense." *Ex parte Fowler*, 574 So.2d 745, 747 (Ala. 1990).

> "The defendant has failed to satisfy the test set out in *Ex parte Grayson*, 479 So.2d 76, 80 (Ala.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), because he has not proved that 'there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity.' 'Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue.' *Id*. 'The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved.' *Id*. 'The relevant question is not whether the community remembered the case, but whether the jurors at [the defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.' *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).

>> "To ensure that the defendant has a fair and impartial jury, it is not necessary that the veniremembers be totally ignorant of the facts surrounding the case. *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 724, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)."

> *Ex parte Whisenhant*, 555 So.2d 235, 238 (Ala. 1989).

*Kuenzel v. State*, 577 So.2d 474, 483-84 (Ala.Cr.App. 1990), *affirmed*, 577 So.2d 531 (Ala.), *cert. denied*, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).

. . . .

92

A criminal defendant is not constitutionally
entitled to trial by jurors ignorant about relevant
issues and events. . . . "The relevant question is
not whether the community remembered the case,
but whether the jurors . . . had such fixed
opinions that they could not judge impartially the
guilt of the defendant." . . . In determining the
existence of presumptive prejudice, a court must
consider the totality of the circumstances,
including the type of pretrial publicity, the time
lapse between peak publicity and the trial, and the
credibility of prospective jurors who indicate
during voir dire that they could be impartial
despite having been exposed to pretrial publicity
about the case. . . .   We note that "the
presumptive prejudice standard . . . is only 'rarely'
applicable . . . and is reserved for an 'extreme
situation.' " . . . "In short, the burden placed upon
the petitioner to show that pretrial publicity
deprived him of his right to a fair trial before an
impartial jury is an extremely heavy one."

*United States v. Lehder-Rivas*, 955 F.2d 1510, 1524 (11ᵗʰ Cir.),
*cert. denied*, 506 U.S. 924, 113 S.Ct. 347, 121 L.Ed.2d 262
(1992).

Our review convinces this Court that the trial judge did
not abuse his discretion in denying the motion for a change of
venue.

"The trial court's findings of impartiality
should be overturned only for 'manifest error.'
*Irvin v. Dowd*, 366 U.S. 717, 724, 81 S.Ct. 1639,
6 L.Ed.2d 751 (1961)." *Fortenberry v. State*, [545
So.2d 129 (Ala.Cr.App. 1988), *affirmed*, 545
So.2d 145 (Ala. 1989), *cert. denied*, 495 U.S. 911,
110 S.Ct. 1937, 109 L.Ed.2d 300 (1990) ].
"Absent a showing of abuse of discretion, a trial
court's ruling on a motion for change of venue
will not be overturned.  *Ex parte Magwood*, 426
So.2d 929, 931 (Ala.), *cert. denied*, 462 U.S.
1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983)."
*Ex parte Grayson*, 479 So.2d [76, 80 (Ala.), *cert.*

93

> *denied*, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d
> 157 (1985)]. We find no abuse of discretion by
> the trial court or manifest error in his finding of
> impartiality.

> *Oryang v. State*, 642 So.2d 979 (Ala.Cr.App. 1993) (every
> member of venire indicated that they had been exposed to
> pretrial publicity). *See also Thomas v. State*, 539 So.2d 375, 394
> (Ala.Cr.App.) ('[a]t the beginning of voir dire, every member of
> the venire stated he or she had read or heard about this case'),
> *affirmed*, 539 So.2d 399 (Ala. 1988), *cert. denied*, 491 U.S. 910,
> 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989). Here, as in *Thomas*,
> 539 So.2d at 395, the appellant has "failed to show a connection
> between the pre-trial publicity and the existence of actual jury
> prejudice."

*Smith v. State*, 646 So.2d 704, 706-07 (Ala.Crim.App.) (where every
veniremember acknowledged having heard of the capital offense), *cert. denied*,
646 So.2d 704 (Ala.1994). *See also Holladay v. State*, 549 So.2d 122, 126
(Ala.Crim.App. 1988) ("The fact that virtually every prospective juror had
some knowledge of the appellant's case does not mean the appellant could not
receive a fair and impartial trial."), *aff'd*, 549 So.2d 135 (Ala.), *cert. denied*,
493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).

In applying the above principles, we first note that Hardy did not
introduce any evidence whatsoever of any pretrial media coverage, much less
substantial, prejudicial publicity. Thus, he has not shown that the media
coverage saturated the community with prejudicial publicity. *See Spurgeon v.
State*, 560 So.2d 1116, 1122 (Ala.Crim.App. 1989), relying on *Ex parte
Kennedy*, 472 So.2d 1106, 1113 (Ala.), *cert. denied*, 474 U.S. 975, 106 S.Ct.
340, 88 L.Ed.2d 325 (1985).

Moreover, although Hardy contends that a review of the cited pages
from the record shows that he was actually prejudiced by any pretrial publicity,
we can find no evidence in the record to support this conclusory and
unfounded assertion. The voir dire of the venire panels, which covered
approximately 1,750 pages of the transcript, was extensive and thorough.
Those veniremembers who, during questioning of each panel, indicated any
specific familiarity with the case were questioned individually. Those
veniremembers who could remember details about the crime either were struck
for cause or were allowed to remain on the venire because they assured the
court that they would not be prejudiced in any way by their knowledge of the
case. A review of the other responses of the veniremembers who were not

excused and to whom Hardy is presumably referring by the pages cited, shows that each assured the court that he or she would set aside any information gained by any pretrial publicity and render a verdict solely on the evidence presented at trial.

The burden of proof is on the defendant to "show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried."  Rule 10.1(b), Ala.R.Crim.P.  Hardy failed to meet this burden. "Rather, he has simply made bare allegations that there was prejudicial pretrial publicity and that this publicity biased the jurors" and thus "did not show that he could not receive a fair trial."  *Hyde v. State*, 778 So.2d 199, 232 (Ala.Crim.App. 1998).  *See also Henderson v. State*, 612 So.2d 1256, 1258 (Ala.Crim.App. 1992) ("A bare allegation is not sufficient to prove that the defendant was actually prejudiced or that the community was so saturated with prejudicial publicity as to render the trial setting inherently suspect."); *Callahan v. State*, 557 So.2d at 1306 ("Having produced no evidence, Callahan failed to demonstrate any prejudice, or even that pretrial publicity actually existed, and the trial court properly denied his motion on that ground.").  The trial court did not abuse its discretion in denying Hardy's motion for a change of venue.

*Hardy*, 804 So. 2d at 291-294.

In *Meeks v. Moore*, 216 F.3d 951, 960-61 (11th Cir. 2000), the Eleventh Circuit announced:

The law on pretrial publicity as it relates to the necessity for a change of venue is clear.  The standards governing this area

derive from the Fourteenth Amendment's due process clause, which safeguards a defendant's Sixth Amendment right to be tried by a panel of impartial, indifferent jurors.  The trial court may be unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere.  In such a case, due process requires the trial court to grant defendant's motion for a change of venue. . . .

*Coleman v. Kemp*, 778 F.2d 1487, 1489 (11th Cir. 1985) (internal citations and quotation marks omitted).  This does not mean, however, that a defendant is entitled to a change of venue whenever potential jurors have been exposed to the facts of the case.

It is not required . . . that jurors be totally ignorant of the facts and issues involved.  In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in criminal cases.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd*, 366 U.S. 717, 722-23, 81 S. Ct. 1639, 1642-43, 6 L. Ed. 2d 751 (1961).

A defendant is entitled to a change of venue if he can demonstrate either "actual prejudice" or "presumed prejudice."

To find the existence of actual prejudice, two basic prerequisites must be satisfied.  First, it must be shown that one or more jurors who decided[22] the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty.  Second, these jurors, it must be determined, could not have laid aside these preformed opinions and rendered a verdict based on the evidence presented in court.

*Coleman v. Zant*, 708 F.2d 541, 544 (11th Cir. 1983) (internal citations and quotation marks omitted).  If a defendant cannot show actual prejudice, then he must meet the demanding presumed prejudice standard.

Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.  The presumed prejudice principle is rarely applicable, and is reserved for an extreme situation . . . . [W]here a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the

---

[22]   The word "decided" references only those individuals who are chosen as jurors in a defendant's case.  *See Coleman v. Zant*, 708 F.2d 541, 544 (11th Cir. 1983).  Therefore, venire members who were not chosen as jurors are immaterial to the actual prejudice standard.

> community as to render virtually impossible a fair trial by an
> impartial jury drawn from the community, jury prejudice is
> presumed and there is no further duty to establish bias.

*Kemp*, 778 F.2d at 1490 (internal citations and quotation marks omitted); see also Manning v. State, 378 So. 2d 274, 276 (Fla. 1979) ("[A] determination must be made as to whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom.").

*Meeks v. Moore*, 216 F.3d at 960- 961.  *See also,  Mills v. Singletary*, 63 F.3d 999, 1009 (11th

Cir. 1995) (*quoting United States v. De La Vega*, 913 F.2d 861, 864-65 (11th Cir. 1990), *cert.*

*denied*, 500 U.S. 916 (1991); *United States v. Lehder-Rivas*, 955 F.2d 1510, 1525 (11th Cir.),

*cert. denied*, 506 U.S. 924 (1992)).

> To determine whether [a petitioner] has established presumed prejudice,
> we examine whether: (1) the pretrial publicity was sufficiently prejudicial and
> inflammatory; and (2) the publicity saturated the community in which the trial
> was held.  *See Coleman*, 708 F.2d at 544 (*relying on Murphy v. Florida*, 421
> U.S. 794, 798-99, 95 S. Ct. 2031, 2035-36, 44 L. Ed. 2d 589 (1975); *Rideau
> v. Louisiana*, 373 U.S. 723, 726-27, 83 S. Ct. 1417, 1419-20, 10 L.Ed.2d 663
> (1963); and *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir.1980), *cert.
> denied*, 451 U.S. 913, 101 S. Ct. 1986, 68 L. Ed. 2d 303 (1981)).  This court
> has repeatedly noted that the principle of presumed prejudice "is rarely
> applicable and reserved for extreme situations."  *Bundy v. Dugger*, 850 F.2d
> 1402, 1424 (11th Cir. 1988), *cert. denied*, 488 U.S. 1034, 109 S. Ct. 849, 102
> L. Ed. 2d 980 (1989); *Woods v. Dugger*, 923 F.2d 1454, 1459 (11th Cir.), *cert.
> denied*, 502 U.S. 953, 112 S. Ct. 407, 116 L. Ed. 2d 355 (1991).

*Mills v. Singletary*, 63 F.3d at 1010.  A proper inquiry involves review of a "number of factors

[to] determin[e] whether the totality of the circumstances raised" the presumption of

prejudice.  *Patton v. Yount*, 467 U.S. 1025, 1030 (1984).  A trial court's findings concerning

this issue will be overturned "only for 'manifest error.'"  *Id*. (*citing Irvin v. Dowd*, 366 U.S.

at 723).

Case 5:07-cv-01222-IPJ-RRA   Document 30   Filed 09/21/10   Page 98 of 132

In stating his claim, Hardy has not distinguished between actual prejudice and presumed prejudice.  In order to establish actual prejudice, Hardy would have to show that one or more of the jurors who decided his case entertained an opinion, before hearing the evidence adduced at trial, that he was guilty, and that these jurors could not have laid aside these pre-formed opinions and rendered a verdict based on the evidence presented in court. *See Meeks*, 216 F.3d at 960-961.  Hardy has not so much as alleged that any juror was of the opinion that he was guilty before hearing the evidence.  Therefore, he has failed to show that he suffered actual prejudice such that the trial court's refusal to change venue was either contrary to or involved an unreasonable application of clearly established federal law, or was based upon an unreasonable determination of the facts in light of the evidence before it.

At best, Hardy's claim alleges that prejudice should be presumed due to media coverage of the murder.

> Petitioner's capital trial was held in Morgan County.  Both the written and the broadcast media extensively covered the tragic murder, the investigation, and Petitioner's arrest. (C. 45, 179-181) Petitioner's co-defendant, Mr. Sneed, had given an inculpatory statement to television reporters while he was being booked at the Morgan County Jail.  (R-2375)  Moreover, many jurors in the jury pool had heard about the case. (R-303, 549, 658-662, 1137, 1256-58) In one venire panel, the entire panel had heard or read about the crime. (R-1548).

*Petition* at 33.  When faced with the petitioner's lack of discussion of facts with regard to this claim, the Alabama Court of Criminal Appeals gleaned the following from the pages referenced by the petitioner:

> We first note that the first series of page citations-C. 45, 179-81-is Hardy's unsworn motion for a change of venue and his unsworn request for an evidentiary hearing on the motion for a change of venue.

98

We further note that on R. 2375, the chief detective for the Decatur Police Department testified that Sneed spoke to some reporters, including a television reporter. This testimony was *after* the trial court's denial of Hardy's motion for a change of venue and would also have been insufficient as evidence of pretrial publicity.

We assume that, by citing to R. 303, Hardy is referring to the individual voir dire answers of veniremember B.L.T. that she did not know if she could consider the case fairly and impartially and that she had heard that "they did have a video and different things of what had happened," such as the fact that the victim begged his assailants not to shoot him. She also explained, on R. 302, that her sister, an employee of a Bud's Convenience Store, talked a lot about the crime when it happened and that she worries for her sister's safety. The defenses' challenges for cause of this veniremember were granted. (R. 331.)

We assume that, by citing to R. 549, Hardy is referring to D.R.P.'s affirmative answer, in the voir dire of panel 1, to the question whether any one remembered thinking, when he or she heard of the crime, that this was a very horrible crime. He subsequently stated that he "just remembered the fact that it was supposedly on film and that [the victim] was shot several times." (R. 551.) During individual voir dire, D.R.P. also remembered that one suspect was caught in Louisville and the other was from Tanner (R. 604); he stated that, during the week following the crime, the newspaper published daily articles about it (R. 604); he answered that his recollection would not affect his ability to determine the facts in evidence and apply the law as instructed by the court (R. 607-08); and he assured the court that he could set aside any preconceived notions or information and render a fair and impartial verdict on the evidence introduced at trial (R. 608).

We assume that, by citing to R. 658-62, Hardy is referring to R.L.B.'s response that he had heard about the case on "the news" (R. 658); and to the responses of L.S.B., E.H.H., E.J.W., W.E.E., and B.L.S. that they had read about the case in the newspaper. Only two answered that they remembered details: R.L.B., who remembered only "bits and pieces," which he did not specify (R. 661), and L.S.B., who remembered "names" and location (R. 662). No member of panel 2 responded to the question whether any one feels that he or she could not disregard what he or she had read or heard in favor of the evidence at trial. The defenses' challenges for cause of L.S.B., based on her responses regarding the death penalty, were granted (R. 860). R.L.B. was questioned individually because he was the only other member of panel 2 to specifically remember the crime. During this voir dire, R.L.B. stated that he read the newspaper coverage on the previous Sunday and that he had not

99

formed an opinion on the question of guilt; he answered that he had not read or heard anything that would have disclosed any facts that indicated either defendant's guilt; and he gave the assurance that he believed he could consider only the evidence introduced at trial.

We assume that, by citing to R. 1137, Hardy is referring to the individual voir dire of B.J.S. On the page cited, B.J.S. stated that he had read a newspaper article published soon after the crime occurred. B.J.S. also stated during individual voir dire that he remembered that Sneed was from Kentucky, that Sneed had been picked up there and brought back, and that Hardy was from Tanner (R. 1137-38); that he could not remember any details of the crime (R. 1138); that he had not formed any opinion about the case (R. 1139); that what he had read would have no bearing on his determination of guilt or innocence (R. 1139); and that he pledged not to consider any knowledge gained from the media (R. 1140).

We assume that, by citing to R. 1256-58, Hardy is referring to the responses of C.E.S., S.D.M., L.L.B., L.D.H., S.R.W., and T.Y.B. that they had read about the crime in the newspaper and also the responses of J.L.K. and E.C.W. that they had heard about it. During the questioning of panel 4, no one responded when asked if anyone who had heard or read something about the crime could not go by the evidence, but would be affected by what he or she had heard or read. (R. 1259-60). The panel was also asked if any one remembered any facts about this case. All indicated that they did not. No veniremember responded to the inquiry whether any facts known to any veniremember indicate that either defendant was guilty. All indicated that he or she had not formed an opinion as to guilt or innocence on what he or she had heard or seen outside the courtroom. (R. 1425-26.) L.L.B. was excused because she and her husband were potential witnesses. (R. 1427-28.) E.C.W. was excused pursuant to a challenge for cause, based on her sentiments against the death penalty. (R. 1450.) T.Y.B. was also excused on a challenge for cause. (C.R.111.)

By citing to R. 1548, Hardy is referring simply to a question directed to panel 5: has anyone heard about this case? All panel members answered affirmatively. (R. 1549.) When asked if anyone remembered details, only S.D.P. answered. (R. 1550.) On individual voir dire, S.D.P. acknowledged that he had frequented the store at which the clerk had been killed and that he knew its layout; that he had seen the victim working there; that he knew that the crime was an execution-style robbery-murder and that it was on videotape; and that he knew how the defendants had been apprehended. (R. 1688-1706.) He further stated that this knowledge would not impair his ability to hear the

100

facts and to make a decision on only the evidence and that he would try the case fairly and impartially and apply the law as required.

*Hardy*, 804 So. 2d at 289-291.

To determine whether Hardy has established presumed prejudice, the court must examine whether the pretrial publicity was "sufficiently prejudicial and inflammatory" and whether the "publicity saturated the community in which the trial was held." *See Coleman v. Zant*, 708 F.2d at 544. The pages of the record cited by the petitioner show nothing more than that several of the potential jurors had heard about the crime, that several had read about the crime in the newspaper, and that several knew there was a video of the crime. There is simply nothing in the record to indicate that any of the information seen or heard by the venire was "sufficiently prejudicial and inflammatory" or that "publicity saturated the community in which the trial was held." Therefore, Hardy has failed to show that the state court's determination that his motion for a change of venue was properly denied because he had not set forth facts to establish that prejudice should be presumed, was either contrary to or involved an unreasonable application of clearly established federal law, or was based upon an unreasonable determination of the facts in light of the evidence before it. This claim is due to be dismissed.

## XII.   THE QUALIFIED VENIRE WAS IMPERMISSIBLY SMALL

In support of this claim, Hardy states the following:

> After qualifying the venire, the list of potential jurors consisted of 58 individuals. (R. 2016) Under the Alabama Rules of Criminal Procedure, a capital jury for an individual defendant cannot consist of fewer than thirty-six (36) qualified individuals. Ala.R.Cr.P.18.4(f)(1)(i-iii) (1991). Where there are

multiple defendants in a non-capital felony, the rule provides that "there shall be added twelve (12) additional names for each additional defendant." Ala.R.Cr.P.18.4(f)(2). However, Rule 18.4 is silent on the number of jurors to be added in capital felony cases. In the absence of clear statutory language, this Court must interpret the statute in a manner that is both logical and consistent; in this instance, that the absolute minimum number of qualified individuals on a venire in a capital trial with two defendants is sixty. The trial court, in this instance, failed to ensure that there was a sufficient number of individuals on the venire, and improperly denied defense counsel's request to add more qualified individuals to the venire. (C-92-93, R-216, 2020, 2024). The addition of names to the venire list provided for under Rule 18.4 clearly applies to non-capital felonies only. Any other reading would lead to nonsensical results: in the case of a misdemeanor trial, two co-defendants would be entitled to a venire with eighteen additional individuals (three times the number of a lone defendant), while in a capital trial, two co-defendants would have a venire with only 36 additional individuals (only one and a half times the number of a lone defendant). Such an interpretation of the code clearly would penalize the capital defendant and favor a defendant accused of a misdemeanor. Such an interpretation stands in conflict with the well-founded rule that "death is different" and a capital defendant is entitled to heightened, not lowered, constitutional and procedural protections. A far more logical interpretation requires that for each co-defendant, the number of additional individuals added to the qualified venire list is increased by the number of surplus venire members that a lone defendant is entitled. Thus, non-capital felony co-defendants are entitled to thirty-six qualified venire members, misdemeanor co-defendants are entitled to a twenty-four member qualified venire, and capital co-defendants are entitled to a sixty member venire. Furthermore, the legislature has a history of clearly specifying when legislation applies to capital cases, and it made no such specification in this instance. *See, e.g.*, AIa.R.Crim.P.19.3(a)(1)(explicitly distinguishing capital from non-capital felonies). Thus, the very silence of the statute indicates that the language requiring an addition of twelve venire members for each co-defendant added to a case applies to non-capital felony cases only. Petitioner was denied his right to a fair and impartial jury under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

*Petition* at 34-36.

The Alabama Court of Criminal Appeals[23] address this claim and found it to be without merit:

> Hardy next contends that the qualified venire, from which his jury was drawn, was impermissibly small.  This argument is based on his asserted premise that Ala.R.Crim.P. 18.4, setting out the procedure for selecting a jury, is silent on the number of veniremembers to be added to the venire for each additional defendant tried in a joint capital trial.  However, this is not the case.

> The pertinent portion of Rule 18.4 states:

> (1) In general. After voir dire examination of the prospective jurors has been completed and challenges for cause have been exercised, the court shall cause to be compiled a list of names of prospective jurors who are competent to try the defendant, from which list the jury shall be obtained. If, in compiling the list, names of qualified prospective jurors are omitted, such omissions shall be made on a nondiscriminatory basis. Unless the parties consent to the use of a lesser number, the number of names appearing upon the list shall be not less than:

> > (i) Thirty-six (36), if the offense charged is punishable by death;

> > . . . .

> (2) Two or more defendants.  If two (2) or more persons are being tried jointly, *to the minimum number of names otherwise required* for striking there shall be added twelve (12) additional names for each additional defendant; provided, there shall then also be added so many additional names as may be necessary to allow all defendants an equal number of strikes. . . .

> (Emphasis added.)

> We do not see a need to apply a strained interpretation to Rule 18.4(2), as Hardy asks; the rule is clear on its face.  Reading 18.4(1) and (2) *in pari materia*, as we must, it is plain that for each additional defendant, 12 jurors are

---

[23]   The Alabama Supreme Court did not specifically address this claim, but found that the "Court of Criminal Appeals has not erred to reversal in its treatment of any of the other issues argued by Hardy." *Ex Parte Hardy*, 804 So. 2d at 308.

to be added to the 36 jurors required when the offense charged is punishable by death.

Hardy's contention in this regard is without merit.

*Hardy*, 804 So. 2d at 294.

The respondent maintains that this issue fails to state a claim for habeas relief because it presents only a question of state law and that federal habeas corpus does not lie to review errors, if any, under state law. *Respondent's Brief* (doc. 17) 59 (*citing Pulley v. Harris*, 456 U.S. 37, 41 (1984) and *Breedlove v. Moore*, 279 F.3d 952, 963-964 (11th Cir. 2002)(state courts are "the final arbiter of [State] evidentiary law; [thus,] federal courts must respect that law absent a constitutional violation.  A federal habeas court may not issue the writ on the basis of a state's interpretation of its own laws and rules, absent extreme circumstances.")). The petitioner, in his reply brief, again argues the merits of the claim. *Petitioner's Reply Brief* (doc. 26) at 39-41.

The petitioner's claim clearly involves a state court's interpretation of its own laws. Generally, a state court's "construction of state law is binding on federal courts entertaining petitions for habeas relief." *Beverly v. Jones*, 854 F.2d 412, 416 (11th Cir. 1988)(*quoting Tyree v. White*, 796 F.2d 390, 392-93 (11th Cir. 1986)).  "A federal habeas corpus court may not interfere with a state court's interpretation of state law absent a constitutional violation." *McCoy v. Newsome*, 953 F.2d 1252, 1264 (11th Cir. 1992) (citations omitted).  Questions of state law rarely raise issues of federal constitutional significance, because "[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved." *Carrizales v. Wainwright*, 699 F.2d 1053,

1055 (11th Cir. 1983)(citation omitted).  Federal courts review questions of state law in habeas proceedings only to determine whether the alleged errors were so critical or important to the outcome of the trial as to render "the entire trial fundamentally unfair." *Id.* at 1055 (defective jury charge raises issue of constitutional dimension "only if it renders the entire trial fundamentally unfair"); *see also Futch v. Dugger*, 874 F.2d at 1487 (improperly admitted evidence "must be inflammatory or gruesome, and so critical that its introduction denied petitioner a fundamentally fair trial").  "A denial of fundamental fairness occurs whenever the improper evidence 'is material in the sense of a crucial, critical, highly significant factor.'" *Snowden v. Singletary*,135 F.3d 732, 737  (11th Cir. 1998)(*quoting Osborne v. Wainwright*, 720 F.2d 1237, 1238 (11th Cir. 1983).  *See also Tejada v. Dugger*, 941 F.2d 1551, 1560 (11th Cir. 1991); *Shaw v. Boney*, 695 F.2d 528, 530 (11th Cir. 1983).

This court is bound by the Alabama Court of Criminal Appeals' interpretation that Rule 18.4 of the *Alabama Rules of Criminal Procedure* requires that the venire consist of forty-eight jurors, rather than sixty, as the petitioner argues.  Although Hardy cites *Pulley v. Harris*, 465 U.S. 37 (1984) for the proposition that "'an error of state law could be sufficiently egregious to amount to a denial of equal protection or due process of law guaranteed by the Fourteenth Amendment' to invoke habeas corpus jurisdiction," *Petitioner's Reply Brief* (doc. 26) at 39, he makes no argument that the state court's interpretation of Rule 18.4 violated his due process or equal protection rights, or that it rendered his entire trial fundamentally unfair.  Thus, this claim is due to be dismissed.

## XIII.   DOUBLE COUNTING ROBBERY AS AN ELEMENT OF THE CAPITAL OFFENSE AND AS AN AGGRAVATING CIRCUMSTANCE WAS IMPROPER

Hardy argues that "[t]he double counting of robbery both as an elevator in the guilt-phase and as an aggravator in the penalty-phase violated Petitioner's rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." *Petition* at 36.  When he raised this claim on direct appeal, the Alabama Court of Criminal Appeals found it to be without merit.[24]

> Hardy claims that, during the sentencing phase, it was a violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights for the prosecution to rely upon the robbery both as an element of capital murder and as an aggravating circumstance, and that as a result of the "double counting" of robbery, he was subjected to two punishments.  This practice of double counting has been upheld.  *Burton v. State*, 651 So.2d 641 (Ala.Crim.App. 1993), *aff'd*, 651 So.2d 659 (Ala. 1994), *cert. denied*, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).  *See also Hagood v. State*, 777 So.2d 162 (Ala.Crim.App. 1998).
>
> > Clearly, § 13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49.  Further, this court has repeatedly held that the use of an element of capital murder in such a way does not . . . punish a defendant twice.  *Kuenzel* ....
>
> 651 So.2d at 657-58.  Thus, the appellant's contention is without merit.  Having held that the jury's consideration of the robbery as an aggravating circumstance was proper, we also hold that, contrary to Hardy's assertion, the use of robbery as an aggravating circumstance did not result in an arbitrary imposition of the death penalty.  *See Williams v. State*, 710 So.2d 1276 (Ala.Crim.App. 1996), *aff'd*, 710 So.2d 1350 (Ala. 1997), *cert. denied*, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).

*Hardy*, 804 So. 2d at 294-295.

---

[24]   The Alabama Supreme Court did not specifically address this claim, but found that the "Court of Criminal Appeals has not erred to reversal in its treatment of any of the other issues argued by Hardy."  *Ex Parte Hardy*, 804 So. 2d at 308.

It is clearly established under federal law that dual use of an aggravating circumstance to satisfy an element of the capital offense during the guilt phase and as a factor in the sentencing phase is not unconstitutional.  *See Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (*citing Lowenfield v. Phelps*, 484 U.S. 231, 244-246 (1988)("the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase. . . .  The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)").

In light of the record, it was in no way unreasonable for the Alabama Court of Criminal Appeals to conclude that the petitioner's constitutional rights were not violated by the prosecution's reliance upon robbery both as an element of capital murder and as an aggravating circumstance.  Hardy has not demonstrated that the state appellate court's decision on this issue was contrary to, or an unreasonable application of, clearly established federal law, or that it was an unreasonable interpretation of the facts in light of the evidence before that court.  This claim is due to be denied.

## XIV.  THE PROSECUTION'S USE OF ITS PEREMPTORY CHALLENGE TO REMOVE FROM THE JURY A BLACK JUROR ON THE BASIS OF HER RACE VIOLATED THE PETITIONER'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

In support of this claim, Hardy alleges that the prosecution used one of its peremptory challenges to strike Eva Jones from the jury solely because she is black, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).  *Petition* at 37-39.  Although he made an unsuccessful

*Batson* objection at the conclusion of jury selection,[25] Hardy did not raise the claim on direct appeal or in his Rule 32 petition.  Rather, he raised this claim for the first time on appeal from the denial of his Rule 32 petition.  In finding the claim to be procedurally defaulted, the Alabama Court of Criminal Appeals found:

> The appellant argues the State improperly used a peremptory challenge to remove a black veniremember, solely on the basis of her race, a violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).
> Because this argument was presented for the first time on appeal, it is not properly before this Court for review.  *Boyd v. State*, supra; *Arrington v. State*, supra.  Moreover, because the claim could have been raised at trial and on direct appeal, it is procedurally precluded by Rule 32.2(a)(3) and (5), Ala. R. Crim. P.

*Hardy v. State*, 4 So.3d 585 (Ala. Crim. App. 2007)(table).[26]

The respondent contends that Hardy is procedurally barred from presenting this claim in federal court since the Alabama Court of Criminal Appeals found the claim to be procedurally barred.  *Respondent's Brief* (doc. 17) at 65 (*citing Wainwright v. Sykes*, 433 U.S. 72 (1977).  Hardy counters:

> However, if a state procedural rule is not regularly and consistently followed, the state cannot rely on it to bar the claims of the petitioner.  *See Ford v. Georgia*, 498 U.S. 411 (1991); *James v. Kentucky*, 466 U.S. 341 (1984).  In this case, the court reached the merits on some of Mr. Hardy's claims at the same time as finding a procedural default. (R. Rule 32 Supp. 12-16).  If the state court ignores the default and rules on the merits, the federal court may do the same.  *See e.g., Horsley v. Alabama*, 45 F.3d 1486, 1489-1490 (11th Cir. 1995).  Clearly, the state courts have not applied the procedural bar in a regular and consistent manner and the state cannot now rely on said procedural bar.

*Petitioner's Reply Brief* (doc. 26) 42-43.

---

[25]  Vol. 13, Tab R-8, pp. 2057-2069.

[26]  Vol. 32, Tab R-71, p. 10.

Although Hardy makes the conclusory allegation that "the state courts have not applied the procedural bar in a regular and consistent manner and the state cannot now rely on said procedural bar," he has not cited a single case in which the Alabama Court of Criminal Appeals has not followed its rule that an appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.  It is clear to this court that it is a firmly established and regularly followed procedural rule in Alabama that an appellate court will not consider a claim raised for the first time on appeal from the denial of a Rule 32 petition.  *See e.g.*, *Beckworth v. State*, CR-07-0051, 2009 WL 1164994, *38, n. 11 (Ala. Crim. App. May 01, 2009); *McNabb v. State*, 991 So.2d 313, 321 (Ala. Crim. App. 2007); *Wallace v. State*, 959 So.2d 1161, 1167 (Ala. Crim. App. 2006); *Murray v. State*, 922 So.2d 961, 963 n. 1 (Ala. Crim. App. 2005); *Boyd v. State*, 913 So.2d 1113, 1143-1144 (Ala. Crim. App. 2003); *Arrington v. State*, 716 So.2d 237, 239 (Ala. Crim. App. 1997); *Cleveland v. State*, 570 So.2d 855, 857 (Ala. Crim. App. 1990); *Morrison v. State*, 551 So.2d 435, 437 (Ala. Crim. App.), *cert. denied*, 495 U.S. 911 (1990).

Moreover, to the extent that Hardy asserts that "the court reached the merits on some of Mr. Hardy's claims at the same time as finding a procedural default," the court notes that the Alabama Court of Criminal Appeals clearly found that the *Batson* claim was procedurally barred, without so much as a mention of the merits of that claim.  Further, even if the appellate court had denied these claims on the merits after finding them procedurally barred, it is clear that an alternative holding by a state court does not mean that this court can ignore the procedural default and address the merits of the claims.  *See Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) ("[W]here a state court has ruled in the alternative, addressing

109

both the independent state procedural ground and the merits of the federal claim, the federal court *should apply the state procedural bar and decline to reach the merits of the claim*.")(*citing Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989))(emphasis added).

Because the Alabama Court of Criminal Appeals clearly found that the *Batson* claim was procedurally defaulted, and that finding rests upon a firmly established and regularly followed state procedural rule, the *Batson* claim is procedurally barred from review in this court.

## XV. ALABAMA'S STATUTORY SENTENCING SCHEME VIOLATES THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SEC. 6, 8, AND 11 OF THE ALABAMA CONSTITUTION

Hardy claims that he was sentenced to death in violation of *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002).  Specifically, he claims that:

A.    the jury did not make all of the findings necessary for imposition of the death penalty as *Ring* requires;

B.    the aggravating circumstances that made him eligible for the death penalty were not presented to the grand jury that indicted him; and

C.    he was sentenced to death by a judge rather than a unanimous jury upon proof beyond a reasonable doubt.

*Petition* at 40-43.

To the extent that Hardy is alleging a straight *Ring* claim, his claim is precluded by *Schriro v. Summerlin*, 542 U.S. 348 (2004).  In *Ring,* the Supreme Court held that a jury, and not a judge, must make all findings of fact, including aggravating factors, that render someone eligible for the death penalty.  *Id*. at 609.  However, the *Summerlin* Court held that "*Ring*

110

announced a new procedural rule that does not apply retroactively to cases already final on direct review." *Summerlin*, 542 U.S. at 358.   Under *Summerlin*, a petitioner may not appeal a conviction or bring a habeas attack based on *Ring* violations that occurred before *Ring* was handed down.   Hardy's conviction was final on November 26, 2001, prior to the Supreme Court's decision in *Ring*.   Therefore, *Ring is* inapplicable to his case and the claim is due to be denied.

To the extent that Hardy is claiming that his death sentence is invalid because his indictment did not reference the aggravating factors required for a death sentence, there is no federal constitutional requirement that the aggravators be included in the indictment.   The Fifth Amendment right to grand jury indictments does not extend to state prosecutions.   *See Apprendi v. New Jersey*, 530 U.S. 466, 477 n. 3 (2000) ("[The Fourteenth] Amendment has not, however, been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury' that was implicated in our recent decision in *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)"); *Hurtado v. California*, 110 U.S. 516, 520-521 (1884) (due process guarantee does not require an indictment by a grand jury in a state murder prosecution).   This claim is due to be denied.

Finally, to the extent that Hardy claims that his death sentence is invalid because the jury did not unanimously agree that the death penalty was warranted, there is no constitutional requirement that a jury make a finding beyond a reasonable doubt in the sentencing phase of a capital trial that the aggravating factors outweigh the mitigating factors. "The Federal Constitution's jury-trial guarantee assigns the determination of certain facts to the jury's exclusive province.   Under that guarantee, th[e United States Supreme] Court held

111

in *Apprendi*, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Oregon v. Ice*, 129 S.Ct. 711, 716 (2009) (*quoting Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (and acknowledging its extension to death penalty cases in *Ring v. Arizona*, 536 U.S. 584, 602, 609 (2002)).

In the instant case, the trial court found two aggravating circumstances, that Hardy "committed the capital offense while he and his accomplice were engaged in the commission of the robbery of Bud's Convenience Store and Clarence Nugene Terry," and that "the offense was especially heinous, atrocious and cruel." *Sentencing Order*, Vol. 32, Tab R-64, pp. 7-8. A unanimous jury found Hardy guilty beyond a reasonable doubt of murdering Clarence Nugene Terry during the commission of a robbery in the first degree, in violation of *Ala. Code* § 13A-5-40(a)(2),[27] thereby satisfying the mandates of the Constitution.

*Ring* and *Apprendi* established that capital defendants are entitled to a jury determination beyond a reasonable doubt of any fact that would increase the maximum punishment they face. In other words, an aggravating factor must be found by the jury beyond a reasonable doubt during the guilt phase of the trial, because a defendant's increased sentence, from the statutory maximum prison term to a death sentence, is dependent upon the jury's finding of an aggravating factor. *Ring* and *Apprendi* do not require a jury to make

---

[27] Additionally, during the sentencing phase of the trial, Hardy admitted that murder during the commission of a robbery was an aggravating circumstance. *Sentencing Order*, Vol. 32, Tab R-64, p. 7.

findings beyond a reasonable doubt, in the punishment phase of a capital trial, that the aggravating factors outweigh the mitigating factors.

Upon the unanimous jury verdict finding beyond a reasonable doubt that the murder was committed during the commission of a first degree robbery, Hardy became eligible for the death penalty.  The jury's consideration of whether the aggravating factors outweighed the mitigating factors could not have increased the maximum sentence for which Hardy was is eligible, since he was already eligible for the ultimate sentence, death.  Therefore, the fact that the jury did not unanimously vote to impose the death penalty does not render his sentence constitutionally infirm.[28]  This claim is due to be denied.

XVI.   **AS APPLIED IN ALABAMA, THE DEATH PENALTY CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT AND VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SEC. 15 OF THE ALABAMA CONSTITUTION**

The petitioner argues that:

Effective July 1, 2002 Alabama's method of execution became lethal injection unless the inmate explicitly elects electrocution. Ala. Code 1975 Sec. 15-18-82.  There is a common perception that lethal injection has been adopted widely by states which still execute inmates because it is more humane than electrocution.  However, there is no evidence to support this belief, and there is compelling circumstantial evidence that, if anything, lethal injection is more barbarous than electrocution.  Both methods are violative of the Eighth Amendment to the United States Constitution, as further set out below.

*Petition* at 44.

---

[28]  Vol. 22, Tab R-28, pp. 3945-3950.

The claim as it pertains to execution by electrocution is moot because Hardy will be executed by lethal injection rather than electrocution. *Alabama Code* § 15-18-82(a)(1975) provides that:

> Where the sentence of death is pronounced against a convict, the sentence shall be executed at any hour on the day set for the execution, not less than 30 nor more than 100 days from the date of sentence, as the court may adjudge, by lethal injection unless the convict elects execution by electrocution as provided by law. If electrocution is held unconstitutional, the method of execution shall be lethal injection.

Hardy has not affirmatively elected electrocution as the means of execution, *Petition* at 48, and so he will be executed by lethal injection. Therefore, to the extent that Hardy challenges the constitutionality of death by electrocution, the claim is due to be dismissed as moot.

In response to the claim as it pertains to execution by lethal injection, the state responds that the claim "is not appropriately within this Court's habeas jurisdiction." *Respondent's Brief* (doc. 17) at 79 (*citing Hill v. McDonough*, 547 U.S. 573, 580 (2006) (Claims challenging the execution process are properly brought pursuant to 42 U.S.C. § 1983.)) The petitioner counters that "[c]learly, the *Hill* court indicated a challenge, such as the one presented here, can be raised either as a habeas corpus petition or a § 1983 action." *Petitioner's Reply Brief* (doc. 26) at 50. The petitioner has offered nothing in support of this theory.

The petitioner is incorrect. "A § 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection procedures." *Thompkins v. Secretary, Dept. of Corrections*, 557 F. 3d 1257, 1261 (11th Cir. 2009) (*citing Hill v. McDonough*, 547 U.S. 573, 579-83

(2006).  Accordingly, this court is without jurisdiction to entertain this claim in a habeas petition and is due to be dismissed.

## XVII.  THE PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL BEFORE, DURING AND AFTER THE TRIAL OF THIS CAUSE, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, SEC. 6 OF THE CONSTITUTION OF THE STATE OF ALABAMA

Hardy alleges that he was deprived of constitutionally effective representation before, during, and after his trial.  Specifically, he claims that:

A.   Counsel were ineffective in part due to grossly inadequate compensation;

B.   Counsel failed to conduct an adequate and independent investigation of the capital murder charge against Hardy;

C.   Counsel failed to obtain favorable rulings on important pre-trial motions including:

1.   the motion to dismiss the indictment based upon the alleged discrimination in the selection of grand jury forepersons in Morgan County; and

2.   the motion to sever;

D.   Counsel failed to adequately challenge the state's investigation and presentation of the case; and

E.   Counsel failed to procure necessary expert assistance.

*Petition* at 55-64.

Hardy presented Claims A, B, D, and E to the trial court in his Rule 32 petition.  *Rule 32 Petition*, Vol. 28, Tab R-41, pp. 25-29.  On September 27, 2004, the state filed a motion for summary dismissal of the petition, arguing that Claim A was due to be dismissed pursuant

to Rule 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure and pursuant to Rule 32.7(d) for failure to plead a claim for which a material issue of law or fact exists; Claim B was due to be dismissed for being insufficiently pled under Rules 32.3 and 32.6(b); Claim D was due to be dismissed pursuant to Rule 32.7(d) for failure to plead a claim for which a material issue of law or fact exists; and Claim E was due to be dismissed for being insufficiently pled under Rules 32.3 and 32.6(b). *State's Motion for Summary Dismissal of Hardy's Rule 32 Petition*, Vol. 29, Tab R-53, pp. 204-217. The trial court summarily dismissed Claims A and D on June 25, 2004. *See Trial Court's Order Denying Rule 32 Petition*, Vol. 32, Tab R-70. In an order dated March 8, 2006, the trial court found claims B and E to be procedurally barred pursuant to Rules 32.2(d), 32.6(b), 32.3, and 32.2(a)(3) & (5) of the *Alabama Rules of Criminal Procedure*. *Id.*

Hardy then raised Claims A, B, C(1), C(2), and D on appeal from the denial of his Rule 32 petition. *See Petitioner's Brief on Appeal from the Denial of the Rule 32 Petition*, Vol. 31, Tab R-60, pp. 11-21. The Alabama Court of Criminal Appeals affirmed the denial of the petition, finding as follows:

> [Hardy] argues that the trial court erred in summarily dismissing his ineffective assistance of counsel claims because, he contends, several of them were meritorious.
>
> The record reveals that all of the appellant's ineffective assistance of counsel claims are barred from appellate review because they were not raised at trial or on appeal. The record indicates that [Hardy] was convicted on October 27, 1995. [His] trial counsel withdrew and newly appointed counsel represented him at the sentencing hearing on December 21, 1995. This was during the time period when the procedure raising ineffective assistance of counsel was governed by *Ex parte Jackson*, 598 So. 2d 895 (Ala. 1992), *overruled by Ex parte Ingram*, 675 So. 2d 863 (Ala. 1996). As this Court in *Avery v. State*, 832 So. 2d 664, 666 (Ala. Crim. App. 2001), stated:

116

If the appellant was convicted before the Alabama Supreme Court's decision in [*Ex parte*] *Ingram*, [675 So. 2d 863 (Ala. 1996)], newly appointed appellate counsel could have presented claims of ineffective assistance of trial counsel in a motion for new trial filed pursuant to *Ex parte Jackson*, 598 So. 2d 895 (Ala. 1992). Those claims of ineffective assistance of trial counsel could then have been presented on direct appeal. Accordingly, if [Hardy] was convicted before the decision in *Ingram*, and [he] was, in fact, represented by separate appellate counsel, then the allegations of ineffective assistance of trial counsel presented in the Rule 32 petition are precluded from review, because the claims could have been, but were not, raised at trial and on appeal. Rule 32.2(a)(3) and (5), Ala. R. Crim. P.

Applying the rationale of *Avery*, supra, and the procedural bars of Rules 32.2(a)(3) and (5), Ala. R. Crim. P., the following claims of ineffective assistance of trial counsel are procedurally precluded from appellate review:

1) Trial counsel rendered ineffective assistance due to inadequate funding;

2) Trial counsel completely failed to challenge the State's case-in-chief;

3) Trial counsel failed to provide evidence to support the motion to dismiss the indictment on grounds that there was discrimination in the selection of the grand jury foreperson;

4) Trial counsel failed to adequately argue the motion to sever his case from that of his co-defendant's on the grounds that a witness and co-defendant had motive for blaming him for the murder;

5) Trial counsel were ineffective for leaving the State's case "largely unchallenged." Trial counsel should have investigated who left fingerprints at the crime scene, and should have identified the fourth person with the appellant, Sneed, and Hines, on the day of the murder; . . .

*Hardy v. State*, 4 So.3d 585 (Ala. Crim. App. 2007)(table).[29]

---

[29] Vol. 32, Tab R-71, pp. 7-8.

In the current petition, Hardy once again presents the same claims of ineffective assistance of counsel that were raised in state court and found to be procedurally barred. The respondent contends that Hardy is procedurally barred from presenting these claims in federal court since the state courts found them to be procedurally barred. *Respondent's Brief* (doc. 17) at 80-85 (*citing Wainwright v. Sykes*, 433 U.S. 72 (1977)). In response, Hardy asserts that:

> the court reached the merits on Mr. Hardy's claims at the same time as finding a procedural default. (R. Rule 32 Supp. 12-16). If the state court ignores the default and rules on the merits, the federal court may do the same. *See e.g., Horsley v. Alabama*, 45 F.3d 1486, 1489-1490 (11th Cir. 1995).

*Petitioner's Reply Brief* (doc. 26) at 62.

Because the last state court to examine each of these ineffective assistance of counsel claims clearly held that the claims were procedurally barred, they are likewise barred from review in this court. To the extent that the merits of these claims were also addressed in either the trial court or the Alabama Court of Criminal Appeals,[30] it is clear that an alternative holding by a state court does not mean that this court can ignore the procedural default and address the merits of the claims. *See Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) ("[W]here a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court *should apply the state*

---

[30] The Alabama Court of Criminal Appeals clearly did not mention the merits of these ineffective assistance of counsel claims when they were raised on appeal from the denial of Hardy's Rule 32 petition. *See Hardy v. State*, 4 So.3d 585 (Ala. Crim. App. 2007)(table), Vol. 32, Tab R-71, pp. 7-8. However, in its order denying the Rule 32 petition, in addition to finding Claims B and E procedurally barred, the trial court noted that Hardy had "failed to establish facts which would substantiate the burden of proof imposed on the claimed ineffective assistance of counsel as provided in *Strickland v. Washington*, 466 U.S. 688 (sic) (1984)." *Trial Court's Order Denying Rule 32 Petition*, Vol. 32, Tab R-70.

*procedural bar and decline to reach the merits of the claim*." (*citing Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989))(emphasis added).

Hardy further argues that his claims are "not barred from federal review because Mr. Hardy is innocent of the crime. Therefore, the Court must consider his ineffective assistance of counsel claims under the "miscarriage of justice" doctrine." *Petitioner's Reply Brief* (doc. 26) at 61. However, in order to establish that a fundamental miscarriage of justice will occur if these claims are not considered on the merits, the petitioner must prove that he is actually, factually innocent.

In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court elaborated on the fundamental miscarriage of justice exception and the necessity of showing innocence. To meet this exception, the petitioner "must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. The standard focuses on the *actual* innocence of the petitioner. As the Supreme Court explained:

> Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. Indeed, with respect to this aspect of the *Carrier* standard, we believe that Judge Friendly's description of the inquiry is appropriate: the habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongfully excluded or to have become available only after trial."

*Id.* at 327-328. (*Quoting* Friendly, *Is Innocence Irrelevant? Collateral Attack on Judgment*, 38 U.Chi.L.Rev. 142, 160 (1970)). To be credible, a claim of actual innocence must be based

on reliable evidence not presented at trial.  *Fortenberry v. Haley*, 297 F.3d 1213, 1222 (11th Cir. 2002)(citations omitted).

Hardy has offered absolutely nothing to support a claim that he is actually, factually innocent of the murder for which he was convicted.  Therefore, he is unable to qualify for extraordinary relief under *Schlup*.

Because the trial court and the Alabama Court of Criminal Appeals clearly found that these claims were procedurally defaulted, and the court's findings rest upon firmly established and regularly followed state procedural rules,[31] Hardy's claims that he received ineffective assistance of counsel before, during, and after his trial are procedurally barred from review in this court.

Even if these claims were not procedurally barred, they would be due to be denied because Hardy has failed to meet the requirements of *Strickland v. Washington*, 466 U.S. 668

---

[31]  Hardy does not claim that the state's procedural rules applied by the Alabama Court of Criminal Appeals were not firmly established or regularly followed.  However, it is clear that Rules 32.2(a)(3) & (5), 32.2(d), 32.3, and 32.6(b) are firmly established and regularly followed.  *See e.g., Jenkins v. Bullard*, 210 Fed. Appx. 895, 900 (11th Cir. 2006)(Rule 32.6(b) has been firmly established and regularly followed by the Alabama courts); *Lamb v. State*, No. CR-08-1682, 2010 WL 2546424, *4 (Ala. Crim. App. June 25, 2010)(applying Rule 32.2(a)(5)); *Scott v. State*, CR-06-2233, 2010 WL 1170216 (Ala. Crim. App. March 26, 2010)(applying Rule 32.2(a)(3) &(5) and 32.6(b)); *Lee v. State*, CR-07-0054, 2009 WL 3255175, *28 (Ala. Crim. App. October 09, 2009)(applying Rule 32.2(a)(3) &(4)); *Freeman v. State*, CR-08-0219, 2009 WL 2657614 (Ala. Crim. App. August 28, 2009)(applying Rule 32.2(a)(5)); *Beckworth v. State*, No. CR-07-0051, 2009 WL 1164994 (Ala. Crim. App. May 01, 2009)(applying Rule 32.2(3) & 32.6(b)); *Smith v. State*, CR-05-0561, 2008 WL 4369249 (Ala. Crim. App. September 26, 2008)(applying Rule 32.2(a)(3) &(5)); *Hooks v. State*, 21 So.3d 772 (Ala. Crim. App. 2008)(applying Rule 32.2(a)(3), (4) &(5)); *Bonds v. State*, 4 So.3d 1207 (Ala. Crim. App. 2008)(applying Rule 32.2(a)(3), (4) &(5)).

(1984).  In *Strickland,* the United States Supreme Court established a national standard for judging the effectiveness of criminal defense counsel under the Sixth Amendment.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result."  *Strickland*, 466 U.S. 686.  The Court elaborated:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.  "Because the [petitioner] must prove both deficiency and prejudice, a [petitioner's] failure to prove either will be fatal to his claim."  *Johnson v. Scott,* 68 F.3d 106, 109 (5th Cir. 1995).

Under the *Strickland* test, the petitioner must initially show that counsel's representation fell below an "objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  "While it need not be errorless, counsel's advice 'must be within the realm of competence demanded of attorneys representing criminal defendants.'"  *Jones v. White*, 992 F.2d 1548, 1557 (11th Cir. 1993)(*quoting Stano v. Dugger*, 921 F.2d 1125, 1151 (11th Cir.)(en banc), *cert. denied*, 502 U.S. 835 (1991))(emphasis omitted).  In making such an evaluation, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  The effectiveness or ineffectiveness of

121

counsel must be evaluated by consideration of the totality of the circumstances. *Stanley v. Zant,* 697 F.2d 955, 962 (11th Cir. 1983), *cert. denied,* 467 U.S. 1219 (1984).

The second requisite element in a claim of ineffective assistance of counsel is a showing of prejudice.  Even if counsel made an error so egregious as to be outside the broad scope of competence expected of attorneys, a movant can obtain relief only if the error caused actual prejudice. *Strickland,* 466 U.S. at 691-92.  In order to establish actual prejudice, a petitioner must show that "there is a reasonable probability that but for the attorney's unprofessional errors, the result of the proceeding would have been different." *Armstead v. Scott,* 37 F.3d 202, 206 (5th Cir. 1994).  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings. *Strickland,* 466 U.S. at 694.  Furthermore, in addition to showing that the outcome would have been different, a petitioner must prove that "counsel's deficient performance caused the outcome to be unreliable or the proceeding to be fundamentally unfair." *Armstead v. Scott,* 37 F.3d at 206 (*citing Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)).  "In other words, a 'counsel's unprofessional errors [must] so upset the adversarial balance between the defense and prosecution that the trial was rendered unfair and the verdict suspect.'" *Fretwell*, 506 U.S. at 369 (*quoting Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986)).  "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Fretwell*, 506 U.S. at 372.

In order to be entitled to relief on this claim, Hardy "must prove both deficiency and prejudice," since his "failure to prove either will be fatal to his claim." *See Johnson v. Scott,* 68 F.3d 106, 109 (5th Cir. 1995).  Even assuming that Hardy's allegations are sufficient to

prove that counsels' performance was constitutionally deficient in any way, Hardy has failed

to establish that he was actually prejudiced by counsels' alleged deficiencies.  In order to

establish actual prejudice, Hardy must show that "there is a reasonable probability that but

for the attorney's unprofessional errors, the result of the proceeding would have been

different." *Armstead v. Scott,* 37 F.3d at 206.  Hardy's argument in support of his claim that

he was prejudiced by counsels' performance consists only of the following statements:

> Had counsel been prepared to demonstrate (1) Mr. Hine's interest, (2) his bond with Mr. Sneed, and (3) that another person who resembled the image on the video tape was involved with Sneed and Hines, there is at least a reasonable probability that the jury would have acquitted Petitioner of the crime. [ ]  R. 269.

*Petition* at 63.[32]

> Trial counsel utterly failed to investigate this case.  They failed to secure necessary expert assistance to prepare the case for trial and thereby prejudiced the Petitioner in his defense of his trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.  Thus, the instant habeas petition is due to be granted.

*Petitioner's Reply Brief* (doc. 26) at 75.[33]

Clearly, these conclusory allegations are insufficient to meet *Strickland's* prejudice

prong.[34]  Thus, even if the claims were not procedurally barred, they would be due to be

denied on the merits.

---

[32]  This prejudice "argument" seems to have been made only as to Claim D.

[33]  This prejudice "argument" seems to have been made only as to Claim E.

[34]   Further, the court notes that Hardy did not even allege that counsel's performance as challenged in Claims A, B, C(1), or C(2) prejudiced him in any way.

123

**XVIII.      TRIAL COUNSEL WERE INEFFECTIVE DURING THE PENALTY PHASE OF THE PETITIONER'S TRIAL, AND THIS INEFFECTIVENESS RESULTED IN THE UNJUST AND UNCONSTITUTIONAL IMPOSITION OF THE DEATH PENALTY**

In support of his claim that he received constitutionally ineffective counsel during the

penalty phase of his trial, Hardy claims:

> Trial counsel called five witnesses during the sentencing phase of Petitioner's trial, requiring a total of 42 pages of reporter's transcript.  FN.

> FN.  Ten pages record the testimony of Frank Travis, who happened to be at the trial and was asked to testify by John's family.  Mr. Travis received no preparation for his testimony.

Counsel prefaced a question to Petitioner's sister by saying, "I want them to know him. . . ." (R3771)  But what did the jury learn?  According to the trial court, almost nothing.  The court found three mitigating factors to have been proved: (1) that John had no significant criminal history (R4009), (2) his youth (R4012), and (3) that he was a member of a caring family, a factor to which the court assigned little weight (R4013).  Of the mitigating factors found, the first was stipulated to by the state and the second was a matter of record.  Only the third, which the court discounted, was developed through evidence presented by trial counsel.

There was abundant available evidence which should have been presented. For example, on several occasions Petitioner suffered head trauma so severe that he lost consciousness, once for several hours.  Such trauma can cause interruption of the normal processes needed to control behavior. However, trial counsel failed to obtain an evaluation of Petitioner from a competent neuropsychologist or to present any evidence to the judge or jury to show how this would have affected him.

Petitioner and his three siblings were forced to live in dire poverty, at one point moving into an abandoned house with several windows broken out. He and his brother were shifted several times between a mother who couldn't care for him and a father who wouldn't. To a significant degree Petitioner had to assume the role of parent to his younger siblings, particularly his sister Emily.

Petitioner dropped out of school because the clothing he was required to wear made him the subject of ridicule.  When finally he was old enough to

124

earn a few dollars for new clothes, his father took the money for himself. Petitioner's father, Josh, was mentioned by several witnesses, always negatively. FN.

> FN.   Christopher Hines testified that Josh accused John of stealing a gun from him (R3202); Frank Travis said he knew everyone in the family but Josh (R3781); John's best friend, Joe Willie Johnson, testified that he had "met Josh a couple of time and we talked" (R3801), but significantly described the family other than Josh as one that "would open their hearts to anybody" (R3801).

And yet neither the jury nor the court were told of Josh's malevolent influence on Petitioner's life.  The children were physically and emotionally abused by Josh and repeatedly forced to witness their mother being similarly abused by him.  This was a pattern extending back several generations on both sides of the family, as a result of which Petitioner's mother was unable to show the children any love or affection.

> These are precisely the type of facts which, the U.S. Supreme Court has taught, would have created a reasonable probability of a sentence less than death.  *Williams v. Taylor*, 529 U.S. 362, 420 (2000); *Wiggins v. Smith*, 123 S.Ct. 2527 (2003).  However, trial counsel failed to develop any theory of mitigation, other than that Petitioner is a good, nonviolent person--an approach at odds with the jury's verdict and one which the court rejected.  R. 4014.  Counsel also failed to investigate and present evidence and to retain appropriate expert assistance in preparation for a possible penalty phase.  As a result, the court and the jury knew almost nothing about the person it was their responsibility to judge.

*Petition* at 64-66.

In his Rule 32 petition, Hardy presented the following claims alleging ineffective assistance of counsel during the penalty phase:

> Because trial counse[l] failed to investigate and present evidence and failure to retain appropriate, qualified expert assistance in preparation for a possible penalty phase, the jury was given a grossly distorted picture of the person it was their responsibility to judge.  Because Petitioner's attorneys had failed to aquaint [sic] themselves with Petitioner's background they were unprepared to help the judge or jury understand the person whose fate they were required to determine.  However, there was abundant available evidence

125

which should have been presented.  For example, Petitioner's family was rife with both physical and psychological abuse, a pattern dating back several generations.  Also, Petitioner dropped out of school in part because the family were so poor that the clothing he was required to wear made him the subject of ridicule.  Finally, several occasions Petitioner suffered head trauma so severe that he lost consciousness, once for several hours (sic).  This is precisely the type of evidence which, the U.S. Supreme Court has taught, would have created a reasonable probability of a sentence less than death.  *Williams v. Taylor*, 529 U.S. 362, 420 (2000).

*Rule 32 Petition*, Vol. 28, Tab R-41, pp. 29-30.

The trial court denied the claims, finding them to be procedurally barred:

The Court finds that the petitioner has failed to establish that his counsels' actions and performance were deficient or below the level expected of other attorneys in the same or similar situation.  The petitioner has failed to establish facts which would substantiate the burden of proof imposed on the claimed ineffective assistance of counsel as provided in *Strickland v. Washington*, 466 U.S. 688 (1984).  The petitioner has the burden of sufficiently pleading the above claims.  Petitioner has failed to comply with the requirements of the above state law[35] and Alabama Rules of Criminal Procedure 32.2(d), 32.6(b) and 32.3.  Additionally, this Court finds that this issue presented by the petitioner is precluded from review pursuant to Rules 32.2(a)(3), 32.2(a)(5), and 32.2(d), A. R. Crim. P. (sic), because this issue could have been, but was not raised on appeal.  Accordingly, [this claim] is due to be and is hereby DISMISSED.

*Trial Court's Order Denying Rule 32 Petition*, Vol. 32, Tab R-70.

---

[35] The court is referencing its previous discussion on page 5 of the order denying the petition:

Rule 32.3, Ala. R. Crim. P., states that "[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief."  Rule 32.6(b), Ala. R. Crim. P., states that "[t]he petition must contain a clear and specific statement of the grounds upon which relief is sought . . . .  A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings."

*Trial Court's Order Denying Rule 32 Petition*, Vol. 32, Tab R-70, p. 5.

On appeal from the denial of the petition, Hardy presented an argument virtually identical to the argument he has presented in the current petition.  *See Petitioner's Brief on Appeal from the Denial of the Rule 32 Petition*, Vol. 31, Tab R-60, pp. 21-24.  The Alabama Court of Criminal Appeals affirmed the denial of the petition, finding as follows:

> [Hardy] argues that the trial court erred in summarily dismissing his ineffective assistance of counsel claims because, he contends, several of them were meritorious.
>
> The record reveals that all of the appellant's ineffective assistance of counsel claims are barred from appellate review because they were not raised at trial or on appeal.  The record indicates that [Hardy] was convicted on October 27, 1995.  [His] trial counsel withdrew and newly appointed counsel represented him at the sentencing hearing on December 21, 1995.  This was during the time period when the procedure raising ineffective assistance of counsel was governed by *Ex parte Jackson*, 598 So. 2d 895 (Ala. 1992), *overruled by Ex parte Ingram*, 675 So. 2d 863 (Ala. 1996).  As this Court in *Avery v. State*, 832 So. 2d 664, 666 (Ala. Crim. App. 2001), stated:
>
>> If the appellant was convicted before the Alabama Supreme Court's decision in [*Ex parte*] *Ingram*, [675 So. 2d 863 (Ala. 1996)], newly appointed appellate counsel could have presented claims of ineffective assistance of trial counsel in a motion for new trial filed pursuant to *Ex parte Jackson*, 598 So. 2d 895 (Ala. 1992).  Those claims of ineffective assistance of trial counsel could then have been presented on direct appeal.  Accordingly, if [Hardy] was convicted before the decision in *Ingram*, and [he] was, in fact, represented by separate appellate counsel, then the allegations of ineffective assistance of trial counsel presented in the Rule 32 petition are precluded from review, because the claims could have been, but were not, raised at trial and on appeal.  Rule 32.2(a)(3) and (5), Ala. R. Crim. P.
>
> Applying the rationale of *Avery*, supra, and the procedural bars of Rules 32.2(a)(3) and (5), Ala. R. Crim. P., the following claims of ineffective assistance of trial counsel are procedurally precluded from appellate review:
>
> . . .

127

6) Trial counsel rendered ineffective assistance of counsel during the penalty phase of his trial.  Specifically, he contends:

    a) Trial counsel failed to present evidence that the appellant had suffered head trauma as a child;

    b) [Hardy] dropped out of school because he was subject to ridicule over his clothes; and

    c) Trial counsel should have retained an expert to help with the investigation and mitigation of evidence.

The remaining allegations regarding trial counsel's ineffective assistance of counsel during the penalty phase were presented for the first time on appeal, and therefore, are not preserved for appellate review:

    1) Trial counsel should have presented evidence from a competent neuropsychologist;

    2) [Hardy] and his siblings lived in dire poverty, including living in an abandoned house;

    3) [Hardy] had to assume the role of parent to his younger siblings;

    4) [Hardy's] father took money that he earned;

    5) [Hardy's] father was a "malevolent influence" and his mother was unable to show any love or affection; and

    6) Trial counsel failed to develop a theory of mitigation.

Because these specific claims were not presented to the trial court in [Hardy's] Rule 32 petition, they are not properly before this Court for review. *See, e.g., Boyd v. State*, 913 So. 2d 1113 (Ala. Crim. App. 2003); *Arrington v. State*, 716 So. 2d 237, 239 (Ala. Crim. App. 1997)(holding that "[a]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.") Moreover, because the claims could have been raised at trial and on direct appeal, but were not, they are subject to preclusion by Rules 32.2(a)(3) and (5), Ala. R. Crim. P.

*Hardy v. State*, 4 So.3d 585 (Ala. Crim. App. 2007)(table).[36]

In the current petition, Hardy again presents the same claims of ineffective assistance of counsel during the sentencing phase that he raised on appeal from the denial of his Rule 32 petition.  The respondent contends that Hardy is procedurally barred from presenting these claims in federal court since the Alabama Court of Criminal Appeals found them to be procedurally barred.  *Respondent's Brief* (doc. 17) at 80-82 (*citing Wainwright v. Sykes*, 433 U.S. 72 (1977)).  In response, Hardy asserts that:

> the court reached the merits on Mr. Hardy's claims at the same time as finding a procedural default. (R. Rule 32 Supp. 12-16).  If the state court ignores the default and rules on the merits, the federal court may do the same.  *See e.g., Horsley v. Alabama*, 45 F.3d 1486, 1489-1490 (11th Cir. 1995).

*Petitioner's Reply Brief* (doc. 26) at 62.

Hardy's contention that "the court reached the merits on [his] claims at the same time as finding a procedural default" is incorrect.  The Alabama Court of Criminal Appeals clearly found that these claims were procedurally barred, without so much as a mention of the merits of the claims.[37]  *Hardy v. State*, 4 So.3d 585 (Ala. Crim. App. 2007)(table), Vol. 32, Tab R-71, pp. 7-10.  Because the Alabama Court of Criminal Appeals found that these claims were procedurally defaulted, and the court's findings rest upon firmly established and regularly

---

[36]  Vol. 32, Tab R-71, pp. 7-10.

[37]  However, even if the state court had addressed the merits of these claims in additional to finding them to be procedurally barred, the claims would still be barred from review in this court.  *See Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) ("[W]here a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court *should apply the state procedural bar and decline to reach the merits of the claim*." (*citing Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989)))(emphasis added).

129

followed state procedural rules,[38] Hardy's claims that he received ineffective assistance of counsel during the penalty phase of the trail are procedurally barred from review in this court.

Hardy further argues that his claims are "not barred from federal review because Mr. Hardy is innocent of the crime.  Therefore, the Court must consider his ineffective assistance of counsel claims under the "miscarriage of justice" doctrine." *Petitioner's Reply Brief* (doc. 26) at 61.  As previously discussed, in order to meet *Schlup's* "fundamental miscarriage of justice" exception, Hardy must prove that he is actually, factually innocent.  To meet this exception, the petitioner "must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Schlup*, 513 U.S. at 327.

Hardy has offered absolutely nothing to support a claim that he is actually, factually

---

[38] Hardy does not claim that the state's procedural rules applied by the Alabama Court of Criminal Appeals were not firmly established or regularly followed.  However, the court notes that Alabama's rule that it will not consider a claim raised for the first time on appeal from the denial of a Rule 32 petition, if it was not raised in the petition itself, is firmly established and regularly followed. *See e.g.*, *Beckworth v. State*, CR-07-0051, 2009 WL 1164994, *38, n. 11 (Ala. Crim. App. May 01, 2009); *McNabb v. State*, 991 So.2d 313, 321 (Ala. Crim. App. 2007); *Wallace v. State*, 959 So.2d 1161, 1167 (Ala. Crim. App. 2006); *Murray v. State*, 922 So.2d 961, 963 n. 1 (Ala. Crim. App. 2005); *Boyd v. State*, 913 So.2d 1113, 1144 (Ala. Crim. App. 2003); *Arrington v. State*, 716 So.2d 237, 239 (Ala. Crim. App. 1997); *Cleveland v. State*, 570 So.2d 855, 857 (Ala. Crim. App. 1990); *Morrison v. State*, 551 So.2d 435 (Ala. Crim. App.), *cert. denied*, 495 U.S. 911 (1990).  Likewise, Rules 32.2(a)(3), (4), or (5) are firmly established and regularly followed.  *See e.g.*, *Jenkins v. Bullard*, 210 Fed. Appx. 895, 900 (11ᵗʰ Cir. 2006)(Rule 32.6(b) has been firmly established and regularly followed by the Alabama courts); *Lamb v. State*, No. CR-08-1682, 2010 WL 2546424, *4 (Ala. Crim. App. June 25, 2010)(applying Rule 32.2(a)(5)); *Scott v. State*, CR-06-2233, 2010 WL 1170216 (Ala. Crim. App. March 26, 2010)(applying Rule 32.2(a)(3) &(5)); *Lee v. State*, CR-07-0054, 2009 WL 3255175, *28 (Ala. Crim. App. October 09, 2009)(applying Rule 32.2(a)(3) &(4)); *Freeman v. State*, CR-08-0219, 2009 WL 2657614 (Ala. Crim. App. August 28, 2009)(applying Rule 32.2(a)(5)); *Smith v. State*, CR-05-0561, 2008 WL 4369249 (Ala. Crim. App. September 26, 2008)(applying Rule 32.2(a)(3) &(5)); *Hooks v. State*, 21 So.3d 772 (Ala. Crim. App. 2008)(applying Rule 32.2(a)(3), (4) &(5)); *Bonds v. State*, 4 So.3d 1207 (Ala. Crim. App. 2008)(applying Rule 32.2(a)(3), (4) &(5)).

innocent of the murder for which he was convicted.  Therefore, he is unable to qualify for extraordinary relief under *Schlup*.

The petitioner's claims that he received ineffective assistance of counsel at the sentencing phase of his trial are due to be dismissed because they are procedurally barred from review in this court.

Even if these claims were not procedurally barred, they would be due to be denied because Hardy has failed to meet either prong of the *Strickland* test.  Under the *Strickland* test, the petitioner must initially show that counsel's representation fell below an "objective standard of reasonableness."   *Strickland*, 466 U.S. at 688.   However, the conclusory allegations of ineffectiveness offered by Hardy are insufficient to meet this standard.  Hardy has offered nothing to substantiate any of his claims.  There is nothing in the record to indicate that the petitioner's allegations concerning his childhood are factually accurate. Hardy has not alleged that his attorney had any knowledge of these alleged facts concerning his childhood or indicated how counsel might have discovered these facts.[39]  Further, he has offered nothing to indicate that a neuropsychologist's evaluation would have benefitted Hardy in any way or identified what any other "appropriate expert assistance" might have revealed.   Quite simply, there is nothing in the record that even hints that counsel's representation fell below an "objective standard of reasonableness."

Moreover, even if counsel's representation of Hardy could be viewed as deficient, he has failed to show that he was actually prejudiced by the lack of this information.  In order

---

[39]   Hardy makes no claim that he ever mentioned any of this evidence to his attorney. Further, his mother, sister, and best friend all testified at the sentencing phase of the trial, yet none of them ever offered anything to indicate that Hardy's childhood was troubled in any way.

to establish actual prejudice, Hardy must show that "there is a reasonable probability that but for the attorney's unprofessional errors, the result of the proceeding would have been different." *Armstead v. Scott,* 37 F.3d at 206.  Hardy's argument in support of his claim that he was prejudiced by counsel's performance consists only of his statement that counsel's "utter lack of investigation and presentation prejudiced the Petitioner in violation of the Sixth and Fourteenth Amendments to the United States Constitution and the instant habeas corpus petition is due to be granted."  *Petitioner's Reply Brief* (doc. 26) at 72.  Clearly, this conclusory allegation is insufficient to meet *Strickland's* prejudice prong.  Thus, even if the claims were not procedurally barred, they would be due to be denied on the merits.

## CONCLUSION

For all of the reasons set out herein, Hardy's petition for writ of habeas corpus and his request for an evidentiary hearing on his claims are due to be denied.  A separate order will be entered.

DONE this 21ˢᵗ day of September, 2010.

_____

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

132